## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAVIER SOTO, Individually and on Behalf of All Others Similarly Situated,<br><br>                             Plaintiff,<br><br>          v.<br><br>JAMES M. HENSLER, ROBERT D. SCHERICH and GREGORY M. BELLAND,<br><br>                             Defendants. | Civil Action No.<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Horsehead Holding Corp. ("Horsehead" or the "Company"), filings by Horsehead in the bankruptcy action styled *In re Horsehead Holding Corp., et al*, No. 16-10287 (D. Del. Bankr.), as well as media and analyst reports about the Company and Company press releases.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Horsehead securities between May 21, 2014 and February 2, 2016, inclusive (the "Class Period") for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Horsehead, together with its subsidiaries, is a leading U.S. producer of zinc metal and a leading recycler of electric arc furnace ("EAF") dust.  The Company derives the majority of its revenues from the sale of zinc.  On February 2, 2016, Horsehead filed for

{FG-W0407497.}

protection under the bankruptcy laws and, therefore, is not named as a defendant in this action.

3.      In September 2011, Horsehead began construction on a new, purportedly state-of-the-art zinc production facility located in Mooresboro, North Carolina (the "Mooresboro Facility") to replace its 80-year old Monaca, Pennsylvania facility (the "Monaca Facility"). The Company heralded a new zinc production process to be used at the Mooresboro Facility that would utilize a solvent extraction technology coupled with electro-winning and casting capabilities. The Company stated that the new facility's design would rely on sustainable manufacturing practices to produce zinc solely from recycled materials and allow the Company to produce new high-grade zinc varieties in addition to the Prime Western zinc produced at the Monaca Facility.

4.      Horsehead also stated that the Mooresboro Facility would produce over 155,000 tons of zinc metal annually once fully operational, compared to 125,000 tons of zinc metal produced at the Monaca Facility in fiscal 2013. The Company highlighted other purported benefits of the new facility, including: (i) reduced manufacturing costs; (ii) higher labor productivity; (iii) reduced maintenance capital spending; (iv) lower hedging costs; and (v) the recovery and valuable reuse of metals from the EAF dust recycling process.

5.      In May 2014, Horsehead commenced zinc production at the new Mooresboro Facility and permanently shut down production at the Monaca Facility the next month.

6.      Unbeknownst to the investing public, the Mooresboro Facility was plagued with severe construction, engineering and operational defects. For example, when the plant began operation a substantial portion of the piping melted and production processes failed immediately. The Company's management decided to bypass the failed piping and attempted to operate the rest of the plant knowing that a portion of the plant would not be

- 2 -

useable.  Other major problems included filter presses which regularly clogged, clarifiers that failed to sufficiently filter out solid materials, unplanned overflow into containment areas resulting in environmental and safety hazards, bleed treatment system failures, equipment sizing issues and electrolyte contamination.  The Mooresboro Facility relied on new and unproven technologies, and from the commencement of its operations it experienced catastrophic setbacks that had no clear solution and would require a substantial investment of time and money and would undermine the feasibility of the facility's zinc production process and, ultimately, threaten the Company's ability to operate as a going concern.

7.  Throughout the Class Period, defendants provided operational updates that misstated the extent and seriousness of the Mooresboro Facility's problems, provided zinc production figures detached from the widespread and unsolved defects throughout the production process, and failed to disclose cash and revenue shortfalls that threatened the Company's ability to pay its creditors and complete the facility's ramp-up.

8.  As a result of defendants' false statements, Horsehead common stock traded at artificially inflated prices during the Class Period, with its share price reaching a high of $20.70 per share on July 23, 2014.

9.  On January 23, 2015, Horsehead conducted a secondary offering of 5.75 million shares of its common stock at $12.75 per share (the "Secondary Offering").  As a result of the Secondary Offering, the Company generated approximately $73 million in gross offering proceeds.  The registration statement ("Registration Statement"), which incorporated a prospectus supplement ("Prospectus"), issued in connection with the Secondary Offering contained false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.

10. Then, in a series of partial disclosures, Horsehead revealed in piecemeal fashion various production problems at the Mooresboro Facility. Although defendants disclosed certain production issues at the Mooresboro Facility, they falsely assured investors that the problems were minor in nature, fixable and would not threaten the viability of the facility, the new production processes being used, or the Company's long-term business and prospects. As late as November 9, 2015, the Company's President and Chief Executive Officer ("CEO"), defendant James M. Hensler, stated on an earnings conference call that "*our confidence in our plans to address the issues at Mooresboro has increased*." On the same call, the Company's Chief Financial Officer, ("CFO"), defendant Robert D. Scherich, stated: "*[W]e believe that we have adequate liquidity and availab[ility] of capital resources . . . to support the business for the next 12 months*."

11. Approximately one month later, on December 10, 2015, ratings agency Moody's downgraded the Company's corporate debt from B3 to Caa2 on a negative outlook due to recurring problems at the Mooresboro Facility. By early January 2016, the Company had failed to make a $1.8 million interest payment to certain holders of the Company's convertible senior notes and shortly thereafter defaulted on multiple credit agreements.

12. On January 22, 2016, Horsehead announced that it was idling the Mooresboro Facility and laying off most employees at the site. Shortly before its idling, the facility achieved only about 25% of its purported production capacity, *approximately the same amount it achieved in its first full month of production in June 2014*, more than a year earlier.

13. On February 2, 2016, Horsehead announced that it had initiated bankruptcy proceedings under Chapter 11 of the U.S. Bankruptcy Code. That same day, the Company filed a plan for restructuring based on its discussions with secured creditors that revealed

{FG-W0407497.}

"'[m]ajor [b]ottlenecks" at the Mooresboro Facility.  The filing stated that "[s]ignificant issues" plagued several steps in the zinc production and recycling process, including: (i) solid/liquid separation; (ii) depletion; (iii) bleed treatment; and (iv) cementation.  The filing also stated that gypsum precipitation and lead/silver recovery at the plant suffered from "equipment sizing issues," and that all steps of the production process had at least "[l]imited issues."  In addition, the filing stated that it would take approximately ***$81.9 million and over two years*** to get the facility back on track.

14.     On February 11, 2016, trading in Horsehead stock was suspended.  On February 23, 2016, Horsehead filed a notice on Form 25-NSE that its common stock had been removed from listing on the NASDAQ stock exchange.

15.     As a result of defendants' false statements, Horsehead common stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, Horsehead common stock was hammered by massive sales, sending the stock price down 99% from its Class Period high as the artificial inflation came out over time and causing economic harm and damages to class members.  At the time of the trading suspension the price of the Company's stock had plummeted to $0.08 per share, and the stock is now essentially worthless.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

{FG-W0407497.}

18.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  Horsehead is also incorporated in this District and the Company's bankruptcy and restructuring proceedings have been initiated in the U.S. Bankruptcy Court for the District of Delaware.

19.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market.

## PARTIES

20.     Plaintiff Javier Soto purchased Horsehead securities during the Class Period as set forth in the attached certification, incorporated herein by reference, and has been damaged thereby.

21.     Horsehead is a Delaware corporation and a leading U.S. producer of zinc metal and recycler of EAF dust.  On February 2, 2016 Horsehead filed for bankruptcy and, therefore, is not named as a defendant in this action.

22.     Defendant James M. Hensler ("Hensler") is, and at all relevant times was, the Company's President and CEO and Chairman of its Board of Directors.

23.     Defendant Robert D. Scherich ("Scherich") is, and at all relevant times was, the Company's Vice President and CFO.

24.     Defendant Gregory M. Belland ("Belland") is a Senior Vice President of the Company responsible for the Mooresboro Facility and has served in that position since October 2015.

- 6 -

25.     Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Horsehead's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   They also participated in conference calls with securities analysts and investors in which they made materially misleading statements and omissions and held themselves out to be knowledgeable on the topics which they discussed.   Because of their positions with the Company, and their access to material non-public information available to them but not to the public, defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   Defendants are liable for the false and misleading statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

**Background**

26.     Horsehead is the parent company of Horsehead Corporation ("Horsehead Corp."), a leading U.S. producer of zinc metal and a leading recycler of EAF dust; The International Metals Reclamation Company, LLC, a recycler of nickel-bearing wastes and nickel-cadmium batteries; and Zochem Inc., a producer of zinc oxide.   Horsehead Corp. is the parent company of Horsehead Metal Products, LLC, which owns and operates the Mooresboro Facility.

27.     Horsehead's products are used in a wide variety of applications, including in the galvanizing of sheet and fabricated steel products, as components in rubber tires, alkaline

batteries, paint, chemicals and pharmaceuticals and as a remelt alloy in the production of stainless steel.  Horsehead purports to be the largest single-site producer of zinc oxide in North America and the largest North American recycler of EAF dust, a hazardous waste produced by the carbon steel mini-mill manufacturing process.  The Company derives the majority of its revenues from the sale of zinc.

28.     In September 2011, the Company began construction on a new, purportedly state-of-the-art zinc production facility located in Mooresboro, North Carolina to replace its 80-year old Monaca, Pennsylvania facility.  The Company heralded a new zinc production process to be used at the Mooresboro Facility which would utilize a solvent extraction technology coupled with electro-winning and casting capabilities.  The Company stated that the new facility's design would rely on sustainable manufacturing practices to produce zinc solely from recycled materials and allow the Company to produce new high-grade zinc varieties in addition to the Prime Western zinc produced at the Monaca Facility, which utilized a higher-cost pyrometallurgical process.

29.     The Company also stated that the Mooresboro Facility would produce over 155,000 tons of zinc metal annually once fully operational, with equipment capable of producing over 170,000 tons of zinc metal per year without significant additional investment. This compared to 125,000 tons of zinc metal produced at the Monaca Facility in fiscal 2013. The Company highlighted other purported benefits of the new facility, including: (i) reduced manufacturing costs; (ii) higher labor productivity; (iii) reduced maintenance capital spending; (iv) lower hedging costs; and (v) the recovery and valuable reuse of metals from the EAF dust recycling process.

**Materially False and Misleading Statements**
**Issued During the Class Period**

30.     The Class Period begins on May 21, 2014.  On that date, Horsehead issued a press release announcing the beginning of zinc production at the Mooresboro Facility. According to the press release, the Mooresboro Facility is "expected to have initial capacity to produce 155,000 tons of zinc per year," and the "[r]amp up to the initial capacity is expected to take up to six months."  Defendant Hensler commented on the announcement stating in pertinent part as follows: "'We are excited to have reached this critical milestone. We look forward to beginning to support our customers' needs from this new facility.'"

31.     On May 28, 2014, Horsehead issued a press release announcing the first shipment of zinc produced at the Mooresboro Facility and stating that production of the "full range of zinc metal products" would follow.  Defendant Hensler commented on the announcement stating in pertinent part as follows: "'This is another exciting milestone for Horsehead, including its employees, customers and shareholders. . . . *We look forward to serving our customers with a full range of zinc metal products as we begin the ramp up of zinc production* . . . .'"

32.     On July 8, 2014, Horsehead issued a press release announcing that initial zinc production at the Mooresboro Facility was "*better than internal projections*."  The press release also quoted defendant Hensler as stating that a "'temporary outage'" to upgrade mixing components would be carried out "for minimal cost" and "'*should result in more reliable and sustainable operations in the long-run*.'"

33.     On August 6, 2014, Horsehead issued a press release providing its fiscal 2014 second quarter financial results.  The press release stated in pertinent part that: (i) initial zinc production at the Mooresboro Facility had exceeded expectations and "validated" the new production process; (ii) no "insurmountable technical or operational obstacles that materially

challenge the value proposition of this project" had been identified; (iii) production ramp-up at the facility would be completed by the end of the year resulting in $90-$110 million of annualized incremental earnings before interest, taxes, depreciation and amortization ("EBITDA") benefit; (iv) the lead-silver recovery circuit was finished and would begin production in August 2014; and (v) the Company had "adequate liquidity" for general corporate purposes "through the full ramp up of the Mooresboro facility."

34.   That same day, Horsehead filed its financial results for the second fiscal quarter of 2014 with the SEC on Form 10-Q (the "2Q14 Form 10-Q"), signed by defendants Hensler and Scherich.   The 2Q14 Form 10-Q extolled the purported benefits of the Mooresboro Facility, stating in pertinent part:

> In September of 2011, we announced plans to construct a new zinc facility to be located in Mooresboro, North Carolina, ***which we anticipate will be capable of production in excess of 155,000 tons of zinc metal per year once fully operational***, including Special High Grade ("SHG") zinc and Continuous Galvanizing Grade zinc, in addition to the Prime Western ("PW") grade zinc that we produced at our Monaca facility. ***The new zinc facility will also enable us to potentially recover other marketable metals from waelz oxide ("WOX") produced from EAF dust recycling. The facility is designed to be capable of producing up to 175,000 tons of zinc metal per year without significant additional investment***. The plant design will rely upon sustainable manufacturing practices to produce zinc solely from recycled materials and use significantly less fossil fuel than our recently closed Monaca smelter. The new zinc facility will convert WOX and other recycled materials into SHG zinc and other grades that sell at a premium to the PW grade that we currently offer. ***This will allow us to expand into new markets***, including selling to continuous galvanizers, which include some of our EAF dust customers, die casters and LME warehouses, while continuing to serve customers in our existing markets. In addition, we believe the new technology will also allow us to recover value from certain metals such as silver and lead from WOX produced from EAF dust recycling. The new zinc facility replaced our older smelter technology, which was permanently closed at the end of April 2014, and will allow us to significantly reduce emissions of greenhouse gases and particulates into the atmosphere.
>
> ***The new facility will significantly reduce our manufacturing conversion costs due to the lower energy cost, higher labor productivity and reduced operating maintenance costs, and lower operating costs in our EAF dust recycling plants resulting from the elimination of the need to calcine a portion of our WOX before it is fed to the smelter***.

The 2Q14 Form 10-Q also stated construction of the facility had been "substantially completed" and reiterated the operational updates listed in ¶¶31-32.

35. Also on August 6, 2014, Horsehead held an earnings conference call with analysts and investors to discuss the second quarter 2014 results. During the call, defendant Hensler stated, among other things, that: (i) the Mooresboro Facility had "exceeded internal projections" for zinc production; (ii) initial production had "validated" the design of the new production process; (iii) nothing other than "normal startup issues" had been experienced at the plant; (iv) the Company had "not encountered or identified any insurmountable technical or operational obstacles that materially challenge the value proposition in this project"; and (v) the timeline and benefits of the project remained on track. Defendant Hensler stated in pertinent part:

> We are very excited that zinc production commenced in Mooresboro on May 21, 2014. *Our first full month of production exceeded internal projections for the first month of the ramp-up period*. We produced over 3,100 tons of metal during the quarter.
>
> During initial weeks of operation, *we validated that the process as designed* is capable of producing special high-grade quality electrolytes from waelz oxide using the solvent extraction process. This was the fundamental technical basis of this investment.
>
> While *we have experienced normal startup issues* including some equipment malfunctions such as the recent temporary outage announced in July to repair mixing equipment in the leaching and effluent treatment sections of the plant, *we have not encountered or identified any insurmountable technical or operational obstacles that materially challenge the value proposition in this project*.
>
> Mooresboro has restarted, and we are continuing the ramp-up process. We *expect to continue ramping up zinc production to our full operating capacity of 155,000 tons per year through the remainder of this year*.
>
> Construction of the co-product recovery circuit, which is designed to recover lead and silver from our incoming raw material has been completed. Commissioning commenced in July, and the expected ramp-up period for this circuit remains at roughly one year, which is *consistent with our previous announcements*.
>
> We expect the first lead-silver concentrate production in August of this year. Once we reach full operating capacity in both the zinc plant and

- 11 -

the co-product circuit **_we continue to believe we will realize $90 million to $110 million of incremental EBITDA benefit_**.

\*        \*        \*

In summary, before we open the call for questions, I'd like to say that we're very excited about zinc production having started at Mooresboro. **_We continue to expect the ramp-up to full production to be completed near the end of the year_**. We also expect that during the ramp-up of a large facility such as Mooresboro, we may experience startup issues, which require periodic and temporary outages similar to the one we took in July as we endeavor to continuously improve the process equipment and increase production output.

\*        \*        \*

**_At full production, annualized EBITDA would be expected to increase by approximately $25 million to $30 million for each $0.10 increase in the price of zinc_**.

36.     During the conference call, defendant Scherich stated that the Company's liquidity, cash on hand, and expected cash flows "**_will provide adequate liquidity to support both general corporate purposes and potential business opportunities through the full ramp-up of the Mooresboro facility_**."  In response to an analyst's question about expected cash flows going forward, defendant Scherich stated that full production at the Mooresboro Facility would lead to "robust cash flow" in 2015 "fairly quickly," which would allow the Company to refinance its debt and grow its revenues.  The following exchange took place:

Near term, and that's really through this ramp-up period, we'll continue, kind of, paying down payables related to the project.  We don't see cash flow generation occurring until we hit, kind of, the end of the year as we've achieved the full ramp-up.  **_So as we go into the new year, we anticipate, as you indicated, robust cash flow starting, and I think that will be our focus fairly quickly, looking at deleveraging a little bit but ultimately looking to refinance the debt down the road to get a better cost of debt in place_**.

And then we've got lots of projects that we've kind of had on the back burner.  We look to continue to grow the business and invest in growth. So we see, once we've restored liquidity, to start down that path, and **_that's kind of the expectation to grow the business_**.

37.     On the call, another analyst asked defendant Hensler whether the "normal startup issues" he had identified in his prepared remarks were simply "boilerplate" disclosures or whether there were any issues of concern that could cause additional

- 12 -

temporary shutdowns.  In response, defendant Hensler stated that besides the one issue already identified, which was to be expected at any large factory startup, no other issues were anticipated that could cause a temporary shutdown.  Defendant Hensler stated as follows:

> Nothing that's identified at this point, but the issue we had in July was unusual, it did catch us a bit by surprise, and it's the kind of thing that happens at times in a startup situation.  So there may be other issues like that we're not aware of.  We don't anticipate them, though, at this point in time.

38.     When asked by another analyst about the capacity at which the Mooresboro Facility was currently operating, defendant Hensler responded that the facility was operating at 40% capacity and he expected it to operate at 50%-60% by the end of the third quarter:

> *I think we're feeding zinc units at a rate that's probably in the 40% of capacity type of run rate*.  But our hope would be that by the time we exit the third quarter, we'll be running in the 50% to 60% of capacity run rate, and that's our target for exiting the third quarter.  So we'll continue to ramp up here over the next few weeks.

39.     In response to another analyst question about the lead and silver recovery circuit at the Mooresboro Facility, defendant Hensler stated that the facility would begin producing revenue "fairly shortly" (including "significant revenue" in the first quarter of 2015), that the Company had set "fairly conservative" targets, and that the commissioning process had "gone relatively smoothly" so far:

> We're going to, we believe, start to introduce the feed to the lead and silver recovery circuit this month.  *So we'll actually be able to start getting revenue here fairly shortly*.  We see that moving slowly.  *We've kind of set our targets fairly conservative for this because it's a relatively new process*, and we are certain that we'll get into some unusual things during startup, and so we've sort of set our sights that it's going to take us 12 months.

> We could, in fact, ramp it up much quicker than that if we don't run into trouble.  *And the commissioning, so far, has gone relatively smoothly. We haven't uncovered any particular issues.  But I think we're probably looking at first quarter of next year of beginning to see some significant revenue from that operation*.

40.     Later in the call, defendant Hensler stated that the Mooresboro Facility had a production capacity of 170,000-175,000 tons of zinc metal per year.  Defendant Scherich

- 13 -

also stated that the anticipated construction cost for the Mooresboro Facility was "unchanged" from the previous quarter's figure of $525 million and, since the Company had "completed most of" the project, Horsehead had "pretty good visibility" that it would not exceed that amount.

41.   The statements referenced above in ¶¶30-40 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a)   That construction defects at the Mooresboro Facility, including but not limited to the construction of defective piping, filtration presses and clarifiers, had left the facility unable to operate as planned and the facility was not ready to commence operations in May 2014;

(b)   That the production ramp-up at the Mooresboro Facility was not ahead of schedule, but instead had since the commencement of operations suffered, and was continuing to suffer, significant and pervasive engineering and operational problems including but not limited to the melting of pipelines, filter presses that regularly clogged, faulty filtration processes, clarifier overflow, bleed treatment failure, defective acid lines and improper acid use;

(c)   That the problems referenced in (a)-(b) above were not "minor" or "normal startup issues," but catastrophic failures that the Company had not rectified and did not know how to rectify;

(d)   As a result of (a)-(c) above, the initial months of zinc production at the Mooresboro Facility had not "validated" the new production process, but, to the contrary, had called into serious doubt the new, unproven technologies upon which it relied;

(e)       As a result of (a)-(d) above, additional temporary production stoppages at the Mooresboro Facility were highly likely and, in fact, anticipated for the foreseeable future;

(f)       As a result of (a)-(e) above, the Mooresboro Facility did not have a potential annual zinc production capacity of 155,000 tons, and could not even sustainably achieve 50% of this capacity;

(g)       That instead of permanently fixing problems at the Mooresboro Facility, the Company was employing expensive, temporary workarounds in order to achieve even limited production capacity, and as a result, the facility was not providing significant cost savings, but instead was causing the Company to spend cash at an unsustainable rate;

(h)       As a result of (a)-(g) above, the Company could not achieve 155,000 tons of annualized zinc production by the end of 2014 and, therefore, statements that the Company would significantly and quickly increase its zinc production revenues and achieve an annualized EBITDA benefit of $90-$110 million in 2015 had no basis;

(i)       That construction at the facility was not "substantially completed," but instead would require additional investments of tens of millions of dollars and several years of highly technical and uncertain work in order to rectify the substantial and pervasive construction, engineering and operational problems identified in (a)-(h) above, and in fact such problems may not have been solvable at scale based on existing technologies; and

(j)       As a result of (a)-(i) above, the Company did not have sufficient liquidity, cash on hand and anticipated cash flows for general corporate purposes to sustain it through the full ramp-up of the Mooresboro Facility.

42.       On October 1, 2014, after the market close, Horsehead issued a press release providing an update on the Mooresboro Facility.  The release stated that the facility had only

produced 4,300 tons of zinc during the third fiscal quarter of 2014, only 900 tons more than the previous quarter, and revealed that production at the facility "was impeded mainly by operational issues associated with controlling the removal of solids in the clarifier unit downstream of the leaching process."

43.     The press release stated that the operational issues were "'normal,'" "'to be expected,'" and had been "diagnosed" with solutions "being implemented." Defendant Hensler was quoted as stating that:  (i) the Company had been "'adept'" at implementing "'corrective actions'" and had made improvements that would "'improve the level of operation going forward'"; and (ii) no issues "'experienced thus far have called into question the viability of the processes being utilized or materially impair the benefits we expect to receive once the plant is fully operational.'"

44.     On this news, the price of the Company's stock declined from $16.05 per share on October 1, 2014 to $14.98 per share on October 2, 2014, a one-day decline of 7% on abnormally high volume of 3.6 million shares traded.  However, the stock continued to trade at artificially inflated levels as defendants misrepresented the extent and seriousness of the problems at the Mooresboro Facility and continued to conceal the true facts about Horsehead's operations and prospects.

45.     On November 10, 2014, Horsehead issued a press release providing its fiscal 2014 third quarter financial results.  The release stated that:  (i) the Company had improved operations at the Mooresboro Facility; (ii) high-grade zinc production had "'met . . . expectations'"; (iii) the "'primary bottleneck'" at the facility resulted from "'conventional technology'" and had been remedied through "'better control'" and "'minor'" equipment modifications; (iv) costs to fix additional problems would not be "'material'"; (v) no "'technical or operational obstacles . . . materially challenge the value proposition of'" the

{FG-W0407497.}

facility; and (vi) the Company had "adequate liquidity to meet the capital needs of the business and the ramp-up of the Mooresboro facility."

46.     That same day, Horsehead also filed its Form 10-Q for the third fiscal quarter of 2014 with the SEC (the "3Q14 Form 10-Q"), which was signed by defendants Hensler and Scherich.   The 3Q14 Form 10-Q purported to provide an operational update of the production process at the Mooresboro Facility, which was substantially identical to that listed in ¶45.  The 3Q14 Form 10-Q provided additional statements about operations at the facility, including that:   (i) construction at the facility had been "completed"; (ii) "numerous improvements" had been made at the facility that should "accelerate the ramp-up rate going forward"; and (iii) past problems had been "diagnosed" with "solutions implemented."  The 3Q14 Form 10-Q stated in pertinent part:

> On October 1, 2014, we reported that the facility produced approximately 4,300 tons of zinc metal in the third quarter of 2014, compared to 3,400 tons in the second quarter, as a previously announced temporary outage at the beginning of the third quarter limited production during the first half of the quarter.  While ***numerous improvements were made to several unit operations at the facility during the quarter which should help to accelerate the ramp-up rate going forward***, production during the second half of the quarter was impeded mainly by operational issues associated with controlling the removal of solids in the clarifier unit downstream of the leaching process*. **These issues were diagnosed and solutions implemented**.* We also commissioned the casting line for SHG and CGG "jumbo" ingots. We continued to supplement zinc metal sales during the third quarter with the sale of zinc calcine to third parties.
>
> Commissioning of the co-product recovery circuit was completed during the third quarter and we started to introduce feed, but we reallocated resources to focus on debottlenecking the zinc production plant in October which delayed the ramp-up of that circuit.  We will restart the ramp-up of the co-product circuit in November.  The ramp up period for the co-product recovery circuit is estimated to be approximately one year.
>
> ***We enter the fourth quarter of 2014 with the expectation that we have resolved several issues that will improve the level of operation going forward***.   The primary bottleneck thus far has been with solids/liquid separation at the front end of the process. ***This is conventional technology used extensively in hydrometallurgical and mining applications, so we anticipate that this issue will be resolved.  We have made progress through better control of the process and by minor equipment modifications***.  If additional equipment modifications or additions are required to fully resolve

the issue we have identified, *we do not believe the cost would be material. Several improvements have been implemented which have allowed us to continue ramping up production.* Since the end of the third quarter of 2014, we have continued to increase the level of production of zinc. *We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of this project*; however, issues such as the solids removal described above have slowed the rate of our ramp-up and delayed the realization of these benefits**.** During this ramp up we plan to continue to sell zinc calcine.

*       *       *

*Construction of our new zinc production facility in Mooresboro has been completed. We enter the fourth quarter of 2014 with the expectation that we have resolved several issues that will improve the level of operation going forward. We have made progress through better control of the process and by minor equipment modifications. If additional equipment modifications or additions are required to fully resolve the issue we have identified, we do not believe the cost would be material*. Several improvements have been implemented which have allowed us to continue ramping up production. We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of this project; however, issues such as the solids removal problem described above have delayed the timetable for our expected realization of these benefits.

Commissioning of the co-product recovery circuit was completed during the quarter and we started to introduce feed to the circuit, however, we reallocated resources to focus on debottlenecking the zinc production plant in October which delayed the ramp-up of that circuit. We will restart the ramp-up of the co-product circuit in November and the ramp up period is estimated to be approximately one year.

47.     Also on November 10, 2014, Horsehead held an earnings conference call with analysts and investors to discuss the third quarter 2014 results.  In his prepared remarks, defendant Hensler stated, among other things, that: (i) production issues at the Mooresboro Facility had been largely resolved or were readily fixable; (ii) zinc production had increased and was expected to increase "at a faster rate" going forward; (iii) additional expenses related to fixing ramp-up issues would not be material; (iv) no technologic or operational challenges had been identified which would materially impact the project's value; and (v) the facility would ultimately provide $90-$110 million annualized EBITDA benefit.

48.     During the conference call, in his prepared remarks, defendant Scherich stated that the Company's cash on hand and expected cash flows "*will provide adequate liquidity*

*to meet our needs through the full ramp-up of the Mooresboro facility*."  Defendant Scherich also stated that the Company "*only need[s] to be at 50% to 60% capacity at Mooresboro to be cash flow positive*, covering interest and maintenance CapEx on a consolidated basis."

49.     In response to an analyst's question, defendant Hensler purported to detail the issues affecting production at the plant, which he stated were limited to a clarifier that was not properly removing solids.  He stated: "Once we get past that issue, *we believe we don't see another significant bottleneck in front of us that would move us up to – restrict us from moving up to closer to design capacity*."  Defendant Hensler continued to downplay the extent and seriousness of the problems facing the facility, stating that the identified solutions "wouldn't necessarily be very capital intensive" and could be accomplished "fairly quickly":

> Over the next few weeks, we think we'll be at a better point of understanding whether this is a clarifier design issue versus an operating issue*.*  But once we get past that issue, *we believe we have a lot more running room in terms of being able to move up production*.  This is as I said in the script, *this is a conventional technology*.  The ability to get solids out is something that the technology exists to do it.  We've been putting all of our efforts right now into trying to get the existing equipment to do what it's supposed to do, but we may come to the conclusion we need to add additional equipment to get the clarity we need.  We haven't spent much time focusing on designing that equipment, but *we know that there is technology out there that we can use*.

> *             *             *

> Well, our hope is we don't have to do anything with the clarifier. And we're working on a number of initiatives to make that perform better. And our options, really if that doesn't pan out, are to potentially add more sand filters, and that would be one approach.  So don't solve the problem with a clarifier but just add more sand filters to take the solids out.  Or perhaps put in an intermediate step maybe another clarifier as an option.

> And the other option that we're considering is we have another clarifier in the facility that we believe could be re-purposed for this.  *And so that wouldn't necessarily be very capital intensive*.  It would require some re-piping and *is something that we may be able to do fairly quickly*.  So if the things we're working on to try to make the current equipment work better don't pan out, we would go down that path.

50.     Defendant Scherich followed up by stating that "*design and construction at clarifiers is not highly technical*."  Defendant Hensler agreed, stating, "[t]hey're basically a big open tank with a pipe coming out of the bottom so it's not a high-tech piece of equipment."

51.     On the call, defendant Hensler also stated that the Mooresboro Facility would be able to produce more than 205 tons of zinc per day:

> *We expect to be able to improve over where we are [at 205 tons per day].*  We think we can make incremental improvements within the constraints that I talked about.  We've got a number of short-term initiatives that once they're implemented, *we think we can get the flow to a higher rate*.  It's a little difficult to predict at this point exactly where that is.  *Our goal is really to get to this cash flow breakeven number that we estimate to be around 230 tons per day.  That's an estimate but – that we think it's reasonably close*.

52.     Defendant Hensler also stated that the internal target for reaching break-even at the Mooresboro Facility was "*early next year in the early first quarter*."  He later clarified that by "breakeven" he meant production revenues from the Mooresboro Facility would be "*covering their own manufacturing costs and the cash interest costs associated with the project*."   Later on the call defendant Hensler also stated that he was referring to "*consistently*" producing at the facility at or above the break-even point, which would allow the Mooresboro Facility to be "self-sustaining":

> *The milestone I was referring to is to get consistently operate above this estimated cash breakeven rate* which we estimate at 230 tons of shipped product per day.  And we – as Bob explained, we think that covers operating cost plus the cash interest expense at Mooresboro.  That's a big target for us to get to that point because *at that point, Mooresboro's self-sustaining*, and so that's really where our focus is.  And *we hope to be able to get there by early in the first quarter next year* based upon the things we have planned between now and then in terms of improvements to this solids issue particularly that we talked about.

53.     With regard to the lead and silver byproduct recovery circuit at the Mooresboro Facility, defendant Hensler stated that the Company had "uncovered some issues," but "nothing really major."  He continued: "*We don't really see any particular*

***issues in the plant ramp-up that would affect our initial thinking on that***, but it's probably a 12 month process before we really ramp it up***.*** But we would expect to start producing some salable product out of that operation before the end of the year."  Similarly, with respect to the production of high-grade zinc at the Mooresboro Facility, an analyst asked "how should we think about it going forward? . . . And is there any lag effect or anything which we should be aware of?"  Defendant Hensler responded: "***No.  Not really***."

54.     On January 5, 2015, Horsehead issued a press release stating that the Mooresboro Facility had produced 12,000 tons of zinc in the fourth quarter of 2014***.*** The release also quoted defendant Hensler as stating that: (i) the facility had operated near the "'estimated cash-flow breakeven level'" for extended periods in December; (ii) the on-site team was "'optimistic that the identified challenges can be mitigated or resolved'"; and (iii) the Mooresboro Facility was still expected to achieve previously stated financial targets, which included 155,000 tons of annualized zinc production and $90-$110 million of incremental annualized EBITDA.

55.     On January 6, 2015, members of senior management of Horsehead delivered an investor presentation to analysts and investors in Mooresboro.  Slides accompanying the presentation stated that the ramp-up at the facility had "***accelerated after some initial delays***" and production was "***approaching cash flow breakeven***" with a target date of January 15, 2015.  The slides also stated that the facility was still expected to generate a $90-$110 million annualized EBIDTA benefit, and that the Company was already looking beyond the ramp-up to "focus on future growth opportunities."

56.     An analyst report from Oppenheimer summarized discussions with Horsehead's senior management at the January 6, 2015 meeting.  The analyst report stated that "***Mooresboro continues to ramp nicely***" and once "***short-term issues***" were resolved

{FG-W0407497.}

"the company could be in a ***highly favorable position*** to significantly improve EBITDA/FCF, deliver and pursue additional growth opportunities."

57.     The statements referenced above in ¶¶43, 45-56 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a)     That construction defects at the Mooresboro Facility, including but not limited to the construction of defective piping, filtration presses and clarifiers, had left the facility unable to operate as planned and the facility was not ready to commence operations in May 2014;

(b)     That operational problems at the Mooresboro Facility were not "conventional," "minor" or "short-term" in nature, but significant, pervasive and the result of fundamental engineering and operational defects, including but not limited to the melting of pipelines, filter presses that regularly clogged, faulty filtration processes, clarifier overflow, bleed treatment failure, defective acid lines and improper acid use;

(c)     That the Company had not rectified the problems at the Mooresboro Facility, including those listed in (b) above, and did not know how to rectify such problems and, as a result, production disruptions and tens of millions of dollars in costs related to these problems were likely and anticipated;

(d)     That the initial months of zinc production at the Mooresboro Facility had not "validated" the new production process "as designed," but, to the contrary, had demonstrated that the facility would not be able to scale its production capabilities without significant redesign;

(e)     That instead of permanently fixing problems at the Mooresboro Facility, the Company was employing expensive, temporary workarounds in order to achieve

- 22 -

even limited production capacity, and as a result, the facility was not providing significant cost savings, but instead was causing the Company to spend cash at an unsustainable rate;

(f)     As a result of (a)-(e) above, the Mooresboro Facility did not have an annual zinc production capacity of 155,000 tons and could not even sustainably achieve 50% of that capacity;

(g)     As a result of (a)-(f) above, the Mooresboro Facility could not possibly achieve production revenues sufficient to "break even," significantly increase production revenues or achieve an annualized EBITDA benefit of $90-$110 million;

(h)     That construction at the facility was not "completed," but instead would require additional investments of tens of millions of dollars and several years of highly technical and uncertain work in order to rectify the substantial and pervasive construction, engineering and operational problems identified in (a)-(g) above, and in fact such problems may not have been solvable at scale based on existing technologies;

(i)     That the operational issues at the Mooresboro Facility were not improving, but were in fact deteriorating, as stop-gap measures used by the Company to boost production in the short term were unsustainable, untested, highly risky and causing decreased operational stability; and

(j)     As a result of (a)-(i) above, the Company did not have sufficient liquidity, cash on hand and anticipated cash flows for general corporate purposes through the full ramp-up of the Mooresboro Facility.

58.     On January 23, 2015, Horsehead conducted a secondary offering of 5.75 million shares (including the full exercise of the underwriters' option) of its common stock at $12.75 per share pursuant to a shelf registration statement.  The Company stated that proceeds from the Secondary Offering would be used for general corporate purposes.

59.     The Registration Statement, which incorporated the Prospectus (together, the "Registration Statement"), for the Secondary Offering contained false and misleading statements of material fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.

60.     The Registration Statement incorporated by reference the Company's recent SEC filings.

61.     The Registration Statement represented that the Mooresboro Facility would provide significant benefits to Horsehead's revenues, earnings and operations. The Registration Statement stated in pertinent part as follows:

**Our New Zinc Facility**

In September 2011, we began construction of a new, state-of-the-art zinc facility in Mooresboro, North Carolina to replace our Monaca, Pennsylvania facility. We began production at our new zinc facility in May 2014. Our new facility provides us with the capability to produce SHG zinc, Continuous Galvanizing Grade ("CGG") zinc and High Grade zinc, in addition to the Prime Western ("PW") grade zinc metal that we produced at our Monaca, Pennsylvania facility. ***The first month of operation of our new facility validated that the process, as designed, is capable of producing SHG quality electrolyte from waelz oxide ("WOX") using the solvent extraction process***. The new facility's design relies upon sustainable manufacturing practices to produce zinc solely from recycled materials and uses significantly less fossil fuel than our former Monaca, Pennsylvania facility, allowing us to significantly reduce emissions of greenhouse gases ("GHGs") and particulates into the atmosphere.

***We believe that the new zinc facility, once fully operational, will provide us with a number of substantial benefits, including reduced manufacturing conversion costs due to lower energy cost; higher labor productivity; reduced operating maintenance costs; and lower operating costs in our EAF dust recycling plants resulting from the elimination of the need to calcine the majority of our WOX prior to its use***. We believe that the new facility's capability to convert WOX and other recycled materials into SHG zinc and other grades will allow us to expand into new markets, including selling to continuous galvanizers, which include some of our EAF dust customers, die casters and potentially LME warehouses, while continuing to serve customers in our existing markets. In addition, the new technology will also allow us to recover value from certain metals such as silver and lead from WOX produced from EAF dust recycling. ***Once the new zinc facility is fully operational, we believe that the foregoing benefits will result in annual incremental Adjusted EBITDA of approximately $90 million to $110 million, independent of the price of zinc, compared to our prior operations at our Monaca, Pennsylvania facility***. . . .

*We also believe that additional benefits not reflected in the above estimate may be realized once the new zinc facility is fully operational.* These additional benefits include a reduction in the cost of hedging the price of zinc, which averaged $9.1 million per year for the period from 2008 to 2013 (the last full year of production at our Monaca, Pennsylvania facility), reduced maintenance capital spending, which averaged $7.8 million per year at our Monaca, Pennsylvania facility for the period from 2007 to 2012 (the last year significant capital expenditures were made at our Monaca, Pennsylvania facility), and reduced state income taxes as a result of certain tax incentives available for the investment in the new zinc facility.

*. . . Once fully operational, we expect the new zinc facility to be capable of producing over 155,000 tons of zinc metal per year with equipment capable of producing over 175,000 tons of zinc metal per year without significant additional investment.*

\*       \*       \*

Our new zinc facility relies upon sustainable manufacturing practices to produce zinc solely from recycled materials and uses significantly less fossil fuel than our prior facility in Monaca, Pennsylvania.  The new zinc facility converts WOX produced from EAF dust recycling and other recycled materials into SHG and other grades of zinc and eliminates the need to calcine the majority of our WOX prior to its use.  *We believe the technology used at our new zinc facility will also allow us to recover value from metals such as silver and lead contained in EAF dust.*

*. . .* In addition, we expect our new zinc facility to be able to produce zinc from a wide range of zinc-bearing raw materials.  *We expect that this flexibility will allow us to modify our feedstock mix based on cost and availability*, as well as to use 100% recycled zinc feedstock, whether purchased from third parties at a discount to the LME zinc price or generated by our EAF dust recycling operations.

62.     The Registration Statement also purported to describe the Mooresboro Facility's operations to date.  The Registration Statement stated that the facility had only experienced minor setbacks, all of which had been resolved or were remediable and none of which had "materially challenge[d] the value proposition of [the] new zinc facility."  The Registration Statement stated in pertinent part as follows:

Our new zinc facility is currently in the ramp-up stage and has experienced operational difficulties that we believe are typical of a start-up of this size and that have resulted in production interruptions.  *Numerous improvements have been made to remediate these issues and improve the ramp-up rate*.  The primary bottleneck thus far has been the removal of solids at the front end of the process.  *This is conventional technology used extensively in hydrometallurgical and mining applications, thus we anticipate that this issue will be resolved.  We have made progress through better control of the process and improvements in equipment reliability.*

- 25 -

*We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility*. However, issues such as the removal of solids described above have slowed the ramp-up rate and delayed the realization of the benefits we believe we can obtain from full operation of our zinc facility. The facility has operated continuously since early August 2014 after a shutdown during the month of July 2014. On January 5, 2015, we reported that the facility produced approximately 12,000 tons of zinc metal in the fourth quarter of 2014 (with approximately 5,400 tons produced in December), compared to approximately 4,300 tons in the third quarter of 2014 and approximately 3,400 tons in the second quarter of 2014.

\*     \*     \*

## Business Strategy

### Ramp-up Production at our New Zinc Facility

In May 2014, we began production at our new zinc facility and on January 5, 2015, we reported that the facility produced approximately 12,000 tons of zinc metal in the fourth quarter of 2014. Once fully operational, we expect the new zinc facility to be capable of producing over 155,000 tons of zinc metal per year with equipment capable of producing over 175,000 tons of zinc metal per year without significant additional investment. Our new zinc facility has experienced operational difficulties that we believe are *typical of a start-up of this size* and that have resulted in production interruptions. *Numerous improvements have been made to remediate these issues and improve the ramp-up rate*. The primary bottleneck thus far has been the removal of solids at the front end of the process. We have made progress through better control of the process and improvements in equipment reliability. The facility has operated continuously since early August 2014 after a shutdown during the month of July 2014. We expect to continue to work to correct the issues we have encountered in order to achieve better production levels in the coming months. *Thus far, we have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility.*

63.     The statements referenced above in ¶¶60-62 were materially false and misleading when made because they failed to disclose the adverse facts listed in ¶57.

64.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the Registration Statement to "[d]escribe any known trends or uncertainties that have or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The regulation also required the Registration Statement to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues." *Id.* The

true extent and severity of the construction, operational and engineering problems at the Mooresboro Facility detailed in ¶57 were required to be disclosed in the Registration Statement pursuant to Item 303 because these problems posed uncertainties that would (and did) have an unfavorable impact on Horsehead's revenues and income from operations.

65.     Moreover, under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), the "Risk factors" section of the Registration Statement  was required to contain "a discussion of the most significant factors that make the offering speculative or risky," and each risk factor was required to "adequately describe[] the risk."  The facts detailed in ¶57 were required to be disclosed under Item 503 because the "risk factors" did not adequately describe the risk.  An adequate description of the risk required disclosure of the true extent and severity of the construction, operational and engineering problems at the Mooresboro Facility detailed in ¶57, in addition to the fact that the new zinc production processes at the facility had not worked successfully as planned and that the Mooresboro Facility could not possibly reach the 155,000 tons of zinc production capacity, or achieve the attendant benefits discussed elsewhere in the Registration Statement, without substantial redesign, tens of millions of dollars of investment and several years of highly technical and uncertain work.

66.     On January 28, 2015, Horsehead completed the Secondary Offering, generating approximately $73.3 million in gross proceeds.

67.     On February 24, 2015, Horsehead issued a press release providing its fiscal fourth quarter and full year 2014 financial results.  The press release stated that the Mooresboro Facility had achieved "break-even" production capacity during the quarter and that the "daily average production rate continued to improve" in early 2015, in addition to

stating that the Company had adequate liquidity and reiterating the purported benefits of the

facility.  The release stated in pertinent part:

>  "*We are pleased with the progress made during the fourth quarter with the ramp-up of production at the Mooresboro, NC facility*.  The fourth quarter represented a milestone for our Horsehead Corporation segment as *we achieved break-even adjusted EBITDA* even though the Mooresboro facility only operated at an average utilization of 30% of projected capacity . . . ."

**Mooresboro Status**

>  "Our primary focus during the quarter was the ramp-up of the Mooresboro facility.  The facility produced approximately 12,000 tons of zinc metal during the quarter compared to 4,300 tons in the third quarter of 2014.  Production for the month of December was approximately 5,400 tons as improvements with equipment reliability and process debottlenecking helped to increase the ramp up rate during the quarter.  *We made significant progress with the previously reported solids/liquid separation issue at the front end of the process, allowing the production rate to increase*.  We were particularly pleased that for extended periods in December, the facility operated near our estimated cash flow break-even level after cash interest expense of 230 tons per day. . . ."

>  "*Since the beginning of 2015, the daily average production rate continued to improve compared with the fourth quarter rate*.  During January 2015 we produced approximately 4,600 tons of zinc metal.  We reduced the plating rate for several days in January to perform some needed maintenance in the cell house.  We also experienced intermittent equipment reliability issues, particularly with some key pumps, which were further exacerbated by recent extreme cold weather conditions.  On February 20, 2015 we began a planned seven day outage to address several of these issues.  We expect to ramp up production following this outage.  *Our interim target is to demonstrate that no bottlenecks exist to operating the facility at 75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015*.  We believe that our ability to achieve this higher level of production will depend primarily on the absence of further unplanned equipment issues.

>  "We began introducing feed into the lead-silver recovery circuit during the fourth quarter and have started to produce lead-silver concentrate that we are currently analyzing to fine tune this circuit.  We are also addressing some issues with pump selection identified during the initial operating period."

>  "*We are pleased with the progress being made and continue to believe that once we are operating at full capacity, we will realize $90 to $110 million of incremental EBITDA benefit as a result of the investment in this transformation*.  However, the timing for completion of the ramp up cannot be determined with certainty at this time," added Hensler.

*       *       *

> *We believe we have adequate liquidity to meet the capital needs of the business and the ramp-up of the Mooresboro facility*.

{FG-W0407497.}

68.     Also on February 24, 2015, Horsehead held an earnings conference call with analysts and investors to discuss the fourth quarter and full year 2014 results.  In his prepared remarks, defendant Hensler represented that: (i) the Mooresboro Facility had reached a "milestone" in the fourth quarter by achieving "break-even adjusted-EBITDA"; (ii) the production rate had continued to improve in early 2015; and (iii) the Company was targeting a production rate of 75% of capacity by the end of March and still expected to realize a $90-$110 million annualized EBITDA benefit from the facility.  Defendant Hensler finished his prepared remarks by stating that *"[a]ll of the equipment or operating issues" the Mooresboro Facility had "experienced recently are minor in nature"*:

> In summary before we open the call for questions, I'd like to say that we're pleased with the progress made during the fourth quarter with the ramp up of production at the Mooresboro facility.  But we also realized that continued progress will have its ups and downs, as evidenced by our current outage.  *All of the equipment or operating issues we've experienced recently are minor in nature*, but each has the ability to impede progress until a permanent fix is installed.  We expect, coming out of this outage, that *we should be able to increase production more steadily*.

69.     In his remarks, defendant Scherich stated: "*We believe we have adequate liquidity to meet the capital needs of the business and the ramp up of the Mooresboro facility*."

70.     In response to an analyst asking defendant Hensler about his claim that the Mooresboro Factory could achieve zinc production of 330 tons per day without any bottlenecks by the end of the quarter, defendant Hensler stated:

> That is our hope.  *What we think right now is as far as bottlenecks are concerned we don't see anything that would impede us from getting to 330 other than unplanned equipment outages*.  And if we can get to that level before the end of March, our goal would be try to run consistently at that level or even higher than that level going forward.  So that would be an objective for the second quarter and it depends upon the fact that I just mentioned.

71.     Later on the call, in response to a question about the timing and potential for silver and lead recovery at the Mooresboro Facility, defendant Hensler stated: "*[U]ltimately*

- 29 -

***we think that there is about 10,000 to 12,000 tons of concentrates that we could recover***

that would have roughly 70% lead content. . . .  Our goal would be to get there over a 12

month period, so hopefully by the end of the year as we ramp up that circle."

      72.    Defendant Hensler also continued to downplay the operational issues at the

Mooresboro Facility.  For example, with respect to the failure of clarifiers at the facility to

adequately separate solids, he stated that the Company was "***doing a pretty good job of***

***managing the solid" issue***, "***working on slight modifications***," and ***was able to "actually***

***manage that solid issue up to pretty high levels of production that way***."  Similarly, as to

the maintenance of the cell house, he stated "***now that's behind us***, we are now into a cycle

where every 30 days we will straighten anodes, ***so we should be able to manage that***

***problem going forward***."  Likewise, as to problems with pipes at the facility, he stated that

the Company was installing a "***permanent bypass line will allow us to continue to ramp***

***up***."  Finally, defendant Hensler stated that he did not expect additional operational issues to

significantly impact the realization of additional production going forward: "***We fully think***

***we can" make "improvements in reliability to be able to get to the highest level of***

***production***."

      73.    On the call, defendant Hensler also stated that the Company expected to be

able to meet all of its high-grade zinc lines and maintain product quality at the Mooresboro

Facility.  He stated in pertinent part:

> We still have to commission the CGG line, the continuous
> galvanizing grade line.  We haven't produced that product yet.  It's a matter
> of alloying zinc with aluminum.  We don't anticipate that being a
> problem. . . .
>
>     . . . ***But we feel, from a technology standpoint, it's capable of***
> ***producing we want to produce.***  We just need to operate consistently be able
> to do that.

74.     In addition, defendant Hensler stated that the Company's recent cash raise from the Secondary Offering had provided adequate liquidity to complete the ramp up of the Mooresboro Facility and deal with any additional purportedly unexpected operational issues: "[A]s we said during the recent equity offering we want to use the proceeds to provide *sufficient liquidity to support not only strategic growth projects but also to provide some backstop liquidity in case we encounter more unforeseen issues at Mooresboro*." Defendant Scherich continued on this same topic, stating that the Company expected to improve its debt profile as it moved "*into steady cash flow generation*":

> [W]e did want to put some back stop liquidity in place as Jim said. *We don't think as long as the Mooresboro ramp up progresses that that's something that will need to use*. But it's good to have it, it's prudent to have it and we have these other strategic investments that we think would be well worth while to start to advance forward. Actually by doing that equity offering, it now frees up some capacity for additional unsecured debt if that become as alternative. But absolutely as we move forward, we look to have better trailing performance that will support a refinancing of debt as we get out as early as mid 2016 or certainly by maturity in 2017. *So we look to both improve the coupon rate, if the market is conducive to that and our trailing performance certainly should support that and we will reduce the debt somewhat. Revolvers don't need to be tapped as you move into steady cash flow generation*.

75.     On March 2, 2015, Horsehead filed an Annual Report Form 10-K for the quarter and year ended December 31, 2014 with the SEC, which was signed by defendants Hensler, and Scherich among others (the "2014 Form 10-K").

76.     The 2014 Form 10-K purported to provide an operational update of the production process at the Mooresboro Facility, which was substantially identical to that listed in ¶67. Moreover, the 2014 Form 10-K provided additional operational updates for the facility, including statements that the Mooresboro Facility could reach 75% nameplate capacity (or 330 tons of zinc per day) with "no bottlenecks" by the end of the first quarter of 2015. The 2014 Form 10-K stated in pertinent part:

{FG-W0407497.}

On January 5, 2015, we reported that the facility produced approximately 12,000 tons of zinc metal in the fourth quarter of 2014 (with approximately 5,400 tons produced in December), compared to approximately 4,300 tons in the third quarter of 2014 and approximately 3,400 tons in the second quarter of 2014.  During January 2015, we produced approximately 4,600 tons of zinc metal.  We reduced the plating rate for several days in January to perform some needed maintenance in the cell house.  We also experienced intermittent equipment reliability issues, particularly with some key pumps, which were further exacerbated by recent extreme cold weather conditions.  On February 20, 2015, we began a planned seven day outage to address several of these issues.  We expect to ramp-up production following this outage.  ***Our interim target is to demonstrate that no bottlenecks exist to operating the facility at 75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015***.  We believe that our ability to achieve this higher level of production will depend primarily on the absence of further unplanned equipment issues.  ***Once fully operational, we expect the new zinc facility to be capable of producing over 155,000 tons of zinc metal per year with equipment capable of producing over 170,000 tons of zinc metal per year without significant additional investment***.  Timing, however, for the completion of the ramp-up to full production cannot be determined with any certainty at this time.

77.     The 2014 Form 10-K also stated that the Company's "***operational standards . . . allow [it] to deliver higher quality metal than many of [its] competitors***."

78.     In addition, the 2014 Form 10-K stated that the Company believed it had cash on hand, credit access and expected cash flow "***sufficient to satisfy our liquidity and capital requirements, including capital requirements related to our capital needs based on the expected ramp-up to full production of the new zinc facility, for the next twelve months***."

79.     On April 1, 2015, Horsehead issued a press release providing an operational update on the Mooresboro Facility.  The release stated that short-term operational issues had been "***addressed***" and quoted defendant Hensler as stating that the "'***most significant reasons***'" for the slower production "'***are behind us*** and we are now focused on ramping up to our interim goal of 75% of nameplate capacity during the second quarter.'"  The release stated in pertinent part:

The Company reported that the facility produced approximately 10,000 tons of zinc in the first quarter of 2015, compared to 12,000 tons in the fourth quarter of 2014.  Production was affected by the previously announced outage taken in late February to install a bypass to resolve a problem with a clarifier in the leach feed circuit.  After an extended period to completely

drain the clarifier, *the root cause of the issue was addressed and the clarifier was placed back into service yesterday.* We continued to supplement zinc metal sales with the sale of approximately 23,200 tons of zinc calcine during the first quarter.

Jim Hensler, the Company's President and CEO, issued the following statement: "*We are pleased to have been able to substantially resolve the issues which forced us to take an outage in February and continue to see progress in our efforts to anticipate and resolve a number of other potential equipment issues*. While we did not reach the production rates we hoped to achieve during the quarter, *we believe the most significant reasons for that are behind us and we are now focused on ramping up to our interim goal of 75% of nameplate capacity during the second quarte*r."

80.    On May 8, 2015, Horsehead issued a press release providing its first fiscal quarter 2015 financial results. The release stated that additional problems at the Mooresboro Facility identified in the quarter had been rectified and that the Company was "'***confident in [its] plan to address the known issues that are affecting the pace of the ramp-up***.'" The release also stated that the Company: (i) had "added resources to accelerate the rate of the ramp-up"; (ii) still believed the facility would achieve $90-$110 million in annualized EBITDA benefits; and (iii) had adequate liquidity to meet the capital needs of the business and complete the ramp-up.

81.    That same day, Horsehead filed a quarterly report on Form 10-Q with the SEC which was signed by defendants Hensler and Scherich (the "1Q15 Form 10-Q"). The 1Q15 Form 10-Q represented that problems at the facility had been "***addressed***" and that the facility would ***provide*** "***significant benefits***" and prove "***transformative***" for the Company, stating in pertinent part:

On April 1, 2015, we announced that the facility had produced approximately 10,000 tons of zinc during the first quarter of 2015. During January 2015, we produced approximately 4,600 tons of zinc metal. We reduced the plating rate for several days in January to perform some needed maintenance in the cell house. We also experienced intermittent equipment reliability issues, particularly with some key pumps, which were further exacerbated by extreme cold weather conditions. On February 20, 2015, we began a planned outage to address several of these issues. Production for the first quarter of 2015 was also affected by the outage taken in late February to install a bypass to resolve a problem with a clarifier in the leach feed circuit.

- 33 -

After an extended period to completely drain the clarifier, *the root cause of the issue was addressed and the clarifier was placed back into service*.

In April 2015, the facility produced approximately 2,800 tons of zinc metal. Production was lower than expected primarily due to an extended period of exceptionally heavy rains which filled our containments and holding ponds, requiring us to process the excess water in the plant rather than produce zinc. This event highlighted a limitation in the capacity of our process and storm water utilization capability. As a result, we are engaging a third party water management company to install a portable unit on-site to mitigate the excess water while we evaluate our options to expand the capacity of our own equipment. In addition, in April, we engaged a team of engineers with hydrometallurgical plant experience from Hatch Associates to supplement our operations and engineering team and support the on-going ramp-up.

. . . *We continue to believe that once we are operating at full capacity, we will realize significant benefits as a result of our investment in this transformative project*.

82.     The 1Q15 Form 10-Q also stated that the Company's cash on hand, availability under various credit facilities, cost reduction initiatives and cash flow from operations "*will be sufficient to satisfy our liquidity and capital requirements*, including capital requirements related to our capital needs based on the ramp-up to full production of the new zinc facility, for the next twelve months."

83.     Also on May 8, 2015, Horsehead held an earnings conference call with analysts and investors to discuss the first quarter 2015 results. In his prepared remarks, defendant Hensler stated that the Company had remedied production defects at the Mooresboro Facility during the quarter and had "*added resources to accelerate the rate of ramp-up*," and that he "continue[d] to believe that after we are operating at full capacity, *we will realize $90 million to $100 million of incremental EBITDA benefit as a result of the investment in this transformative project*." Defendant Hensler continued, stating the Company was "*gaining confidence*" in turning the corner on the known issues affecting the ramp-up:

I would like to say that while the first quarter was challenging, we are gaining confidence in our plan to address the known issues affecting the pace

of ramp-up at Mooresboro and continue to believe that we will realize the incremental of $90 million to $110 million EBITDA after we are operating at full capacity.  The rate of ramp-up has improved in May and should be enhanced as we make improvements in a few persistent problem areas over the next several weeks.  To that end we've brought on additional resources to provide assistance.

84.     When asked by an analyst whether he was still confident the Mooresboro

Facility would reach full production, defendant Hensler responded in the affirmative:

> ***Yes, we still believe that's possible.  We get that confidence because of the sizing of our facility***, and we look at the size of tanks, reactors, cell house, and so on, is the same size as other facilities around the world that are using the same technology and getting the production levels that we expect to get.  ***So we don't see fundamental problem with the design to get us there***.  It's really some of the unique things that we're working through to make the process more reliable and to deal with the specifics of the design that we've got.

85.     On the call, defendant Scherich stated: "***So our expectation is we'll continue***

***to ramp that up [from 200 tons a day]***, and I think our hope is in May to produce somewhere

north of 5,000 tons of finished product and then [we're] going to move up from there in

June."  Similarly, defendant Hensler stated that none of the problems identified so far would

"***require a significant capital investment***," and the Company would "***move up the reliability***

***curve quite a bit***" once those problems were addressed.  Later, defendant Hensler stated that

production in the second quarter had improved and was expected to "improve even more

during the course of the year":

> [W]e actually installed some upgrades during the outage in January, and that's allowed us to increase the power input rate in our melting furnace which has actually resulted in even higher production rates as we exited the quarter, and ***through April so far we're actually making up ground on the production we lost in January.  So, yes, I think we expect to see the second quarter being stronger, and we actually expect to see that maybe improve even more during the course of the year***.

86.     Defendant Hensler also stated that the Company expected to produce 330 tons

of zinc per day at the Mooresboro Facility by the end of the third quarter and would

"probably see kind of a slow ramp to full production sometime early next year."  Defendant

- 35 -

Scherich, meanwhile, stated that the increased production was expected to "***produce very acceptable run rates on the performance of the business to support refinancing***" later in the year.

87.     On June 1, 2015, Horsehead issued a press release providing an operational update on the Mooresboro Facility.  The release stated that:  (i) in May 2015 the facility achieved its "highest monthly production since January" 2015; (ii) the Company was "***confident***" the issues identified could be addressed; and (iii) the Company expected the facility to achieve 75%  production capacity in the third quarter.

88.     The statements referenced above in ¶¶67-74, 76-87 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a)     That construction defects at the Mooresboro Facility, including but not limited to the construction of defective piping, filtration presses and clarifiers, had left the facility unable to operate as planned and the facility was not ready to commence operations in May 2014;

(b)     That operational problems at the Mooresboro Facility were not "conventional," "minor" or "short-term" in nature, but significant, pervasive and the result of fundamental engineering and operational defects, including but not limited to the melting of pipelines, filter presses that regularly clogged, faulty filtration processes, clarifier overflow, bleed treatment failure, defective acid lines and improper acid use;

(c)     That the Company had not rectified the problems at the Mooresboro Facility, including those listed in (b) above, and did not know how to rectify such problems and, as a result, production disruptions and tens of millions of dollars in costs related to these problems were likely and anticipated;

(d)     That the initial months of zinc production at the Mooresboro Facility had not "validated" the new production process "as designed," but, to the contrary, had demonstrated that the facility would not be able to scale its production capabilities without significant redesign;

(e)     That instead of permanently fixing problems at the Mooresboro Facility, the Company was employing expensive, temporary workarounds in order to achieve even limited production capacity, and as a result, the facility was not providing significant cost savings, but was instead causing the Company to spend cash at an unsustainable rate;

(f)     As a result of (a)-(e) above, the Mooresboro Facility did not have an annual zinc production capacity of 155,000 tons and could not even sustainably achieve 50% of that capacity;

(g)     As a result of (a)-(f) above, the Mooresboro Facility could not possibly achieve 75% production capacity in the first, second or third fiscal quarters of 2015, generate the revenue increases that would result from such production levels, or achieve an annualized EBITDA benefit of $90-$110 million;

(h)     That construction at the facility was not "completed," but instead would require an additional investment of tens of millions of dollars and several years of highly technical and uncertain work in order to rectify the substantial and pervasive construction, engineering and operational problems identified in (a)-(g) above, and in fact such problems may not have been solvable at scale based on existing technologies;

(i)     That the operational issues at the Mooresboro Facility were not improving, but in fact were deteriorating, as stop-gap measures used by the Company to boost production in the short term were unsustainable, untested, highly risky and causing decreased operational stability; and

{FG-W0407497.}

(j)      As a result of (a)-(i) above, the Company did not have sufficient liquidity, cash on hand and anticipated cash flows for general corporate purposes through the full ramp-up of the Mooresboro Facility.

89.      On July 2, 2015, after the market closed, Horsehead issued a press release purporting to provide an update on the Mooresboro Facility.  The release represented that the facility had only produced 3,700 tons of zinc during June 2015, a nearly 10% decrease from the prior month.  The release stated that the slowdown in production was due to problems in the facility's bleed-treatment system and ongoing "equipment reliability issues."

90.      The release also stated that:  (i) production at the Mooresboro Facility had "accelerated through the latter half of the month"; (ii) various production problems at the facility had been solved; (iii) the Company still expected the facility would reach 75% production capacity in the third quarter of 2015; and (iv) Horsehead had adequate liquidity to complete the ramp-up.

91.      In response to this news, the price of Horsehead's stock declined from $11.45 per share on July 2, 2015 to $9.54 per share on July 6, 2015 (the next trading day), a one-day decline of 17% on high trading volume of 4.7 million shares.  A BB&T analyst report stated that the disappointing results placed the Company's "ability to execute" and EBITDA projections "***increasingly in doubt***," while "***investors want results, not more excuses***." Defendants, however, continued to misrepresent the extent and seriousness of the problems at the Mooresboro Facility and continued to conceal the true facts about Horsehead's operations and prospects.

92.      On August 7, 2015, Horsehead issued a press release providing its second quarter 2015 financial results.  The release stated that the "***pace of the ramp-up increased***" during the quarter and reaffirmed the Mooresboro Facility's projected EBITDA benefits and

- 38 -

the Company's purportedly "adequate" liquidity to complete the ramp-up, stating in pertinent

part:

> "***The pace of the ramp-up increased as we exited the second quarter and in July***, a month in which we took a planned outage, the facility produced approximately 4,000 tons of zinc metal, a 7% increase over June's production.  ***Upgrades made during the planned outage, along with the additional processing capacity supplied by Veolia (a water treatment specialist), have eased the bottleneck in our bleed treatment circuit***.  We also made progress on the previously mentioned pilot plant designed to quickly add and evaluate incremental bleed treatment capacity.  We expect it to be operational sometime in August.  We expected better performance in July; however, we experienced unexpected production constraints due to equipment reliability issues, caused mainly by design deficiencies, some of which we have already remedied.  We are encouraged that the operations in Mooresboro appear to have stabilized over the past quarter.  We expect continued steady progress as we debottleneck the facility and systematically address equipment reliability issues.  ***We continue to believe that, once the Mooresboro facility is fully and efficiently operating, we will realize $90 to $110 million of incremental Adjusted EBITDA compared to our prior operations at Monaca***.  However, the timing for achieving specific milestones during the ramp-up or the completion of the ramp-up cannot be predicted with certainty," added Hensler. . . .
>
> ***We believe we have adequate liquidity to meet the capital needs of the business through completion of the ramp-up of the Mooresboro facility.***

93.     That same day, Horsehead filed its Form 10-Q for the second quarter of 2015

with the SEC, which was  signed by defendants Hensler and Scherich (the "2Q15 Form 10-

Q").  The 2Q15 Form 10-Q stated that:  (i) production had substantially improved in May

2015; (ii) July developments at the facility "were encouraging"; and (iii) the Company

expected "continued steady progress" at the facility.

94.     In addition, the 2Q15 Form 10-Q stated that the Company's cash on hand,

availability under various credit facilities, cost reduction initiatives and cash flow from

operations "***will be sufficient to satisfy our liquidity and capital requirements***, including

capital requirements related to our capital needs based on the ramp-up to full production of

the new zinc facility, for the next twelve months."

{FG-W0407497.}

95.     Also on August 7, 2015, Horsehead held an earnings conference call with analysts and investors to discuss the second quarter 2015 results.  In his prepared remarks, defendant Hensler stated that the Company had made substantial improvements at the Mooresboro Facility and expected to increase production by as much as 100 tons per day, and reaffirmed the Company's previously stated annualized EBITDA benefits.  Defendant Hensler continued, stating that operations had "*stabilized*" and zinc production would "*continue to progress*":

> I'd like to say that while the second quarter was challenging, *operations in Mooresboro have started to stabilize and we are making steady progress toward addressing the various design deficiencies and equipment issues that we have discovered since startup*, including those related to the most significant bottleneck associated with the bleed treatment system.  *We are implementing a plan to mitigate this bottleneck*.
>
> Production in July was approximately 7% higher than in June, as we partially eased the bottleneck and as equipment reliability continues to improve.  *We believe production will continue to progress through the third quarter as we implement plans discussed earlier and in recent updates*.
>
> We will be aided in these efforts by having extended our relationship with Hatch Associates to continue taking advantage of their hydrometallurgical engineering expertise, and by having made further additions to our in-house staff.  We are particularly excited that one of the key technical experts involved in the commissioning and ramp up of the Scorpion zinc plant, which is similar in design to ours, has joined the Company and will be leading the technical efforts at Horsehead to support the ramp up.

96.     Later on the call, defendant Hensler also stated that the Company did not anticipate any liquidity problems during the remainder of the year and had the capacity to add $50 million in unsecured debt if needed:

> So we think that holds fairly steady, given the hedging that's in place and kind of the steady progress that we're making.  *So we're not anticipating the liquidity changing much here for the balance of the year*.
>
> But it could, and one of the things that's still out there is the capacity to add up to $50 million of additional unsecured debt.  *And that's something that's always a next available alternative*.

97.     On September 1, 2015, Horsehead issued a press release providing an update on the Mooresboro Facility.  The release stated that the Company had "*completed several*

***upgrades to the plant in August which should improve plant reliability going forward***, including upgrading of some of the problematic pumps and acid distribution components and improvement to the operating efficiency of the solvent extraction circuit."

98.     On October 23, 2015, Horsehead announced that it had entered into an at-the-market offering sales agreement (the "ATM Offering") with an investment bank.  Pursuant to the agreement, the Company stated it could sell up to $50 million worth of shares of its common stock, from time to time.  The prospectus supplement for the ATM Offering (the "ATM Prospectus") included the purported benefits of the Mooresboro Facility, which were substantially identical to those listed in ¶29.  The ATM Prospectus also stated that the Company had "made and continues to make ***numerous improvements*** to remediate the issues we have faced at our new zinc facility" and that the facility's operations had "***further improve[d]***" during October.

99.     The statements referenced above in ¶¶89-90, 92-98 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

(a)     That construction defects at the Mooresboro Facility, including but not limited to the construction of defective piping, filtration presses and clarifiers, had left the facility unable to operate as planned and the facility was not ready to commence operations in May 2014;

(b)     That operational problems at the Mooresboro Facility were not "conventional," "minor" or "short-term" in nature, but significant, pervasive and the result of fundamental engineering and operational defects, including but not limited to the melting of pipelines, filter presses that regularly clogged, faulty filtration processes, clarifier overflow, bleed treatment failure, defective acid lines and improper acid use;

- 41 -

(c)     That the Company had not rectified the problems at the Mooresboro Facility, including those listed in (b) above, and did not know how to rectify such problems, and as a result, production disruptions and tens of millions of dollars in costs related to these problems were likely and anticipated;

(d)     That the initial months of zinc production at the Mooresboro Facility had not "validated" the new production process "as designed," but, to the contrary, had demonstrated that the facility would not be able to scale its production capabilities without significant redesign;

(e)     That instead of permanently fixing problems at the Mooresboro Facility, the Company was employing expensive, temporary workarounds in order to achieve even limited production capacity, and as a result, the facility was not providing significant cost savings, but instead was causing the Company to spend cash at an unsustainable rate;

(f)     As a result of (a)-(e) above, the Mooresboro Facility did not have an annual zinc production capacity of 155,000 tons and could not even sustainably achieve 50% of this capacity;

(g)     As a result of (a)-(f), above, the Mooresboro Facility could not possibly achieve 75% production capacity in the third fiscal quarter of 2015, generate the revenue increases that would result from such production levels, or achieve an annualized EBITDA benefit of $90-$110 million;

(h)     That construction at the facility was not "completed," but instead would require an additional investment of tens of millions of dollars and several years of highly technical and uncertain work in order to rectify the substantial and pervasive construction, engineering and operational problems identified in (a)-(g), above, and in fact such problems may not have been solvable at scale based on existing technologies;

- 42 -

(i)     That operational issues at the Mooresboro Facility were not improving, but were in fact deteriorating, as stop-gap measures used by the Company to boost production in the short term were unsustainable, untested, highly risky and causing decreased operational stability;

(j)     That the purported experts and specialists hired by the Company to improve the Mooresboro Facility could not substantially remedy the problems at the site without a prolonged shutdown and redesign of the facility, and the Company did not have sufficient liquidity for these tasks; and

(k)     As a result of (a)-(j), above, the Company did not have sufficient liquidity, cash on hand and anticipated cash flows for general corporate purposes through the full ramp-up of the Mooresboro Facility

100.    On November 9, 2015, Horsehead issued a press release announcing its third quarter 2015 financial results.  The release stated that the Company had suffered a consolidated net loss of *$27.4 million*, or $(0.48) per diluted share, during the quarter, *nearly four times* the consolidated net loss of $7 million, or $(0.14) per diluted share, for the third quarter of 2014.  The release also revealed that the Mooresboro Facility had only produced 9,700 tons of zinc during the entire quarter, an average run rate *of only 25%* of the facility's purported capacity more than a year after production commenced in May 2014.  *This is roughly the same production capacity the facility achieved in June 2014, its first full month of operation*.

101.    In response to this news, the price of Horsehead stock declined from $2.86 per share on November 6, 2015 to $2.57 per share on November 9, 2015 (the next trading day), a one-day decline of 10%.  However, Horsehead stock continued to trade at artificially inflated levels, as defendants misrepresented the extent and seriousness of the problems at

- 43 -

the Mooresboro Facility and continued to conceal the true facts about Horsehead's

operations and prospects.   This artificial inflation would come out over time, as the

Company's liquidity problems and its inability to operate as a going concern were slowly

revealed to the market, culminating in the Company's bankruptcy in February 2016 and the

price of Horsehead stock approaching zero and thereby causing economic harm and damages

to Class members.

102.     On November 9, 2015, the Company held an earnings call with analysts and

investors to discuss its third quarter 2015 results.  In his prepared remarks, defendant Hensler

continued to contend that operational results at the Mooresboro Facility were improving.  In

defendant Scherich's prepared remarks, he stated that the Company had sufficient liquidity

for 12 months of operations:

> Given our current liquidity and expected cash flow from operations; at
> current commodity prices, ***we believe that we have adequate liquidity and
> available [sic] of capital resources, including the ATM program, to support
> the business for the next 12 months***.

103.     On the call, defendant Belland was introduced as the Senior Vice President

for the Mooresboro Facility.  In response to analyst questions, defendant Belland stated that

the facility had "***no fundamental flaws whatsoever***" and a "***very solid core of operations***,"

and that he did not "***see anything that is preventing us from getting to the design rates as***

***expected***":

> But first off, let me say that my opinion, after being here for a couple of
> weeks, on the core of the operation, so that is the leach SX electro – our
> cellhouse.  It is a solid core operation here.  ***There is [sic] no fundamental***
> ***flaws.  There is nothing that I see as being impossible to resolve here***.  We
> certainly just need to improve some of the deficiencies that we are
> experiencing.  ***But there is absolutely nothing that we should not be able to***
> ***resolve here.  And it is a very solid core of the operation***.
>
>                    *          *          *
>
> But again, I do not see anything that is preventing us from getting to the
> design rates as expected.  And it is just going to take a little bit of time to

resolve the deficiencies and some capital to invest in whatever those deficiencies are.

*     *     *

I had confirmation that the core of the operation is very solid. ***There is no fundamental flaws whatsoever in the leach SX or solvent extraction, electrowinning cellhouse operation; I have full confidence that we are going to be able to get this plant up to design capacity***. As I mentioned, it is just going to take a little bit of time. So there is [sic] no real big surprises that I have seen in the two weeks of joining the company**.** I think, you know, there is [sic] a few challenges that I was not aware of ahead of time. But again, all of those are solvable.

   ***These are just problems that exist that all metallurgical operations***, hydro- or pyro-metallurgical operations, that with engineering focus and operations focus can be resolved. So there is absolutely nothing that I see that the team here – and it is a very solid team. There has [sic] been a number of other changes that Jim has put in place here that has a very strong focus on both the operations and on the projects required to improve the reliability of the operations, to enable us to get to the design capacity. So I think, to answer your questions, ***no real concerns*** since joining the company. Just a lot of challenges. But ***I am very confident we are going to be able to address all of those challenges***.

104. The statements referenced above in ¶¶102-103 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

  (a) That the Company did not have sufficient liquidity to meet its capital needs or complete the ramp-up of the Mooresboro Facility;

  (b) That the Mooresboro Facility had significant issues affecting several steps of the production process, including but not limited to solid/liquid separation, depletion, bleed treatment and cementation;

  (c) That the Mooresboro Facility had equipment sizing issues in addition to those listed in (b) above for gypsum precipitation and lead/silver recovery and other issues throughout the zinc production process; and

{FG-W0407497.}

(d)     That the problems identified at the Mooresboro Facility were significant, pervasive and the result of fundamental engineering and operational defects that the Company had not rectified and did not know how to rectify.

105.     On December 9, 2015, the Company amended its credit agreement with PNC Bank National Association ("PNC").

106.     On December 10, 2015, Moody's downgraded the Company's corporate debt to Caa2 from B3 on a negative outlook.  A release announcing the downgrade stated that it was based in large part on the continued delays at the Mooresboro Facility.

107.     On January 13, 2016, it was reported that the Company was in a 30-day grace period after missing a $1.8 million interest payment to its 3.8% convertible senior note holders earlier in the month.

108.     On January 14 and 15, 2016, the Company entered into forbearance agreements with two of its creditors, PNC and Macquarie Bank Limited, respectively.

109.     On January 22, 2016, the Company announced that it was idling the Mooresboro Facility and retaining only a "small workforce" at the site.

110.     On February 2, 2016, Horsehead announced that it had initiated bankruptcy proceedings under Chapter 11 of the U.S. Bankruptcy Code.  That same day, the Company filed a plan for restructuring from its discussions with secured creditors that revealed "'*[m]ajor [b]ottlenecks*'" at the Mooresboro Facility.  The plan stated that "*[s]ignificant issues*" plagued several steps in the zinc production and recycling process, including: (i) solid/liquid separation; (ii) depletion; (iii) bleed treatment; and (iv) cementation.  In addition, the plan stated that gypsum precipitation and lead/silver recovery at the plant suffered from "equipment sizing issues," and that all steps of the production process had at least "[l]imited

{FG-W0407497.}

issues."  The plan further stated that it would take approximately *$81.9 million and over two years* to get the facility back on track.

111.    On February 11, 2016, trading in Horsehead stock was suspended.  On February 23, 2016, the Company filed a notice on Form 25-NSE that its common stock had been removed from listing on the NASDAQ stock exchange.

112.    On March 1, 2016, Horsehead filed a notice on Form NT 10-K that it would be unable to file its annual report for the 2015 fiscal year on time and disclosed that it "expects that its results of operations for the year ended December 31, 2015 will reflect a significant adverse change compared with the Company's results of operations for the year ended December 31, 2014," due in part to "continuing issues that delayed the ramp-up of the Company's zinc facility in Mooresboro, North Carolina."

113.    On April 14, 2016, the Company filed its disclosure statement for the debtor's joint plan of reorganization pursuant to Chapter 11 of the Bankruptcy Code in the bankruptcy proceedings, which stated: "The Debtors presently anticipate that *approximately 36 months* may be required to implement engineering and operational repairs or modifications necessary to bring the Mooresboro Facility up to full capacity."

## LOSS CAUSATION/ECONOMIC LOSS

114.    During the Class Period, as detailed herein, defendants made false and misleading statements by misrepresenting the Company's business and prospects and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Horsehead securities and operated as a fraud or deceit on Class Period purchasers of Horsehead securities.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the prices of Horsehead securities fell precipitously, as the prior artificial inflation came out of the prices over time.  As a result of their purchases

{FG-W0407497.}

of Horsehead securities during the Class Period, plaintiff and other members of the Class

suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## AND FRAUD ON THE MARKET

115.    Plaintiff will rely upon the presumption of reliance established by the fraud-

on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose

material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable

investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Horsehead

securities between the time defendants misrepresented or failed to disclose material facts and

the time the true facts were disclosed, without knowledge of the misrepresented or omitted

facts.

116.    The market for Horsehead securities was efficient for the following reasons,

among others:

(a)     Horsehead stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market, until trading was

suspended in February 2016;

(b)     As a regulated issuer, Horsehead filed periodic public reports with the

SEC; and

(c)     Horsehead regularly communicated with public investors via

established market communication mechanisms, including through regular disseminations of

- 48 -

press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## NO SAFE HARBOR

117.    Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by defendants, and thus did not fall within any "Safe Harbor."

118.    Adequate verbal "Safe Harbor" warnings did not accompanying defendants' oral FLS issued during the Class Period effective to shield those statements from liability.

119.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Horsehead who knew that the FLS was false.  Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Horsehead securities during the Class Period (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

{FG-W0407497.}

121.    The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, Horsehead stock was actively traded on the NASDAQ and there were nearly 58 million shares of Horsehead common stock outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Horsehead or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

122.    Common questions of law and fact predominate and include:  (i) whether defendants violated the 1934 Act; (ii) whether defendants made materially false and misleading statements; (iii) whether defendants omitted and/or misrepresented material facts; and (iv) whether defendants' statements and/or omissions artificially inflated the prices of Horsehead securities and the extent and appropriate measure of damages.

123.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

124.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

125.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class

{FG-W0407497.}

to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

126.   Plaintiff incorporates all allegations in ¶¶1-125 above by reference.

127.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

128.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   Employed devices, schemes and artifices to defraud;

(b)   Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Horsehead securities during the Class Period.

(d)   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Horsehead securities. Plaintiff and the Class would not have purchased Horsehead securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

{FG-W0407497.}

(e)     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Horsehead securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934
### Act Against All Defendants

129.    Plaintiff incorporates all allegations in ¶¶1-128 above by reference.

130.    Defendants acted as controlling persons of Horsehead within the meaning of §20(a) of the 1934 Act.  By virtue of their positions with the Company, and ownership of Horsehead common stock, defendants had the power and authority to cause Horsehead to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendants named herein are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding damages and interest;

C.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

{FG-W0407497.}

FRIEDLANDER & GORRIS, P.A.

*/s/   Joel Friedlander*
Joel Friedlander (Bar No. 3163)
Jeffrey M. Gorris (Bar No. 5012)
Christopher P. Quinn (Bar No. 5823)
1201 N. Market Street, Suite 2200
Wilmington, DE  19801
(302) 573-3500
jfriedlander@friedlandergorris.com
jgorris@friedlandergorris.com
cquinn@friedlandergorris.com

*Counsel for Plaintiff*

OF COUNSEL:

ROBBINS GELLER RUDMAN
      & DOWD LLP
David C. Walton
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

ROBBINS GELLER RUDMAN
      & DOWD LLP
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100


DATED:  April 22, 2016

{FG-W0407497.}