**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| JAVIER SOTO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 16-292-LPS-CJB |
| JAMES M. HENSLER, ROBERT D. SCHERICH and GREGORY M. BELLAND, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| UMESH JANI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 16-369-LPS-CJB |
| JAMES M. HENSLER, ROBERT D. SCHERICH and GREGORY M. BELLAND, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

In these related securities class actions (referred to herein as the "*Soto* Action" and the "*Jani* Action," respectively), presently pending before the Court are motions filed by: (1) Raymond Cook ("Cook") and Dyson Capital Management Ltd. ("Dyson," and collectively with Cook, "Cook and Dyson") and (2) John and Mary Elizabeth Moring Anacker (collectively, "the Anackers"). (*Soto* Action, D.I. 10, D.I. 13; *Jani* Action, D.I. 11)[1] Cook and Dyson's motion

---

[1]    The *Soto* Action is Civil Action Number 16-292-LPS-CJB and the *Jani* Action is Civil Action No. 16-369-LPS-CJB. Citations herein are, unless otherwise noted, to the docket in the earlier-filed *Soto* Action.

seeks an order consolidating the two cases. And both motions seek to have the respective movants appointed as Lead Plaintiff, as well as to have their counsel appointed as Lead Counsel and Liaison Counsel. (*Id.*)[2] For the reasons stated below, the Court GRANTS Cook and Dyson's motion and DENIES the Anackers' motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On April 22, 2016, the *Soto* Action was filed against Defendants James M. Hensler, Robert D. Scherich and Gregory M. Belland ("Defendants"), who are senior executives of Horsehead Holding Corp. ("Horsehead" or the "Company"). (D.I. 1) The *Soto* Complaint asserts claims, pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5, on behalf of all purchasers of Horsehead securities between May 21, 2014 and February 2, 2016 (the "Class Period"). (*Id.*)

---

[2]      Other members of the proposed class (movant Rory Johnson, movant Dirk Sievers and a group of movants known as the "Horsehead Investor Group") had also filed their own motions seeking consolidation and seeking to have themselves appointed Lead Plaintiff and their counsel appointed as Lead Counsel and Liaison Counsel. (D.I. 14, D.I. 18; *Jani* Action, D.I. 10, D.I. 15, D.I. 18)

As to these parties' requests for consolidation, for the reasons set forth below, the Court will GRANT their motions.

With regard to the remainder of the relief sought in these motions, the Court will DENY the motions AS MOOT. This is because after the filing of these motions, each of the three sets of movants made additional filings wherein they stated that: (1) they had since determined that they do not have the largest financial interest in the case; and (2) they now did not oppose the Court appointing one of the remaining movants as Lead Plaintiff, so long as the Court found at least one other movant to be a suitable Lead Plaintiff. (D.I. 21, D.I. 22, D.I. 27; *Jani* Action, D.I. 21, D.I. 22, D.I. 26) In light of the Court's decision herein, in which the Court finds Cook and Dyson to be a suitable Lead Plaintiff, the remainder of these movants' requests for relief are now moot.

On May 18, 2016, the *Jani* Action was filed. (*Jani* Action, D.I. 1) The *Jani* Complaint asserts claims pursuant to the same statutes and rules at issue in the *Soto* Complaint, on behalf of the same proposed class at issue in the *Soto* Complaint, and against the same Defendants sued in the *Soto* Complaint. (*Id.*)

The allegations in the respective Complaints are similar, and they relate to Horsehead, a leading U.S. producer of zinc metal. (D.I. 1 at ¶ 2; *Jani* Action, D.I. 1 at ¶ 2) In September 2011, Horsehead began construction on a new, purportedly state-of-the-art zinc production facility in Mooresboro, North Carolina, (D.I. 1 at ¶ 3; *Jani* Action, D.I. 1 at ¶ 3), and made a number of positive statements about the future capabilities and production capacity of the Mooresboro Facility, (D.I. 1 at ¶¶ 3-4; *Jani* Action, D.I. 1 at ¶¶ 3-4). The Complaints allege, however, that thereafter (and unbeknownst to the investing public), the Mooresboro Facility was plagued with severe construction, engineering and operational defects. (D.I. 1 at ¶ 6; *Jani* Action, D.I. 1 at ¶ 6) Yet throughout the Class Period, Defendants are alleged to have provided operational updates that misstated the extent and seriousness of the facility's problems, provided misleading zinc production figures and failed to disclose cash and revenue shortfalls that threatened the Company's ability to pay its creditors and to complete the facility's ramp-up. (D.I. 1 at ¶ 7; *Jani* Action, D.I. 1 at ¶ 7)

It is alleged that through 2014 and into early 2015, the Company's stock thus traded at an artificially inflated price. (D.I. 1 at ¶ 8; *Jani* Action, D.I. 1 at ¶ 8) The Company proceeded forward with a January 2015 Horsehead stock offering (offering 5.75 million shares of its common stock at $12.75 per share, and generating $73 million in gross offering proceeds), despite allegedly making similarly false and misleading disclosures in the relevant registration

3

statement. (D.I. 1 at ¶ 9; *Jani* Action, D.I. 1 at ¶ 9). The Complaints allege that only thereafter, in a series of partial disclosures, did the Company reveal various production problems at the Mooresboro Facility. (D.I. 1 at ¶ 10; *Jani* Action, D.I. 1 at ¶ 10) At the same time, however, certain Defendants continued to make allegedly false and misleading positive statements about the Company's ability to address these issues and to grow in the future. (*Id.*)

By January 2016, the Company had seen its corporate debt downgraded, and it had failed to make a $1.8 million interest payment to creditors. (D.I. 1 at ¶ 11; *Jani* Action, D.I. 1 at ¶ 11) Then on January 22, 2016, the Company announced that it was idling the Mooresboro Facility. (D.I. 1 at ¶ 12; *Jani* Action, D.I. 1 at ¶ 12) On February 2, 2016, the Company announced that it had initiated bankruptcy proceedings under Chapter 11 of the U.S. Bankruptcy Code. (D.I. 1 at ¶ 13; *Jani* Action, D.I. 1 at ¶ 13) And in a bankruptcy filing on that same day, the Company made additional disclosures about the significant issues that plagued the Mooresboro Facility, stating that it would take approximately $82 million in funds over two years to get the facility back on track. (*Id.*)[3]

The Complaints allege that as a result of the Defendants' false statements, Horsehead common stock traded at an artificially inflated price during the Class Period, but that after the above-referenced revelations were made public, Horsehead common stock plummeted, causing economic harm and damages to class members. (D.I. 1 at ¶ 15; *Jani* Action, D.I. 1 at ¶ 15) By February 2016, when trading in Horsehead stock was suspended, the stock was down to $0.08 per share in value, and is now said to be essentially worthless. (*Id.*)

---

[3]     The bankruptcy case is currently pending in the United States Bankruptcy Court for the District of Delaware. *In re Horsehead Holding Corp., et al.*, Case No. 16-10287-CSS (Bankr. D. Del.).

4

On June 21, 2016, Cook and Dyson and the Anackers each filed the instant motions. (D.I. 10, D.I. 13; *Jani* Action, D.I. 11)  Cook is a retired U.S. Army Master Sergeant and value investor who purchased Horsehead shares between July 2014 and January 2016.  (D.I. 25, ex. C at 2)  Dyson is a United Kingdom-based institutional investment manager that purchased Horsehead securities on behalf of its clients.  (D.I. 30, ex. A at ¶ 2)  The Anackers are a married couple, (D.I. 29 at 1), and are Horsehead shareholders, (D.I. 12, exs. B, C).

The motions were fully briefed as of July 18, 2016.  (D.I. 29, D.I. 30; *Jani* Action, D.I. 28, D.I. 29).  On July 29, 2016, Chief Judge Leonard P. Stark ordered that the cases be referred to this Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions.  (D.I. 31; *Jani* Action, D.I. 30)

## II.   DISCUSSION

Below the Court first briefly addresses Cook and Dyson's request that the two cases be consolidated.  Thereafter, the Court will take up the movants' competing requests to be designated as Lead Plaintiff and for their counsel to be designated as Lead Counsel and Liaison Counsel, respectively.

### A.   Consolidation

"If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions[.]" Fed. R. Civ. P. 42(a).  The Court has broad authority to consolidate actions for trial involving common questions of law or fact if, in its discretion, it finds that such consolidation would "facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964); *see also Resnik v. Woertz*, 774 F. Supp. 2d 614, 624-25 (D. Del. 2011).

Here Cook and Dyson argue that the two cases should be consolidated, and the Anackers do not oppose that request. (D.I. 13; D.I. 24 at 1 n.1)  All other movants had also sought consolidation. (*See supra* n.2)  And there can be no dispute that both cases involve common questions of law and fact.  Both actions were filed by Horsehead shareholders, and the respective Defendants in both actions are identical. (D.I. 1; *Jani* Action, D.I. 1)  Both Complaints allege violations of the same statutes and rules, and they both contain nearly identical factual allegations. (*Id.*)  For all of these reasons, the request for consolidation of the cases for all purposes shall be granted. *See, e.g., Resnik*, 774 F. Supp. 2d at 625.

### B.   Designation of Lead Plaintiff and of Lead Counsel and Liaison Counsel

#### 1.   Legal Standard

The Private Securities Litigation Reform Act of 1995 ("PSLRA") establishes that in any private action arising under the Exchange Act that is brought as a class action, the Court shall consider any motion made by a class member and shall appoint as lead plaintiff the member or members of the purported plaintiff class the Court determines to be the "most capable of adequately representing the interests of class members" (or, in other words, the "'most adequate plaintiff'"). 15 U.S.C. ¶ 78u-4(a)(3)(B)(i).  To do so, the Court engages in a two-step process. *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 63 F. Supp. 3d 394, 399 (D. Del. 2014); *Vandevelde v. China Nat. Gas, Inc.*, 277 F.R.D. 126, 131 (D. Del. 2011).

First, the Court must identify the presumptive lead plaintiff. *OFI Risk Arbitrages*, 63 F. Supp. 3d at 399; *Vandevelde*, 277 F.R.D. at 131.  Under the PSLRA, the presumptive lead plaintiff is the person or group that (1) "has either filed the complaint or made a motion" to serve as lead plaintiff; (2) "has the largest financial interest in the relief sought by the class" and (3)

"otherwise satisfies" the requirements of Federal Rule of Civil Procedure 23 ("Rule 23"). 15 U.S.C. ¶ 78u-4(a)(3)(B)(iii)(I)(aa)-(cc); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 399.

Second, the Court must determine whether the presumption has been rebutted. *OFI Risk Arbitrages*, 63 F. Supp. 3d at 399; *Vandevelde*, 277 F.R.D. at 131. The presumption may be rebutted by opposing parties "only upon proof by a member of the purported plaintiff class" that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or is "subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. ¶ 78u-4(a)(3)(B)(iii)(II)(aa)-(bb); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 399.

Once the most adequate plaintiff is determined by the Court, the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. ¶ 78u-4(a)(3)(B)(v); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 399. Both the selection of a lead plaintiff and the approval of lead counsel in a case like this are committed to the Court's discretion. *OFI Risk Arbitrages*, 63 F. Supp. 3d at 399; *Vandevelde*, 277 F.R.D. at 131.

## 2.    Discussion

### a.    **Presumptive Lead Plaintiff**

The threshold determination of the presumptive lead plaintiff "should be a product of the court's independent judgment[.]" *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 399. Below, the Court assesses the factors set out by the PSLRA that are relevant to that determination.

#### (1)    **Motion for Appointment**

The PSLRA requires that the presumptive lead plaintiff must have filed the complaint or

made a motion for appointment within 60 days of the publication of notice regarding the action. 15 U.S.C. § 78u–4(a)(3)(A)(i)(II).  Cook and Dyson, as well as the Anackers, have filed the requisite motions within the appropriate time frame.

### (2)    Largest Financial Interest

Next, the Court must make a determination as to which of the movants have "the largest financial interest in the relief sought by the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb); *see also Cendant*, 264 F.3d at 262.  Here, it is undisputed that, when one considers Cook's and Dyson's holdings together, they have the largest financial interest in the suits.  (*See* D.I. 15 at 6; D.I. 24 at 1, 5-6 (Anackers acknowledging that Cook and Dyson together possess a larger financial interest in the litigation than they do))  But for the sake of completeness, below the Court will briefly discuss why this is the case.

To identify the movants with the largest financial interest, the Court "should consider, among other things:  (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs." *Cendant*, 264 F.3d at 262 (citations omitted); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 400.  Courts in this Circuit have afforded the third factor the most weight. *See Roby v. Ocean Power Techs., Inc.*, Civil Action No. 14-cv-3799 (FLW) (LHG), 2015 WL 1334320, at *5 (D.N.J. Mar. 17, 2015) (citing cases).

As to that third factor, the record demonstrates that Cook and Dyson, together, have larger losses than the Anackers.  Courts employ multiple methods to calculate loss in this context. *See OFI Risk Arbitrages*, 63 F. Supp. 3d at 400 n.1.  Here, the Court will use the "First-In-First-Out" ("FIFO") and "Last-In-First-Out" ("LIFO") methods, as well as the "*Dura* method"

(which excludes losses suffered when shares purchased at an inflated price are sold before a relevant misrepresentation is disclosed). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005); *OFI Risk Arbitrages*, 63 F. Supp. 3d at 400. Regardless of which method the Court looks to, Cook and Dyson's loss is the more substantial.

Between May 21, 2014 and February 2, 2016, Cook and Dyson suffered combined FIFO/LIFO losses of $453,447.10. (D.I. 23-1, ex. A at 1-4) During the same period, the Anackers' total LIFO/FIFO losses were approximately $244,976.90.[4] (*Id.* at 6; *see also* D.I. 11 at 5; D.I. 12, ex. B) Cook and Dyson's combined *Dura* losses are $83,918, while the Anackers' losses in that regard are $42,407. (D.I. 23-1, ex. B at 2-3, 7-8)

Thus, Cook and Dyson have the largest financial interest in this case.[5]

### (3)   Rule 23 Requirements

To determine whether the movants with the largest financial interest otherwise satisfy the requirements of Rule 23, the Court's inquiry "need not be extensive." *Cendant*, 264 F.3d at 264; *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 401. At this threshold stage, the court need only assess whether "movants have stated a *prima facie* case of typicality and adequacy[,]" taking into account "the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted." *Cendant*, 264 F.3d at 264. In making this

---

[4]     The Anackers' loss chart actually indicates a slightly smaller loss of $239,600.74. (D.I. 12, ex. B) This discrepancy does not affect the Court's analysis here, as this version of the Anackers' alleged losses are less than those of Cook and Dyson in any event.

[5]     In their briefs, the parties do not discuss other factors that a court may look to in determining who has the largest financial interest in a case (such as the number of shares purchased during the putative class period, or the total net funds expended during the class period). For that reason, the Court focuses here exclusively on the respective losses suffered by the competing plaintiffs.

determination, the Court "should apply traditional Rule 23 principles." *Id.* at 264-65.

With regard to typicality, the Court considers whether Cook and Dyson's circumstances "'are markedly different'" from the claims of the class. *Id.* at 265 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988)). With regard to adequacy, the Court examines whether Cook and Dyson have "'the ability and incentive to represent the claims of the class vigorously, [whether they have] obtained adequate counsel, and [whether] there is [a] conflict between [their] claims and those asserted on behalf of the class.'" *Id.* (quoting *Hassine*, 846 F.2d at 179). Whether the movants have "obtained adequate counsel" depends in part on "whether selected counsel is competent and the retainer agreement is reasonable." *OFI Risk Arbitrages*, 63 F. Supp. 3d at 401 (citing *Cendant*, 264 F.3d at 265).

As to typicality, it appears that Cook and Dyson's claims and legal theories are not "markedly different" from those advanced by the putative class. Like the class, Cook and Dyson allege that Defendants "violated the Exchange Act by making what they knew or should have known were false or misleading statements of material facts concerning Horsehead[.]" (D.I. 15 at 7) Like all of the class members, Cook and Dyson "purchased shares of Horsehead during the Class Period in reliance on defendants' alleged misstatements and omissions and were damaged thereby." *Id.* Their claims are based on the same statutes, rules, and legal theory, and arise from the same course of conduct (alleged fraudulent misrepresentations by Defendants) as the class claims. This is more than sufficient to establish typicality. *Cf. OFI Risk Arbitrages,* 63 F. Supp. 3d at 401; *Vandevelde*, 277 F.R.D. at 132.

The pleadings and Cook and Dyson's application also make out a *prima facie* case of

adequacy.[6]  First, they have demonstrated that they have "the ability and incentive" to represent

the class "vigorously."  *Cendant*, 264 F.3d at 265 (internal quotation marks and citation omitted).

Both Cook and Dyson represent that they have substantial experience in the stock market.  (D.I.

15, ex. D at ¶¶ 2-3)  Next, both have demonstrated an understanding that they must undertake

significant efforts in order to stay abreast of developments throughout the litigation.  (*Id.* at ¶ 5)

Additionally, as was previously noted, Cook and Dyson each individually have a substantial

financial interest in the litigation (and one that, taken together, is more substantial than other

plaintiffs of which the Court is aware).  (*Id.*, ex. B; D.I. 23-1, exs. A-B)  Further, Cook and

Dyson's application is strengthened by the PSLRA's preference for institutional investors (like

Dyson) as lead plaintiff.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321

(2007); *Cendant*, 264 F.3d at 244; *In re FleetBoston Fin. Corp. Sec. Litig.*, 253 F.R.D. 315, 335

n.21 (D.N.J. 2008).  As an institutional investor, Dyson seems to be well-situated to "adequately

manage and direct this litigation[.]"  *OFI Risk Arbitrages*, 63 F. Supp. 3d at 402.

It is not apparent on the face of Cook and Dyson's submissions that there are any

"conflicts between [these] movants and the class[.]"  *OFI Risk Arbitrages*, 63 F. Supp. 3d at 401.

And it is not disputed, as will be discussed further below, that Cook and Dyson have "obtained

adequate counsel[.]"  *Hassine*, 846 F.2d at 179.

There is an additional factor that the Court must consider here in assessing the *prima*

*facie* case as to adequacy.  In *In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001), the

---

[6]     The Anackers make several arguments as to why Cook and Dyson would not be
adequate representatives of the putative class.  (*See* D.I. 24 at 9-14; D.I. 29 at 2-5)  Because these
arguments are not plain from the face of the pleadings or Cook and Dyson's application, the
Court will address them in the "Rebuttals" section below.  *See Cendant*, 264 F.3d at 263-64.

United States Court of Appeals for the Third Circuit explained that a court's initial inquiry as to adequacy should—in cases where a proposed lead plaintiff is a "group rather than an individual person or entity"—assess whether the group was constituted in a manner that "would preclude [them] from fulfilling the tasks assigned to a lead plaintiff[.]" *Cendant*, 264 F.3d at 266.

As an initial matter, the Court notes that the PSLRA does not preclude "a group of 'unrelated individuals' from serving as a lead plaintiff." *Id.* (citations omitted); *see also* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)); *Janbay v. Canadian Solar, Inc.*, 272 F.R.D. 112, 119 (S.D.N.Y. 2010); *Cook v. Atossa Genetics, Inc.*, No. C13-1836-RSM, 2014 WL 585870, at *6 (W.D. Wash. Feb. 14, 2014). With that said, courts are nevertheless "skeptical of such arrangements when they are the product of an artificial grouping designed merely to qualify as lead plaintiff under the PSLRA." *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621 (S.D.N.Y. 2015). Proposed lead plaintiff groups must therefore "demonstrate their ability to function as a cohesive and independent unit to protect the interests of the class." *Id.* at 622. "Relevant considerations include whether the group's members have a pre-existing relationship, whether they have cooperated effectively thus far, and whether they have a coherent plan for dividing responsibilities, resolving conflicts, and managing the litigation." *Id.* (citing *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008)).

Consideration of such factors indicates that Cook and Dyson, even though an unrelated group, can still adequately protect the class's interests. For one thing, they are not merely two unfamiliar parties selected by counsel, whose only other connection stems from their common ownership of Horsehead stock. Instead, Cook and Dyson both worked toward the same end in the Horsehead bankruptcy proceeding, where they each vocally supported the formation of an

equity committee. (D.I. 30 at 5)  And both state that they were aware of each other before the filing of their motion, and that they had earlier corresponded with each other in connection with monitoring their respective Horsehead investments.  (D.I. 15, ex. D at ¶ 9)

Moreover, it is also notable that although they are a "group," Cook and Dyson are the smallest type of "group" possible.  As compared to proposed groups of three, four, five or more, a two-person/entity group should have an easier time in coordinating their work as lead plaintiff. *See Janbay*, 272 F.R.D. at 119 ("A group consisting of persons that have no pre-litigation relationship may be acceptable as a lead plaintiff candidate so long as the group is *relatively small and therefore presumptively cohesive*.") (emphasis added) (citation omitted).  A small group such as this one is "more likely to diligently monitor counsel, and more likely to make consensus decisions that protect the interests of absent class members, rather than simply protecting the financial interests of a single individual." *In re Molycorp, Inc. Sec. Litig.*, Civil Action No. 12-cv-0292-WJM-KMT, 2012 U.S. Dist. LEXIS 89191, at *10 (D. Colo. May 29, 2012) (citing *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998)).

### (4)    Conclusion

Cook and Dyson have the largest financial interest and otherwise appear to satisfy the requirements of Rule 23.  They are therefore the presumptive Lead Plaintiff in these actions.  The Court will now address the arguments offered by the Anackers in an attempt to rebut the presumption.

### b.    Rebuttals

The Anackers make three arguments as to why they have rebutted Cook and Dyson's *prima facie* case of adequacy.  *See Cendant*, 264 F.3d at 263-64 ("[A]rguments by members of

13

the purported plaintiff class as to why [the movant with the largest financial loss does not satisfy

the typicality and adequacy requirements] should be considered *only* in the context of assessing

whether the presumption has been rebutted.") (emphasis in original).  First, they assert that Cook

and Dyson took positions in the Horsehead bankruptcy proceeding that contradict the allegations

in the respective Complaints here.  (D.I. 24 at 6; *see also id.* at 11-13; D.I. 29 at 3-4)  Second, the

Anackers argue that the grouping of Cook and Dyson is improper.  (D.I. 24 at 7-11; D.I. 29 at 2-

3)  And third, they claim that Dyson lacks standing to represent the interests of the class.  (D.I. 24

at 13-14; D.I. 29 at 4-5)  The Court will address each of these arguments in turn.

### (1)      Positions Taken in Horsehead's Bankruptcy Proceeding

The Anackers' first rebuttal argument is that Cook and Dyson have taken positions with

regard to Horsehead's bankruptcy proceeding that are inconsistent with the allegations in the

Complaints in this case.  Specifically, they point to statements that Cook and Dyson made in

letters sent to the U.S. Bankruptcy Court in support of the formation of an equity committee.  In

those letters, *inter alia*, Cook and Dyson indicated their agreement with certain prior statements

of the Company to the effect that:  (1) the Company, at the time of Cook and Dyson's letters, still

had significant value and (2) if the approximately $82 million investment was made in the

Mooresboro Facility, then the facility would produce significant value for the Company going

forward.  (*See* D.I. 25, ex. A at 8 (motion of Horsehead shareholder Guy Spier, suggesting that

Horsehead's value is "in excess of $2 billion"); *id.*, ex. B at 3 (motion of Horsehead shareholder

Phil Town, stating that the Company has a value of over $1 billion, and crediting Company

statements to the effect that with the $82 million investment, renovations of the Mooresboro

Facility could be completed in 12-18 months and would produce EBITDA of $150-200 million

per year, all of which could raise the Company's market value to $2 billion); *id.*, ex. C (Cook

"supporting and agreeing with" Mr. Spier's and Mr. Town's motions); *id.*, ex. D at 2-3 (Dyson

stating its support of Mr. Spier's and Mr. Town's motions, and noting its determination that "the

intrinsic value of [Horsehead is] far in excess of book value . . ." and that the Mooresboro

Facility will eventually be able to "reach close to 100% name plate capacity"))  Paragraph 6 of

the Complaints, however, makes negative suggestions about the Mooresboro Facility's worth and

that facility's overall impact on the Company's future:

> Unbeknownst to the investing public, the Mooresboro Facility was
> plagued with severe construction, engineering and operational
> defects. . .  The Mooresboro Facility relied on new and unproven
> technologies, and from the commencement of its operations it
> experienced catastrophic setbacks that had no clear solution and
> would require a substantial investment of time and money and
> would undermine the feasibility of the facility's zinc production
> process and, ultimately, threaten the Company's ability to operate
> as a going concern.

(D.I. 1 at ¶ 6; *Jani* Action, D.I. 1 at ¶ 6; *see, e.g.*, D.I. 24 at 6 (Anackers citing to this paragraph

as one in conflict with Cook and Dyson's statements))

     The Anackers therefore argue that Cook and Dyson's positions in the bankruptcy

proceeding "are diametrically opposed to allegations at the heart of this case." (D.I. 29 at 4)

Essentially, the Anackers assert, Cook and Dyson "have taken a position that defendants['] Class

Period statements [about the Company's worth and the Mooresboro Facility's value] were *true*,

whereas the central allegation in this fraud case is that defendants' Class Period statements were

*false and misleading.*" (D.I. 24 at 6 (emphasis in original))  According to the Anackers, this

presents a "clear conflict [that] would distract from the lead plaintiffs' obligations to protect and

further the interests of the class." (*Id.*)

The Court does not agree that there is a manifest conflict here.  It so concludes for a few

reasons.

First, even if Cook and Dyson do believe that (for example) the Mooresboro Facility has

real future value and can be productive, this does not necessarily conflict with the excerpted

allegations from the Complaints set out above.  (*Id.* at 6, 12)  It could be the case that, as the

Complaints allege, the Mooresboro Facility "relied on new and unproven technologies" that

required "a significant investment of time and money, and that "threaten[ed]" Horsehead's

future, (D.I. 1 at ¶ 6; *Jani* Action, D.I. 1 at ¶ 6), but that the facility nevertheless has the potential

for future success, were Horsehead to spend significant monies in order to address the facility's

many problems.[7]  Additionally, even if Cook and Dyson were accepting as credible certain

statements that the Company made as to its future valuation, this would not necessarily put Cook

or Dyson in conflict with the Complaints.  To be sure, a main theme of the Complaints is that

Horsehead's executives have made many allegedly false or misleading statements in the past.

But this does not mean that Cook and Dyson must assert that *every statement* the Company has

---

[7]       Perhaps the statement in Cook's or Dyson's letters that is the hardest to square
with the allegations in paragraph 6 of the Complaints is the assertion in Dyson's letter that
"Horsehead was using similar technology to existing manufacturing sites throughout the world
[at the Mooresboro Facility, and] that once the inevitable teething problems that always occur"
were fixed there, the Mooresboro Facility "would be able to reach close to 100% name plate
capacity." (D.I. 25, ex. D at 3)  This seems at least potentially at odds with the Complaints'
allegation that the Mooresboro Facility had "relied on new and unproven technologies[.]" (D.I. 1
at ¶ 6; *Jani* Action, D.I. 1 at ¶ 6)  But given how broad both statements are, and how little
additional explanation the Anackers provide as to the nature of this asserted conflict, any
potential inconsistencies are not clear enough to warrant the rebuttal of the presumption.  It might
be, for example, that much of the technology that Horsehead used at the facility *was* similar to
that used by existing manufacturing sites, while a subset of the Mooresboro Facility's equipment
was "new and unproven."  At any rate, again, there simply is not enough information provided by
the Anackers to conclude that a real conflict exists here.

made (particularly as to valuation statements made at the very end of the Class Period, when the Company filed for bankruptcy) is false or misleading. Lead plaintiffs are expected to be forceful advocates, but that does not mean that they need be without nuance.

Second, in a number of ways, the letters that Cook and Dyson submitted in the bankruptcy proceeding are well-aligned with the Complaints' allegations. As Cook and Dyson note, for example, "the equity committee appointment requests [made by Mr. Spier and Mr. Town, and championed by Cook and Dyson] actually acknowledge and support the contention that Defendants committed securities 'fraud in this case.'" (D.I. 30 at 3 (quoting D.I. 25, ex. A at 12); *see also* D.I. 25, ex. B at 4) Moreover, Cook's letter in support of those requests notes that Horsehead filed for bankruptcy "[o]ut of no where" and states that "Horsehead failed to keep shareholders apprised" of ongoing issues with the company. (D.I. 25, ex. C at 3) Similarly, Dyson's supportive letter discusses how Horsehead's capital shortfall came "as a great surprise given management[']s representations" and notes how Horsehead's management has "fall[en] short of [its] duties[.]" (D.I. 25, ex. D at 3)

Third, Cook and Dyson's letters also show their commitment to being careful stewards of their investments in Horsehead. Cook, for example, notes that he purchased his shares "with the intent of building a long-term position in Horsehead." (*Id.*, ex. C at 2) Dyson states that before investing, it "performed a great deal of due diligence" on the Company. (*Id.*, ex. D at 2) These letters, filed in the bankruptcy proceeding, suggest that Cook and Dyson are long-term investors who care about their stake in the Company—the very kind of investors who would presumably make for a responsible lead plaintiff.

And fourth, it is worth reflecting on how little evidence the Anackers have offered here as

17

to proof of a conflict. "The Third Circuit has stressed that the [PSLRA] requires more than mere assertions in order to rebut the presumptive lead plaintiffs' status." *OFI Risk Arbitrages*, 63 F. Supp. 3d at 402 (citing *Cendant*, 264 F.3d at 270). Instead, it is the Anackers' burden to put forward "actual proof" that Cook and Dyson are inadequate representatives of the class. *Cendant*, 264 F.3d at 269. And yet, in making this argument about conflicting statements, the Anackers are really citing to but a single paragraph (paragraph 6) of the Complaints as assertedly being at odds with other statements that Cook and Dyson have made. (D.I. 24 at 6, 11-13; D.I. 29 at 4) This is hardly a robust presentation as to conflicts.

For all of these reasons, the alleged conflict at issue cannot amount to a basis for rebutting the presumption that Cook and Dyson should serve as Lead Plaintiff.

### (2)     Whether Cook and Dyson Amount to an Improper Grouping

The Anackers next argue that Cook and Dyson are an improper group under the PSLRA. They assert that the grouping was little more than an "attempt to manufacture relatedness" and that, in reality, Cook and Dyson's "only relatedness is that they share the same counsel." (D.I. 24 at 9) The Anackers charge that Cook and Dyson "have no pre-existing relationship[,]" (*id.* at 10), and that "the only plausible explanation for [their grouping], despite virtually no prior connection, is a marriage of convenience to serve the interests of their counsel to gain control of the litigation[,]" (D.I. 29 at 3).

While unrelated groups may be considered together as lead plaintiff under the PSLRA, there are circumstances where such groups may not be appropriate:

> If, for example, a court were to determine that the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it

> could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner. *See, e.g.*, *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307–08 (S.D.N.Y. 2001) (refusing to appoint as lead plaintiff a group that, in the court's view, was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel'").

*Cendant*, 264 F.3d at 267. "Allowing unrelated plaintiffs to band together in order to manufacture a larger financial interest" would not be in line with the goals of the PSLRA. *Petrobras*, 104 F. Supp. 3d at 621. Indeed, in drafting the PSLRA, Congress mandated that the lead plaintiff be appointed on the basis of financial interest so as to "transfer primary control of private securities litigation from lawyers to investors." S. REP. NO. 104-98, at 6 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 679, 685. If unrelated plaintiffs form groups solely for the appearance of a larger financial interest, "[i]t ensures that the lawyers . . . are the true drivers of the litigation. Moreover, it creates problems of coordination, risks duplication of effort, and reduces the incentive of any individual group member to carry out its lead plaintiff duties to the fullest extent." *Petrobras*, 104 F.3d at 621-22.

With all of this in mind, the Court finds that here, there is insufficient evidence that Cook and Dyson have been "cobbled together" in the manner discussed in the cases above. For one thing, although the Anackers assert that Cook and Dyson's "only relatedness" is that they share counsel, (D.I. 24 at 9), the Court has already noted that the two plaintiffs have other connections. As was discussed above in Section II.B.2.a.(3), Cook and Dyson worked toward the same end in Horsehead's bankruptcy proceeding. Moreover, in a joint declaration submitted to the Court, Cook and Dyson explain that they had some (perhaps small) form of a preexisting relationship

19

before their motion was filed. (*See* D.I. 15, ex. D at ¶ 9 ("We were each previously aware of one another before deciding to make this motion and corresponded with one another about Horsehead in connection with monitoring our respective Horsehead investments."))

In that same declaration, Cook and Dyson also acknowledged the responsibilities of serving as a lead plaintiff, and demonstrated an understanding of how they must fulfill that role, such as by staying informed, functioning cohesively, and communicating regularly with each other and with counsel. (*See id.* at ¶¶ 4-9)  Other courts have relied on similar declarations to find that proposed groups will be able to function as a lead plaintiff—particularly when the proposed plaintiffs provided some details on how they will work together. *See, e.g.*, *Molycorp*, 2012 U.S. Dist. LEXIS 89191, at *8-9; *In re Bank of Am. Corp.*, No. MDL 09-02014 JSW, 2009 WL 2710413, at *3 (N.D. Cal. Aug. 26, 2009); *Cook*, 2014 WL 585870, at *6; *In re Nature's Sunshine Prods., Inc.*, No. 2:06-CV-267 TS, 2006 WL 2380965, at *1 (D. Utah Aug. 16, 2006).[8]

Lastly, the Court notes that even if Cook and Dyson were not considered as a group, Dyson's financial loss would still outstrip the Anackers' combined loss. (D.I. 30 at 6; D.I. 23-1, exs. A-B)  This also eases any concerns about the two plaintiffs having come together solely due to manipulation by their counsel. *See Hodges v. Akeena Solar, Inc.*, 263 F.R.D. 528, 533 (N.D. Cal. 2009); *Barnet v. Elan Corp.*, 236 F.R.D. 158, 162 (S.D.N.Y. 2005).  Since Dyson would have been the shareholder with the largest financial loss regardless of Cook's participation in the group, this suggests that other considerations (beyond merely demonstrating the largest loss)

---

[8]    The Anackers note, and the Court acknowledges, that some of the statements in Cook and Dyson's declaration (as to how they came together, and how they will work together) are vague. (D.I. 24 at 10)  But while it could have been more specific, the declaration at least demonstrates some forethought by Cook and Dyson about what is required of an adequate lead plaintiff, which helps their cause here.

drove Cook and Dyson to band together.

For all of these reasons, the Court finds that the Anackers have not shown that Cook and Dyson are an improper grouping under the PSLRA.

### 3.      Whether Dyson Lacks Standing

The Anackers' last argument for rebutting the presumption relates to whether Dyson has standing. To achieve standing, a plaintiff must satisfy the case and controversy requirements of Article III at the time the complaint is filed and also must satisfy certain prudential requirements. *Nichols v. Markell*, Civil Action No. 12-777-CJB, 2014 WL 1509780, at *6 (D. Del. Apr. 17, 2014) (citations omitted). Article III standing requires, *inter alia*, a plaintiff to have suffered an "injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.]" *Id.* at *8.

Before the Supreme Court's decision in *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008), district courts in the Third Circuit had found that investment advisors had standing to bring suits on behalf of their clients. *See, e.g., EZRA Charitable Trust v. Rent-Way, Inc.*, 136 F. Supp. 2d 435, 442-43 (W.D. Pa. 2001) (citing cases). Then in *Sprint*, the Supreme Court of the United States held that "an assignee of a legal claim for money owed has standing to purse that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor." *Sprint*, 554 U.S. at 271. The *Sprint* Court found that such assignees satisfy the "injury-in-fact" requirement, despite not having suffered a direct injury; in effect, an assignment transfers the assignor's claims to the assignee. *See id.* at 286. Thereafter, in *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit interpreted *Sprint* to

indicate that a plaintiff investment advisor attempting to bring suit on behalf of its client must "have legal title to, or a property interest in," its client's claim in order to satisfy the "injury in fact" requirement. *Huff*, 549 F.3d at 108. The *Huff* Court held that an investment advisor did not have standing to sue on behalf of its clients, even where: (1) it held a power of attorney authorizing it to bring the suit in question on its clients' behalf; and (2) it had full discretionary authority to make investment decisions for its clients. *Id.* at 109-11.

The Anackers claim that Dyson "appears to lack standing" based on the rationale of *Huff* because "there is no dispute that Dyson . . . is [simply] an investment manager managing private client portfolio on a discretionary basis." (D.I. 24 at 13-14) And yet, at this stage, it is the Anackers' burden, not Dyson's, "to show that standing will be a legitimate issue" so as to rebut the presumption that Cook and Dyson will be an adequate lead plaintiff. *OFI Risk Arbitrages*, 63 F. Supp. 3d at 403. In order to satisfy this burden, the Anackers must "come forward with some proof" of why Dyson is inadequate and is subject to a unique defense on standing grounds. *In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 151 (D. Del. 2005); *see also OFI Risk Arbitrages*, 63 F. Supp. 3d at 403.

Despite this, most of what the Anackers do here is suggest that it is *Dyson's burden* to produce evidence of standing; they fault Dyson for "not submitt[ing] any evidence [beyond] . . . conclusory assertions" to prove that it has suffered an injury in fact. (D.I. 24 at 14; *see also* D.I. 29 at 4) Apart from stating that Dyson is an investment manager, (D.I. 24 at 14 & n.8), the Anackers do not put forward any of their own "proof" as to what type of entity Dyson is, how it manages its client funds or what relationship it has with Horsehead stock.

For its part (and though it does not have the burden here), Dyson *has* submitted some

evidence on these issues.  In the previously-referenced joint declaration (filed on behalf of it and Cook), Dyson states that it "purchased" Horsehead shares and has "suffered substantial losses[.]" (D.I. 15, ex. D at ¶ 3)  Dyson also submitted a second declaration saying that it "manages investments on behalf of private clients . . . [and has] invested hundreds of thousands of dollars on behalf of its clients to purchase Horsehead securities, and suffered large losses as a result of the violations of the federal securities laws alleged in this action."  (D.I. 30, ex. A at ¶ 2)  This second declaration further asserts that, pursuant to its management agreement (which presumably operates under United Kingdom law), Dyson "has the right to initiate legal proceedings to protect investors' assets and to protect any right derived from them."  (*Id.* at ¶ 3)  Lastly, in its briefing, Dyson further claims that is "the equivalent of a trustee" in its relationship to its clients and their investments.  (D.I. 30 at 8)[9]

The Third Circuit has not addressed *Huff*, nor has it indicated whether it will follow *Huff*'s reasoning.  But for our purposes here, the Court assumes *arguendo* that it would.  *Cf. In re Herley Indus. Inc. Sec. Litig.*, Civil Action No. 06-2596, 2009 WL 3169888, at *5 (E.D. Pa. Sept. 30, 2009) ("While Second Circuit decisions are not binding authority, the Court finds *Huff* persuasive and will apply its reasoning to this case.").  Even if *Huff*'s rationale controlled, however, there would simply not be enough information of record here (as to how a United Kingdom-based entity like Dyson works with its clients, or what its relationship is with the Horsehead stock at issue) for the Court to determine that there is a legitimate claim of no injury-in-fact.  Nor could the Court determine that there is a legitimate claim that Dyson will not be

---

[9]      In *Huff*, the Second Circuit noted that "courts historically have permitted '[t]rustees [to] bring suits to benefit their trusts[.]'"  *Huff*, 549 F.3d at 109-10 (quoting *Sprint*, 128 S.Ct. at 2543).

found to have prudential standing. (*See* D.I. 30 at 8; *see also Huff*, 549 F. 3d at 109 (noting that there are "a few well-recognized, prudential exceptions to the 'injury-in-fact' requirement.")) *Huff* suggests that whether Dyson has a claim to prudential standing would depend on certain characteristics of Dyson's clients—such as their level of sophistication, or whether they could easily protect their own interests in the absence of Dyson's intervention. *Huff*, 549 F.3d at 110. Again, here the record before the Court on these issues is somewhere between sparse and non-existent.

All of these missing details could end up being important to the standing inquiry. *See OFI Risk Arbitrages*, 63 F. Supp. 3d at 404 (considering the specific structure of the proposed plaintiff's business in its assessment as to whether that plaintiff, a foreign asset manager, would have standing in a PSLRA case). On this record, the Court cannot say, for example, whether Dyson is analogous to a United States mutual fund or a trust, or whether it is more similar to a typical investment advisor. Such details and others could play a dispositive role in the standing inquiry. *Cf. OFI Risk Arbitrages*, 63 F. Supp. 3d at 402-05; *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 444 (S.D.N.Y. 2013) (finding that a mutual fund manager had standing to sue on behalf of a mutual fund based on the "close relationship, akin to that of trustee and beneficiary[]" of the entities); *Hufnagle v. Rino Int'l Corp.*, No. CV 10-8695-VBF (VBKx), 2011 WL 710704, at *5 (C.D. Cal. Feb. 14, 2011) (finding that plaintiff had standing based in part on the fact that it was "not [an] investment advisor, but a public investment company, comparable to a mutual fund in the United States."). At this stage, the Court must hold this lack of sufficient proof against the Anackers. *OFI Risk Arbitrages*, 63 F. Supp. 3d at 403.

Therefore, since there is insufficient proof of the merit of the "lack of standing" defense,

this defense cannot serve to rebut the presumption that Cook and Dyson would be an adequate

lead plaintiff.

### c.    Approval of Lead Counsel and Liaison Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the

court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v).  The

PSLRA "evidences a strong presumption in favor of approving a properly-selected lead

plaintiff's decisions as to counsel selection and counsel retention." *Cendant*, 264 F.3d at 276.

The Court's inquiry is limited to "whether the lead plaintiff's selection and agreement with

counsel are reasonable on their own terms." *Id.*  In making this determination, courts should

consider:

> (1) the quantum of legal experience and sophistication possessed
> by the lead plaintiff; (2) the manner in which the lead plaintiff
> chose what law firms to consider; (3) the process by which the lead
> plaintiff selected its final choice; (4) the qualifications and
> experience of counsel selected by the lead plaintiff; and (5) the
> evidence that the retainer agreement negotiated by the lead plaintiff
> was (or was not) the product of serious negotiations between the
> lead plaintiff and the prospective lead counsel.

*Id.*

Here, no party, including the Anackers, questions the reasonableness of Cook and

Dyson's selection of firms (Glancy Prongay & Murray LLP ("Glancy") as Lead Counsel and

Montgomery McCracken Walker & Rhoads LLP ("Montgomery") as Liaison Counsel).  Glancy

has significant experience with securities litigation and class actions, having successfully

prosecuted many such cases in federal and state courts throughout the country. (D.I. 15, ex. C at

1-5)  And there is no dispute that Montgomery has the requisite experience to serve in the

(largely administrative) role of Liaison Counsel. *See KBC Asset Mgmt. NV ex rel. Chemed Corp.*

25

*v. McNamara*, 78 F. Supp. 3d 599, 607 n.8 (D. Del. 2015).  In light of these facts, and the

PSLRA's "strong presumption" in favor of approving Cook and Dyson's choice of counsel, the

Court will do so here.

## III.   CONCLUSION

For the reasons set forth above, Cook and Dyson's motion is GRANTED, and the

Anackers' motion is DENIED.  The Court will separately enter an Order of Consolidation and

Appointment of Lead Plaintiff, Lead Counsel and Liaison Counsel.  That Order will largely

mirror the proposed Order put forward by the Horsehead Investor Group, (*Jani Action*, D.I. 18-

1), as that proposed Order appears to generally track the guidance from the *Manual for Complex

Litigation* (4th ed. 2011) and the content of other similar orders entered in cases of this kind.


Dated:  February 14, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

26