## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE HORSEHEAD HOLDING CORP. SECURITIES LITIGATION | Civil. Action No. 16-cv-292-LPS-CJB<br>Consolidated<br>CLASS ACTION |

### CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning themselves, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Horsehead Holding Corp. ("Horsehead" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, conference calls, and media reports issued by and/or disseminated by Horsehead; (c) review of pleadings and transcripts from Horsehead's bankruptcy; (d) interviews of witnesses; and (e) review of other publicly available information concerning Horsehead.

### NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired Horsehead securities between February 25, 2014 and February 2, 2016, inclusive (the "Class Period"). Plaintiffs seek to remedy Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Horsehead was the parent company of Horsehead Metal Products, LLC which owned and operated a zinc processing facility in Mooresboro, North Carolina (the facility is referred to as "Mooresboro" or the "Mooresboro Facility"). The Defendants are James M. Hensler, President and CEO during the Class Period, and Robert D. Scherich, Vice President and

CONSOLIDATED CLASS ACTION COMPLAINT

CFO during the Class Period. Horsehead would have been named as a Defendant but for its bankruptcy.

3.      Beginning in February 2014, Defendants misrepresented the level of testing that Horsehead had purportedly conducted at the Mooresboro Facility. Defendants misrepresented to the investing public that the Mooresboro Facility was tested satisfactorily and in May 2014 was made "ready" for zinc production (what was known as the "commissioning" phase of Mooresboro's operation). Once zinc production commenced, Defendants quickly realized that there were significant equipment deficiencies and bottlenecks at Mooresboro, which prevented it from ever getting to a "breakeven" point (where it generated as much revenue as it cost to run), let alone nameplate capacity[1] of 155,000 tons of zinc per year. As a result of the problems at Mooresboro that Defendants concealed, Horsehead was burning through cash – it cost approximately $8 million per month to run Mooresboro.

4.      Defendants decided to conceal known problems in an attempt to muddle through and hope the problems could be fixed later. Fixing Mooresboro's concealed issues up front would have required significant money and time that Horsehead did not have. Likewise, if Defendants had revealed the true problems at Mooresboro in 2014 and the first half of 2015 they would have jeopardized Horsehead's access to the capital markets as well as to commercial lines of credit. Thus, instead of revealing the true nature of these problems at the outset, Defendants concealed the true nature of Horsehead's problems from the public. Defendants knew that losing access to these financing sources could likely push Horsehead into bankruptcy, and they sought to forestall this outcome as long as possible.

---

[1] "Nameplate capacity" is the intended full-load sustained output of a facility.

CONSOLIDATED CLASS ACTION COMPLAINT

5.     Despite known issues at Mooresboro, Defendants not only falsely stated that it would get to nameplate capacity of 155,000 tons of zinc per year, they also repeatedly stated that Horsehead could expand to 170,000 or 175,000 tons without "significant additional investment," a claim that had no basis in fact, as even Defendant Hensler himself later admitted.

6.     One of Mooresboro's most significant bottlenecks was in Mooresboro's bleed treatment area, where water used in the production process at Mooresboro was treated to either be recycled back into the facility or released into a river. After the Mooresboro facility was opened, it soon became apparent (as detailed below, by at least the summer of 2014, if not earlier), that Mooresboro's bleed treatment area was too small in size. Upon information and belief, ultimately, this bottleneck, by itself, restricted Mooresboro to about 60% of nameplate capacity. Defendants either knew or were reckless in not knowing of the problems from the bleed treatment area from soon after Mooresboro's opening. As a result, Defendants also knew or were reckless in not knowing that a fix of this bleed treatment area would require significant additional investment. Nevertheless Defendants hid these facts from investors to protect Horsehead's financing options.

7.     Similarly, Mooresboro was designed with four clarifiers, which are large tanks where solid metals can be separated from a liquid mix of materials. Since Mooresboro's commissioning, one of the four clarifiers did not work at all, and another one had constant problems. This caused another bottleneck. Defendants knew or should have known that fixing or replacing the clarifiers would require significant additional investment. Again, Defendants hid this fact from investors to protect Horsehead's financing options.

8.     By making misrepresentations concerning the Mooresboro Facility, Defendants were able to buy some time and additional funding. First, Horsehead conducted a secondary

CONSOLIDATED CLASS ACTION COMPLAINT

offering in January 2015, through which Horsehead raised more than $70 million from unsuspecting investors. Later in the Class Period, Horsehead was able to secure and retain a credit facility from new lender Macquarie Bank Limited ("Macquarie") for up to $80 million, increasing potentially available credit by more than $30 million over the Company's previous credit facility. Throughout the Class Period, Defendants stated that they were keeping their options open concerning debt, equity, and/or credit financing. Accordingly, Defendants made misrepresentations about Mooresboro to ensure that these funding options remained available.

9.      Because the lines of credit Horsehead used were tied to a "borrowing base" which was based in large part on the value of the Mooresboro facility, it was all but certain that, unless Horsehead could fix Mooresboro's problems quickly, available credit would be reduced. In fact, beginning in September 2015, Macquarie (who only became Horsehead's lender two months earlier) quickly reduced Horsehead's available credit, and ultimately froze credit entirely. However, even as this was happening, Defendants concealed Macquarie's credit reductions from investors.

10.     Throughout the Class Period, Defendants repeatedly made misrepresentations regarding the Mooresboro Facility, including regarding the steps and the testing they had allegedly conducted to prepare Mooresboro, Mooresboro's readiness and functionality, as well as Mooresboro's potential maximum operating capacity. In truth, but unbeknownst to the investing public, the Mooresboro Facility was thrust into production without proper vetting, and as a result was plagued with deficiencies and could not process enough material to generate sufficient cash flow. At the same time, Defendants misrepresented the true financial health of the Company, and hid its serious financial problems.

11.     On May 8, 2015, July 2, 2015, September 11-14, 2015, and November 9, 2015,

CONSOLIDATED CLASS ACTION COMPLAINT

4

the truth of Defendants' misrepresentations was gradually revealed as Defendants issued statements containing partial corrective disclosures regarding the Mooresboro Facility, causing Horsehead's stock price to substantially decline and damaging Lead Plaintiffs and the Class thereby.

12.     Ultimately, on February 2, 2016, the Company filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware, and the Class members' Horsehead securities were rendered all but worthless. In the bankruptcy, an even clearer picture of Defendants' misrepresentations regarding the Mooresboro Facility emerged.

13.     On February 2, 2016, in his affidavit in support of Horsehead's bankruptcy, Defendant Hensler made clear that design and operational difficulties with the Mooresboro Facility were a substantial factor in the Company's demise:

> The Debtors began construction of the Mooresboro Facility in September 2011, which was designed to employ state-of-the-art zinc processing technology. However, the Mooresboro Facility has been plagued by significant operational challenges and cost overruns, and has operated at levels significantly below its capacity. These challenges have had a corresponding impact on the Debtors' financial position.

14.     Defendant Hensler further elaborated on these challenges in ¶ 43 of his affidavit:

> The newly-constructed [Mooresboro] facility already has required replacements of faulty and poor-quality anodes, pumps, and filters. As a result, costs associated with the Mooresboro Facility significantly exceeded the estimated expenses. To date, the Debtors have invested approximately $550 million for the construction, development, and operation of the Mooresboro Facility. The Debtors expect that at full capacity, the Mooresboro Facility will be capable of producing over 155,000 tons of zinc per year, and up to 170,000 tons per year with certain modifications. However, during the third quarter of 2015, the Mooresboro Facility only produced approximately 9,700 tons of zinc, at an annualized rate of approximately 38,800 tons per year. The Debtors presently anticipate that approximately 12 to 18 months may be required to implement engineering and operational repairs or modifications necessary to bring the Mooresboro Facility up to full capacity.

CONSOLIDATED CLASS ACTION COMPLAINT

15.     On April 14, 2016, Horsehead further elaborated on these issues in its first Disclosure Statement:

> Since construction began in 2011, the Debtors have experienced a number of significant operational, production, and equipment issues associated with the ramp-up of the Mooresboro Facility. For example, it was discovered that the bleed treatment section of the facility was undersized causing a bottleneck to production, electrolyte quality deteriorated causing significant corrosion to electrodes in the cell house due, in part, to poor control of solids carryover into the solvent extraction units combined with equipment issues related to faulty organic filters and the HCl regeneration units, and several pumps and lines were improperly designed for the intended application.

16.     In the Disclosure Statement, Horsehead estimated that the Mooresboro Facility would require an additional $117 million in capital expenditures to bring it to full operational capacity. In the bankruptcy proceedings, Horsehead estimated that, absent these repairs, the Mooresboro Facility had a maximum liquidation value of $27 million.

17.     In his ruling confirming Horsehead's bankruptcy plan, the Honorable Christopher S. Sontchi of the Bankruptcy Court likewise found that the Mooresboro Facility needed $85-$100 million in additional capital expenditures.

18.     Thus, far from being on track throughout the Class Period, as Defendants represented, it was never on track and even months after the Class Period the Mooresboro Facility continued to suffer from failed execution and flaws which Defendants' Class Period misrepresentations and omissions concealed.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

CONSOLIDATED CLASS ACTION COMPLAINT

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

23.     Lead Plaintiff Raymond Cook purchased Horsehead shares during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein, as detailed in his certification filed with the Court.

24.     Lead Plaintiff Dyson Capital Management Ltd. ("Dyson") purchased Horsehead shares during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein, as detailed in its certification filed with the Court.

25.     Additional Plaintiff Ross O. Swimmer purchased Horsehead 3.8% notes, maturing on July 1, 2017 during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Cook and Dyson are referred to herein as "Lead Plaintiffs." Lead Plaintiffs and Swimmer are referred to herein as "Plaintiffs."

CONSOLIDATED CLASS ACTION COMPLAINT

27.     Defendant James M. Hensler was, at all relevant times, President and Chief Executive Officer ("CEO") of Horsehead. During the Class Period, Hensler signed numerous SEC filings mentioned herein, and participated on each investor conference call.

28.     Defendant Robert D. Scherich was, at all relevant times, Vice President and Chief Financial Officer ("CFO") of Horsehead. During the Class Period, Scherich signed numerous SEC filings mentioned herein, and participated on each investor conference call.

29.     Defendants Hensler and Scherich (the "Defendants" or "Individual Defendants."), because of their positions with the Company, possessed the power and authority to control the contents of Horsehead's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

30.     Nonparty Horsehead filed for bankruptcy on February 2, 2016 in this district. In late August 2016, Judge Sontchi held a four-day confirmation hearing where he ultimately approved Horsehead's proffered bankruptcy plan (the "Bankruptcy Trial").

CONSOLIDATED CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

### A.    Background

31.    Horsehead was the parent company of (i) Horsehead Corporation, a producer of zinc metal and recycler of electric arc furnace dust, (ii) the International Metals Reclamation Company, LLC, a recycler of nickel-bearing wastes and nickel-cadmium batteries in North America, and (iii) Zochem Inc., a leading producer of zinc oxide in North America. Horsehead Corporation was also the parent company of Horsehead Metal Products, LLC which owns the Mooresboro Facility in North Carolina.

32.    Horsehead was a recycler of a product called electric arc furnace dust, which contains zinc. Horsehead took this product and converted it into Waelz oxide, which contains approximately 60% zinc, as well as other metals and minerals.

33.    Mooresboro is a facility that takes the raw material Waelz oxide, and extracts metals, including zinc, silver, cadmium, and other minerals. It does this using several processes including physical, chemical, and electrolytic processes.

34.    The following diagram demonstrates the flow of materials through Mooresboro:

CONSOLIDATED CLASS ACTION COMPLAINT



35.     As demonstrated in the diagram, after the Waelz oxide is brought in by rail, it enters the wash/leach/naturalization and skimming facility. The initial process in Mooresboro was Waelz oxide skimming. In this process, the raw material is put in a pump where slurry (i.e. a semi-liquid zinc soup) is made by adding water. Leaching tanks then removed impurities.

36.     After this process, this material is brought to one of four clarifiers. As Defendant Hensler testified at the Bankruptcy Trial, a clarifier is "just a big tank that allows solids to settle out, and the overflow is supposed to be clear so that it ends up going through this next step in the process." Lead, silver, and a form of zinc (Zinc A) are obtained from these solids.

37.     Liquid material from the wash/leach/naturalization and clarifier facilities is also sent to the solvent extraction (or "SX") facility, where it is eventually sent for a process called

CONSOLIDATED CLASS ACTION COMPLAINT

10

electrowinning. This process entails using anodes and cathodes to send electrical current through the liquid, in a facility called a cell house. This causes zinc to plate onto the cathodes. This zinc is then removed from the cathodes, and melted and casted.

38.     These processes use a significant amount of water. In fact, the location of the Mooresboro facility was chosen because of its proximity to the Broad River, where it can both use water from and discharge water into the river. The bleed treatment area is one of the final stages that water passes through before it is discharged into the river. Some water from the bleed treatment area is also recycled back into the plant to be used in the solvent extraction process. Accordingly, if the bleed treatment area produces contaminated water, this could not only lead to pollution problems, but the contaminated water that is recycled back to the plant could cause problems for all the processes in the plant that use the water, including the solvent extraction processes.

### B.     Safety and Cost Issues Necessitated the Development of the Mooresboro Facility

39.     In July 2010, an explosion occurred at the Company's then-primary zinc processing facility in Monaca, Pennsylvania, which, according to Defendant Hensler, had been built in 1931 (the "Monaca Facility"). The Company described the explosion and its impact in subsequent SEC filings, including its Form 10-Q for the second quarter of 2011:

> On July 22, 2010, an explosion occurred at the Company's Monaca, PA facility which resulted in the complete shutdown of the plant's refinery operations. Each of the 10 columns used to produce zinc oxide and refined zinc metal in the refining facility was rebuilt. Production operations resumed late in 2010 as these repairs were completed. The Company pursued recovery of the cost of repairs, lost profit and other losses from its zinc oxide and refined metal production during the rebuilding period, subject to customary deductibles, under the Company's business interruption and property insurance. As of March 31, 2011, the Company incurred $17,902[000] in clean-up, repair and other costs associated with the explosion. The Company submitted a claim totaling $33,831[000] and

CONSOLIDATED CLASS ACTION COMPLAINT

reached a final settlement in the amount of $29,614[000] in the first quarter of 2011.

40.     Thus, the Monaca Facility incident caused the loss of over $4.2 million in unreimbursed direct operating costs, not to mention legal, regulatory, and reputational exposure. Unsurprisingly, given the July 2010 explosion, acquiring or building a new facility became a significant priority for the Company.

41.     According to Defendant Hensler's testimony at the Bankruptcy Trial, following a November 2010 meeting of Horsehead's board of directors:

> We asked them if we could spend an amount of about five million dollars to begin a basic engineering study of this solvent extraction-electrowinning process and also to begin a site search, and they agreed to that expenditure.

42.     As disclosed in its Form 10-Q for the second quarter of 2011, Horsehead proceeded to take several steps to that end:

> During the first quarter of 2011, we announced the completion of a preliminary feasibility study to construct a zinc plant capable of producing in excess of 150,000 tons per year based on state-of-the-art "green" technology. The goals of the proposed plant would be to produce zinc at much lower costs, to significantly reduce air emissions and to provide opportunities for us to serve the broader market for special high grade zinc and the continuous galvanizing market, in addition to our traditional zinc markets. We are actively pursuing our plans to construct the new zinc facility. Total capital expenditures for the construction of the new zinc facility are currently estimated to range from $350 million to $375 million. Site evaluations and negotiations continue regarding the final location for the new zinc facility. A primary site has been identified for engineering design purposes. We currently plan to announce site selection and submit environmental permit applications during the third quarter of 2011, and we hope to begin construction before the end of the year. We currently intend to continue operating our existing smelter until such time as the new zinc facility has achieved its targeted run-rate.
>
> On July 27, 2011, we issued $100 million of 3.80% Convertible Senior Notes due 2017 (the "Convertible Notes") in a private placement. We received net proceeds of approximately $96.7 million and recognized approximately $3.3 million in issuance costs in connection with the offering. We intend to use the proceeds from the offering, together with cash on hand, for the initial stages of construction of

CONSOLIDATED CLASS ACTION COMPLAINT

the new zinc facility and general corporate purposes, including working capital needs, investment in business initiatives, capital expenditures and acquisitions.

43.     On September 29, 2011, the Company announced it had secured a credit facility

to help build the Mooresboro facility:

> September 29, 2011--Horsehead Corporation, a wholly-owned subsidiary of Horsehead Holding Corp. (Nasdaq: ZINC), today announced that on September 28, 2011, it entered into a new, five-year senior secured credit facility with PNC Bank, N.A. The new facility provides for borrowings of up to $60 million, subject to a borrowing base, and is secured by substantially all of the tangible and intangible assets of Horsehead Corporation. The Company entered into the new credit agreement to support liquidity needs for the Company's new, state-of-the-art zinc and diversified metals production facility under construction in Rutherford County, NC, and to allow for the availability of previously restricted cash.

44.     In September 2011, Horsehead began construction on the Mooresboro Facility,

described as a new, purportedly state-of-the-art zinc production facility, to replace its 80 year-old

Monaca Facility. The Company heralded a new zinc production process to be used at the

Mooresboro Facility that would utilize a solvent extraction technology coupled with

electrowinning and casting capabilities. The Company stated that the new facility's design would

rely on sustainable manufacturing practices to produce zinc solely from recycled materials and

allow the Company to produce new high-grade zinc varieties in addition to the Prime Western

zinc produced at the Monaca Facility. Thus, Horsehead portrayed Mooresboro as the state of the

art, environmentally-friendly solution to its losses and safety woes.

45.     Thereafter, the Company provided updates regarding the proposed Mooresboro

facility. The Company's Form 10-K for 2012 stated in part:

> In September 2011, we announced plans to construct the new zinc facility in Rutherford County, North Carolina. The new zinc facility will replace our current zinc smelter in Monaca, Pennsylvania, which is over 80 years old and utilizes a higher-cost pyrometallurgical process. Total capital expenditures for the construction of the new zinc facility are currently estimated to be approximately $415 million. We have recorded approximately $206 million of total project costs,

CONSOLIDATED CLASS ACTION COMPLAINT

excluding capitalized interest, through December 31, 2012. We expect to complete construction and begin start-up of the new zinc facility in the second half of 2013.

46.     Rather than outsource the construction of the facility to a single entity, Horsehead operated as the general contractor on the project and hired outside companies for different parts of the project.

47.     Defendant Hensler testified that the Company had decided to hire Tecnicas Reunidas, a Spanish company, to supply the Mooresboro Facility's technology. To that end, on August 28, 2012, Horsehead Corporation and Horsehead Holding Corp. entered into a Credit Agreement with Banco Bilbao Vizcaya Argentaria, S.A., a Spanish bank, which provided over $20 million in credit for purchases under the contracts between Horsehead and Tecnicas Reunidas and other related financing.

48.     Mooresboro was designed with a nameplate capacity of 155,000 tons of zinc annually, and Horsehead had the goal of making Mooresboro one of their main revenue generators, if not the main one. Defendant Hensler testified at the Bankruptcy Trial that to break even Mooresboro would need to produce 60% of nameplate capacity. While Mooresboro was able to come close to break even for a few days at a time, it never averaged more than 40% in a month (which happened in December 2014). This goal of breaking even was a significant necessity for Horsehead. As Hensler testified at the Bankruptcy Trial, Mooresboro was burning cash at approximately $8 million per month.

## C.     **Known Problems At The Mooresboro Facility**

49.     During the Class Period, Mooresboro faced numerous problems that prevented it from running at capacity. These problems were detailed by the Confidential Witnesses described below.

CONSOLIDATED CLASS ACTION COMPLAINT

50. CW1 was a Horsehead employee who worked at the Mooresboro facility from 2013 until Mooresboro's idling in 2016. He served in various positions, including Senior PLINT operator.[2] He reported to a plant supervisor, who reported to an engineer, who reported to the assistant plant manager.

51. CW2 was a Horsehead employee from July 2013 until January 2016. He started as a Control Room Operator observing the solvent extraction process and later served as a Control Room Operator observing the leaching process.

52. CW3 was hired as an Engineering Procurement Construction Project manager in May 2015. He was hired to help fix the myriad problems at Mooresboro. He reported to the Director of Engineering, which was first Frank Stulgis, and then after Stulgis was fired, to Bob Williamson. Stulgis and Williamson both reported to Vice President Lee Burkett, who in turn reported to Defendant Hensler.

53. CW4 was hired in January 2015 as a Project Engineer, and was responsible for developing solutions to improve various processes at Mooresboro, including the bleed treatment process. Like CW3, he reported first to Stulgis and then to Williamson. He was employed by Horsehead until January 2016.

### D. <u>The Bleed Treatment Area Was Too Small</u>

54. As admitted by Defendants themselves, the bleed treatment area was too small to handle the requisite volume of water. Defendant Hensler testified at the Bankruptcy Trial that "[t]hat bleed treatment plant was just undersized. It didn't take into consideration the -- we believe the Tecnicas Reunidas folks did not properly account for all the water sources that would have to be treated, and so they just didn't design the pilot plant or the bleed treatment plant to

[2] "PLINT" is a metallurgical process consisting of leaching, precipitating, purifying, smelting, and casting zinc.

have enough capacity. And so that became a bottleneck in ramping up production." However, as stated by CW1 below, Tecnicas Reunidas recognized from the outset that the Mooresboro facility was not designed properly.

55.     As soon as Mooresboro began operation it was evident that because the electric arc furnace dust used at the Mooresboro facility contained a higher iron content than material that was used in similar facilities, the processing of the material required more water, and this required a larger bleed treatment area. Because the bleed treatment area was too small, it could not remove the impurities that it needed to, which led to two problems. First, the material leaving the bleed treatment area was of lower quality. Second, the impurities caused greater corrosion to other parts of the facility, specifically the anodes and cathodes in the cell house, where the zinc plating occurred. Ultimately, many of these anodes and cathodes failed before their anticipated lifespans and needed to be replaced.

56.     According to CW1, the capacity of the bleed treatment system was a widely known issue that created additional problems with processing gypsum and Zinc B. The tanks in the bleed treatment area were not big enough to run high volume so material would bypass bleed treatment, resulting in impure material being sent to the solvent extraction area. As a result, according to CW1, "you could not get good plating" in the electrowinning area. Essentially, the tanks lacked appropriate capacity, which would result in impure materials being used in the production process, and greatly hinder the zinc plating process.

57.     CW4, who was hired to fix various problems at Mooresboro, including problems with bleed treatment, believed that, by the time he was hired in January 2015, Horsehead knew that the bleed treatment area was too small.

CONSOLIDATED CLASS ACTION COMPLAINT

16

58.     CW3 confirmed that the bleed treatment area was "grossly undersized" and was one of the main items that needed to be fixed at Mooresboro. He stated that because the bleed treatment area was so small, it could not handle the additional water that would flow through when it rained, and, as a result, Mooresboro would have to decrease capacity whenever it rained.

59.     Similarly, CW2 confirmed that issues in the bleed treatment area were apparent early on, and well-known within the company. He believes that Horsehead management knew that the bleed treatment area was too small as early as the Summer or Fall of 2014.

60.     Defendant Hensler's testimony in the Bankruptcy Trial corroborates the seriousness of this issue:

> One significant issue is that as part of this process we bring in water continuously. And so we need to be able to remove that water to keep the process in balance. And we have to be able to treat that water, so that we can discharge it to the river. We do that through what's called a bleed treatment process, which is essentially a water treatment facility designed to remove cadmium and other metals; zinc dissolved in the water before we discharge it to the river. And that bleed treatment plant was just undersized. It didn't take into consideration the -- we believe the Tecnicas Reunidas folks did not properly account for all the water sources that would have to be treated, and so they just didn't design the pilot plant or the bleed treatment plant to have enough capacity. And so that became a bottleneck in ramping up production.

61.     In 2015, Horsehead retained the company Veolia Water Technologies to provide an interim facility to supplement the bleed treatment. As Defendants themselves later stated publicly starting in mid-2015, the only solution to the undersized bleed treatment area was to expand it.

**E.     Leaking Pipes Due to Insufficient Initial Water Testing and Heat Tracers**

62.     According to CW1, before the Mooresboro facility was to begin operation the plant equipment should have been flushed for 30-60 days with nothing but pure water. However, this was never done. The purpose of such an exercise was to allow for the comprehensive and

CONSOLIDATED CLASS ACTION COMPLAINT

safe detection of leaks and issues before the plant went live with toxic chemicals that are intrinsic to zinc processing. Access to and use of a water supply, both to obtain adequate water and disposing of water, is crucial to Mooresboro – that is why it is located close to a river.

63.     According to CW1, Horsehead skipped this water-run process, and instead added chemicals at the outset. Proper water-only testing was never conducted. As a result, since inception, there was prevalent leaking throughout the over 65 miles of piping within Mooresboro. Because the water testing was never done, and the leaking was identified only after inclusion of chemicals within the system, Horsehead could not safely and effectively identify root causes of these leaks. As such, Horsehead was constrained to patchwork solutions. For example, leaking caused low volumes of water circulation. To attempt to increase water circulation, Horsehead used diesel pumps to increase water volume and pressure to pump water out of the clarifiers.

64.     Furthermore, according to CW1, Horsehead did not put heat tracers (a system of electric insulating wire) on any of the pipes. As a result, during cold weather pipes would break, compounding the water piping issues.

65.     Similarly, according to CW2, shortly after beginning Mooresboro's commissioning phase, the pipes froze and it was determined that the pipes had not been treated or covered with the proper materials to prevent freezing. The frozen pipes resulted in certain aspects of the facility not operating properly.

CONSOLIDATED CLASS ACTION COMPLAINT

F.      **Problems With Clarifiers and Reactors**

66.      Mooresboro utilized four "clarifiers," which are tanks that allow solids to settle from the water. For the silver/lead extraction and Zinc A extraction, the next production stage was use of the clarifiers. In this stage, the liquid overflow separates from the solids and solids go to the filter presses. According to CW1, one of the four clarifiers (CL 103) did not work effectively since February 2014, and there were constant issues with another clarifier (CL 104). These problems known at the facility since commissioning.

67.      Defendant Hensler acknowledged these very issues in his testimony at the Bankruptcy Trial:

> Another area that was a bottleneck is the clarifier that is used after the leaching process. And just to explain a little bit, without going into a lot of technical detail, in this process we take this Waelz oxide and we dissolve it in sulfuric acid. And about eighty-five to ninety percent of it dissolves, but there's some -- still some solids left over. And you have to remove those solids from the liquid before the liquid is then transported to the solvent extraction facility.
>
> And you do that in what's called a clarifier. It's just a big tank that allows solids to settle out, and the overflow is supposed to be clear so that it ends up going through this next step in the process. And that clarifier was just undersized. It wasn't designed properly. And initially we felt that was a bottleneck only because there were too many solids in the overflow, and that was plugging up sand filters and accumulating in our solvent extraction tanks, and we thought we could manage our way through that. But then later on we realized that those solids contained iron, and the iron was contaminating the organic in the solvent extraction process, and that had the effect not only of reducing the capacity of the organic to transport zinc, but it also affected impurities getting over into the cell house.

68.      Clarified zinc was, post-clarification, sent to the solvent extraction drain (the last stage of separation), then to a holding tank, and finally to the cell house for zinc plating. According to CW1, the clarifiers were full of junk/debris; before water could be pumped in the clarifiers the cadmium (an element found with zinc that is insoluble in water) had to be a certain low level but it was not. This caused issues with the clarifiers' function. In conjunction with the

CONSOLIDATED CLASS ACTION COMPLAINT

clarifiers, it was necessary to truck material to the sand filters, but only three of five sand filters were online.

69.     According to CW2, the clarifiers were designed with a rubber lining, but this lining was never installed. This was discovered during the commissioning phase, and led to clogs and corrosion issues later on.

70.     According to CW2, there were similar problems in the reactors used in the early-stage leaching process. A reactor is a tall cylindrical concrete container where the dust is put in an aqueous solution and the impurities are removed through a mixing process. The plans originally put together by Tecnicas Reunidas indicated the leaching area should have 12 reactors, However, Horsehead only built six reactors – half of what was designed in the plan. Of the six reactors, only three or four were functional and the others had problems. CW2 understood from Tecnicas Reunidas that the Company recommended 12 for just this reason so that if any of the reactors were not operating then the plant could still run at capacity.

### G.     Problems With The Gypsum Pad

71.     The Mooresboro facility utilized a "gypsum pad" to separate gypsum from water. According to CW1, as far as gypsum segregation, there was no water in the building where the gypsum precipitation was located. Because of this, the Company manually ran hoses that were totally inefficient. The Gypsum pad designed to catch gypsum (a sulfate mineral compound) was too small to handle the water and had no drainage.

72.     CW2 also confirmed that, as a result of the problems with gypsum extraction, the quality of the gypsum produced by Mooresboro was so poor that it could not be sold, and Horsehead actually had to pay for the gypsum to be disposed.

CONSOLIDATED CLASS ACTION COMPLAINT

## H.    **These Problems Were Recognized by Tecnicas Reunidas**

73.    Horsehead engaged Tecnicas Reunidas to provide the solvent extraction technology to Mooresboro. According to CW2, Tecnicas licensed the rights to use the various processes to Horsehead and reserved the right to be on-site and collect data to improve processes. Tecnicas was occasionally on-site for a couple of weeks at a time with two to three people there at a time for each shift observing and sometimes offering advice. Tecnicas personnel monitored production processes in the control room.

74.    CW2 had conversations with representatives from Tecnicas Reunidas. He learned from these conversations that Horsehead did not follow specifications provided by Tecnicas Reunidas, which led to the problems experienced at Mooresboro. Specifically, these conversations revealed that Horsehead either re-engineered plans from Tecnicas Reunidas, or did not build to the recommended scale or use the recommended materials.

75.    CW1 also dealt with Tecnicas Reunidas employees that were brought in from Spain and Africa, who told him that the plant was not properly designed from inception.

76.    Furthermore, beginning in the spring of 2015, Horsehead stopped making payments on outstanding invoices to Tecnicas Reunidas. This reflects fact that, by no later than this time, Defendants recognized the depth of problems at the Mooresboro Facility. Surprisingly, Horsehead ceased making payments just after completing a $70 million secondary offering, as discussed below -- at a time when it was relatively flush with new cash. Thus, particularly in light of this sequence of events, the refusal to pay the Mooresboro Facility's primary equipment supplier underscores the depth of challenges Defendants knew that it faced.

CONSOLIDATED CLASS ACTION COMPLAINT

**I.      There Was Never Any Way, During The Class Period, To Estimate
Accurately The Ability To Ramp Up Mooresboro Past Nameplate Capacity**

77.     While Horsehead repeatedly stated that a ramp up from 155,000 tons to 170,000
or 175,000 tons could be done "without significant additional investment," this statement was
made without any basis in fact, and the ability to ramp up past nameplate capacity could not be
determined until Mooresboro approached that capacity.

78.     In fact, Andy Torgove of Lazard testified at the Bankruptcy Trial that, in trying to
develop options for Horsehead, "I went to Mooresboro; I have met with the engineers; I have
talked to Jim Hensler, the CEO. My understanding is that the growth from 155,000 tons to
170,000 tons is not something that they are comfortable they could decide or view until they get
closer to 155,000 tons."

79.     Similarly, Hensler essentially admitted at the Bankruptcy Trial that such
statements were made without any basis in fact. When asked what modifications would need to
be made to get Mooresboro to 170,000 tons a year, he stated that "[w]e don't know which
specific modifications would be required. You know, we -- given the fact that we haven't
operated it near nameplate capacity, it's hard to know at this point, you know, where the
bottlenecks would be to get it above nameplate capacity."

**J.      Hatch Is Hired In A Futile Attempt to Fix Myriad Problems At Mooresboro**

80.     In early 2015, Horsehead hired engineering consultants Hatch Associates
Consultants ("Hatch") to solve many of the problems at Mooresboro. Hatch quickly realized the
severity and magnitude of such problems.

81.     On August 7, 2015, Hatch provided a proposal, titled "Off-site Process
Engineering Support – Interim Bleed Treatment Preliminary Process Engineering." This
proposal noted that its "Project Objectives" were "[t]o carry out preliminary process engineering

CONSOLIDATED CLASS ACTION COMPLAINT

and define sufficient information to . . . [p]repare basic preliminary equipment layouts [and] prepare preliminary capital and operating cost estimates." The proposal noted that "[t]he work is estimated to take 5 weeks for the completion of this phase of process engineering."

82.     Similarly, in a proposal dated August 26, 2015, almost three weeks later, Hatch stated: "[t]he output of the interim system along with the existing plant will be sufficient for the plant to continue operation until a long term solution for the Bleed Treatment process can be implemented. The design life of the interim system is 2 years. The implementation of the interim system is to be fast-tracked with a target implementation period of approximately 6 months."

83.     Despite these proposals demonstrating that any solutions to the bleed treatment problems were still in their preliminary stages, Defendants publicly stated on August 7, 2015 that Horsehead had developed a "final solution" to these issues.

84.     On October 23, 2015, Hatch provided a proposal for "Support of Mooresboro Ramp-Up" which provided for the following proposed assignments:

- The Mooresboro hydrometallurgical plant has experienced a difficult start-up with production presently at ~30% of nameplate after 15 months of operation. Horsehead is currently dealing with a range of process and equipment issues that have caused significant downtime and prevented the facility from reaching a steady state of operation.

- Hatch will work closely with the operations team to interpret the data and diagnose root causes of process upsets. There can be many reasons why unit operations do not operate as expected and can be a result of maintenance practices, methods of operation, process control, unexpected changes in feed composition or design issues.

  The Mooresboro team have identified a number of issues impeding ramp-up and are busy implementing solutions. Plant staff are too busy to look ahead to the next potential bottleneck. Hatch proposed having a dedicated look-ahead team that will focus on identifying problems so solutions can be implemented in parallel rather than sequentially, improving overall ramp-up schedule.

CONSOLIDATED CLASS ACTION COMPLAINT

**K.      After the Class Period, Horsehead Writes Down the Mooresboro**
**Facility to Zero, Reflecting the Breadth and Depth of It Problems**

85.      The multiple issues identified the confidential witnesses and acknowledged by Tecnicas Reunidas and Hatch were so broad and deep that after the Class Period, Horsehead, with new auditors, was forced to write down the Mooresboro Facility more than 80% of its recorded value. As disclosed in the Company's financials filed with the SEC on June 1, 2016:

> The Company recorded a non-cash, pretax long-lived asset impairment loss of $527,621[000] for the Mooresboro asset group. The write down resulted in a reduction of $574,060[000] in the cost and $46,439[000] in the accumulated depreciation of the Company's property, plant and equipment. The total amount of this write-down is included in Loss from operations in the Consolidated Statement of Operations for the year ended December 31, 2015. Following the write-down of the asset group, the remaining net book value of the Mooresboro asset group was $87,643 at December 31, 2015.

86.      This contrasts sharply with a $786 million carrying value shown in Horsehead's 10-Q for the third quarter of 2015.

**L.      Horsehead Was Heavily Dependent On Additional**
**Financing And Tenuous Lines Of Credit To Stay Solvent**

87.      Fixing Mooresboro's concealed issues would require significant money and time that Horsehead did not have. Likewise, if Defendants had revealed the true problems at Mooresboro in 2014 and the first half of 2015, they would have jeopardized Horsehead's access to the capital markets as well as to commercial lines of credit. Thus, instead of revealing the true nature of these problems at the outset, Defendants concealed the true nature of Horsehead's problems from the public.

88.      As Horsehead was burning through a significant amount of cash, primarily because of the failure to ramp up Mooresboro, Horsehead was dependent on lines of credit to continue operations. Up until June 2015, Horsehead had a $60 million revolving credit facility (through subsidiary INMETCO) with PNC Bank, and a $20 million revolving credit agreement

CONSOLIDATED CLASS ACTION COMPLAINT

with Wells Fargo. In the second quarter of 2015, Horsehead gave notice to PNC and Wells Fargo that it was terminating these facilities as of June 30, 2015. These facilities were terminated on July 6, 2015, when Horsehead and its subsidiaries entered into an $80 million revolving credit facility with Macquarie Bank Limited. According to Horsehead's 2Q 2015 Form 10-Q, "[t]he new revolving credit facility matures on May 15, 2017 and accommodates a broader borrowing base than the two previous credit facilities adding approximately $30,000 [000] of additional liquidity."

89.     However, this credit facility was contingent on the borrowing base of Horsehead, and Horsehead needed to provide weekly updates to Macquarie to keep the credit facility. The borrowing base was the sum of, among other things, cash collateral, value of receivables and inventory, and net fixed asset liquidation value, minus exposure and reserves.

90.     Upon information and belief, in August 2015, Horsehead received a communication from Macquarie warning that Horsehead's borrowing base was insufficient, and if not cured could result in reduction of credit. Accordingly, Horsehead was well aware of the likelihood of a reduction in credit.

91.     Macquarie then sent Horsehead a letter dated September 1, 2015, informing Horsehead that, due to the decrease in Horsehead's borrowing base, it was lowering the credit limit by $10 million.

92.     In late November 2015, Macquarie informed Horsehead that its reducing the revolving credit facility by another $10 million, and would reduce it by an additional $15 million if Horsehead did not raise an additional $40 million by the end of December. On January 5, 2016, Macquarie sent Horsehead a notice of default, which froze Horsehead's bank accounts. As

CONSOLIDATED CLASS ACTION COMPLAINT

Hensler testified at the Bankruptcy Trial, this was the "catalyst" for Horsehead's bankruptcy filing.

<div align="center">

**Materially False and Misleading**
**Statements Issued During the Class Period**

</div>

93.     On February 25, 2014, Horsehead filed a Form 8-K, signed by Defendant Scherich, attaching a press release discussing fourth quarter 2013 results, as well as the status of the Mooresboro facility:

> "We are very excited as we near the start of zinc production at our Mooresboro facility. **Although severe cold weather delayed the progress of water circulation testing by several weeks, we have successfully achieved key milestones of our commissioning plan.** The critical path for first zinc production is now commissioning of the cellhouse, which is expected before the end of March. The Zochem capacity expansion has started to ramp up and is expected to be fully commissioned by the end of the first quarter of 2014," said Jim Hensler.

> (Emphasis added.)

94.     That same day, Horsehead held a conference call with investors and analysts to discuss fourth quarter 2013 results. On the call, Defendant Hensler stated:

> We are near the point of mechanical completion required to begin zinc production at the Mooresboro facility, while the commissioning process also heads toward completion in all of the critical areas. **We've experienced delays during the past several weeks and some damage to piping valves and fittings as a result of severe and prolonged cold weather conditions and due to minor equipment issues, such as locating and repairing sources of leaks in piping and flanges.**

> (Emphasis added.)

95.     In the question and answer session with securities analysts, the following exchanges occurred:

> Carter W. Driscoll - Ascendiant Capital Markets LLC, Research Division: All right. And then I know you had in your prepared remarks, you talked about some of the cold weather issues that you don't think will repeat once you begin the cellhouse portion of the commissioning. Can you talk about what you've learned so far and why you expect that not to be an issue as you begin to ramp, once we hit potential cold weather 12 months from now or 10 months from now?

<div align="center">

CONSOLIDATED CLASS ACTION COMPLAINT

26

</div>

James M. Hensler: **Yes. Well, during this phase of commissioning, we are circulating water through pipes that are -- ultimately ended up having acidified solution going through them. And those solutions have a lower melting point and there'll be some residual heat in the system that will essentially prevent that freezing from occurring. Now, things like the potable water lines, which will still have water in them, we've learned that those areas where we need to make sure we've got proper insulation and heat tracing to prevent them from freezing.** But the main process equipment and piping that we'll be using or processing in moving either acid or loaded electrolyte, will actually be operating at a temperature that's around 90 to 100 degrees Fahrenheit. So we wouldn't expect that to be susceptible to freezing.

(Emphasis added.)

96.     On that day, Horsehead's stock closed at $17.45, up from the previous day's close of $17.12.

97.     The statements referenced above in ¶¶ 93-95 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

    a.     The statement that "severe cold weather delayed the progress of water circulation testing by several weeks" was false and misleading because, according to CW1, there was no true water circulation testing actually done in late 2013 or early 2014; and

    b.     As confidential witnesses have attested, the issues relative to weather were greatly self-inflicted by non-placement of heat tracers and were not "minor equipment issues."

98.     On March 13, 2014, Horsehead filed its Annual Report with the SEC on Form 10-K for the fiscal year ended December 31, 2013. The Form 10-K was signed by Defendants Hensler and Scherich. Therein, the Company commented on the Mooresboro facility. In relevant part, the Company stated:

CONSOLIDATED CLASS ACTION COMPLAINT

27

In September of 2011, we announced plans to construct a new zinc facility to be located in Mooresboro, North Carolina, which we anticipate will be capable of production in excess of 155,000 tons of zinc metal per year once fully operational, including SHG zinc and CGG zinc, in addition to the PW zinc that we currently produce and will also enable us to potentially recover other marketable metals from WOX produced from EAF dust recycling. **The facility is designed to be capable of producing up to 175,000 tons of zinc metal per year without significant additional investment.** The plant design will rely upon sustainable manufacturing practices to produce zinc solely from recycled materials and use significantly less fossil fuel than our current smelter. The new zinc facility will convert WOX and other recycled materials into SHG zinc and other grades that sell at a premium to the PW grade that we currently offer. This will allow us to expand into new markets, including selling to continuous galvanizers, which include some of our EAF dust customers, die casters and LME warehouses, while continuing to serve customers in our existing markets. In addition, we believe the new technology will also allow us to recover value from certain metals such as silver and lead from WOX produced from EAF dust recycling. The new zinc facility will replace our older smelter technology and will allow us to significantly reduce emissions of greenhouse gases and particulates into the atmosphere.

The new facility will reduce our manufacturing conversion costs due to the lower energy cost, higher labor productivity, reduced operating maintenance costs, and lower operating costs in our EAF dust recycling plants resulting from the elimination of the need to calcine a portion of our WOX before it is fed to the smelter.

We are approaching the point of mechanical completion of the equipment required to begin zinc production at the Mooresboro facility. Work continues on punch list items and ancillary facilities not needed to begin zinc production. The commissioning process is working toward completion in all of the critical areas. Throughout this process, no issues have been identified affecting our key assumptions regarding the technology, the value of the project, or our ramp-up expectations upon startup. **We have experienced delays during early 2014 and some damage to piping, valves and fittings as a result of severe and prolonged cold weather conditions. The facility is particularly vulnerable to cold weather during the water circulation testing phase of the commissioning process. This is not expected to be the case during normal operations since residual heat in the system should be sufficient to minimize the risk of freezing. We have also experienced delays due to minor equipment issues mostly related to locating and repairing sources of leaks, which is to be expected during the commissioning process.** The critical path to start-up is being paced by the commissioning activity in the cellhouse, which is primarily related to fine tuning the automation of crane movements and cathode stripping equipment. We expect to complete this work in March which could allow zinc production to begin before the end of the first quarter of 2014. The lead-silver recovery circuit is still expected to start up late in the second quarter of 2014. We

CONSOLIDATED CLASS ACTION COMPLAINT

have approximately 230 employees on-site and trained, supporting both the commissioning and start-up activities.

(Emphasis added.)

99.     The statements referenced above in ¶ 98 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.      The statement that "[t]he facility is particularly vulnerable to cold weather during the water circulation testing phase of the commissioning process" was false and misleading because, according to CW1, there was no true water circulation testing actually done in late 2013 or early 2014;

b.      As confidential witnesses have attested, the issues relative to weather were greatly self-inflicted by non-placement of heat tracers and were not "minor equipment issues"; and

c.      As testimony at the Bankruptcy Trial revealed, until Mooresboro came close to producing at nameplate capacity (which never occurred), Defendants had no basis in fact to state that Mooresboro could exceed nameplate capacity "without significant additional investment".

100.    On May 2, 2014, Horsehead announced the shutdown of its operations at the Monaca Facility, describing it as "the final step associated with Monaca in the transition to zinc metal production in Mooresboro, NC." In view of Defendant Hensler's statements on the February 25, 2014 analyst call, this was reasonably understood as an assurance that Defendants were "sure that we've got ramp up underway at Mooresboro."

101.    On May 12, 2014, the Company issued Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports First Quarter 2014 Results."

CONSOLIDATED CLASS ACTION COMPLAINT

Therein, Defendant Hensler was quoted as saying:

> We are very excited that zinc production at our new Mooresboro, North Carolina
> facility is imminent. Construction of the zinc production facility is essentially
> finished. We have completed all of the pre-production checks and operated nearly
> all of the key unit operations in an actual production mode including Waelz oxide
> unloading and washing, leaching, solvent extraction, effluent treatment and the
> melting and casting facilities. The cellhouse is fully commissioned awaiting the
> production of sufficient on-specification electrolyte in order to fill the cells, turn
> on the power and begin zinc production. We expect first zinc production to begin
> shortly . . . said Jim Hensler, President and Chief Executive Officer.

102.    That same day, the Company filed a Form 10-Q, signed by Defendants, which

stated that "[c]onstruction of the zinc production facilities in Mooresboro is essentially finished."

103.    At 11:00 am that day, Horsehead held a conference call for investors and analysts.

On the call, defendant Hensler stated:

> We permanently shut down the zinc operations at Monaca at the end of April
> 2014, reflecting our state of readiness in Mooresboro and that the continued sale
> of zinc calcine and Waelz oxide from our recycling operations will generate
> higher margins than the continued operation of the Monaca smelter.

104.    On May 21, 2014, Horsehead filed a Form 8-K, signed by Defendant Scherich,

attaching a press release entitled "Horsehead Starts Zinc Production at Mooresboro, NC

Facility." In the press release, Defendant Hensler described the commencement of production at

the Mooresboro Facility as a "critical milestone."

105.    On May 28, 2014, Horsehead filed a Form 8-K, signed by Defendant Scherich,

attaching a press release entitled "Horsehead Ships First Zinc from Production at Mooresboro,

NC Facility." In the press release, Defendant Hensler touted the shipment of zinc from the

Mooresboro Facility as "another exciting milestone."

106.    On July 8, 2014, Horsehead filed a Form 8-K, signed by Defendant Scherich,

attaching a press release announcing that initial zinc production at the Mooresboro Facility was

"better than internal projections." The press release also quoted Defendant Hensler as stating that

CONSOLIDATED CLASS ACTION COMPLAINT

a "temporary outage" to upgrade mixing components would be carried out "for minimal cost" and "should result in more reliable and sustainable operations in the long-run."

107.    The statements referenced above in ¶¶ 100-06 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.    That significant and costly problems at the Mooresboro Facility, including but not limited to problems with the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.    Defendants knew or were reckless in not knowing that they had no basis in fact to state that they "completed all of the pre-production checks" because, as stated herein, such checks were essentially never done; and

c.    As a result of these issues, it was misleading to say that "[c]onstruction of the zinc production facilities in Mooresboro is essentially finished."

108.    Over the weekend of July 20, 2014 *Barron's* ran a profile praising the progress of the Mooresboro Facility. On Monday, July 21, 2014, the first trading day following this article, Horsehead's stock rose 5.5%.

109.    On August 6, 2014, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports Second Quarter 2014 Results." Therein, Defendant Hensler was quoted as saying:

> "The second quarter represented a significant milestone in the Company's transition from Monaca to Mooresboro. Our financial results were affected by several transitional issues including the shutdown of operations of the smelter at the Monaca, Pennsylvania facility, the startup of the Mooresboro, North Carolina facility and the ramp-up of the new seventh furnace at Zochem" said Jim Hensler, President and Chief Executive Officer.

\*\*\*

CONSOLIDATED CLASS ACTION COMPLAINT

31

"We were pleased with the initial operation of the new zinc plant in Mooresboro and after a temporary outage for equipment repairs we have resumed zinc production. We are also pleased with the recent increase in commodity prices. The LME zinc price recently reached a three-year high in July which, if sustained, will result in higher earnings going forward," added Hensler.

110.    That same day, Horsehead issued a Form 10-Q for announcing 2Q 2014 results, signed by the Individual Defendants, which stated that "[w]hile we have experienced normal start-up issues including some equipment malfunctions, we have not identified any insurmountable technical or operation obstacles that materially challenge the value proposition of this project.

111.    That same day, Horsehead also had an earnings call announcing the 2Q 2014 results, where Defendant Hensler stated that:

- While **we have experienced normal startup issues** including some equipment malfunctions such as the recent temporary outage announced in July to repair mixing equipment in the leaching and effluent treatment sections of the plant, **we have not encountered or identified any insurmountable technical or operational obstacles that materially challenge the value proposition in this project**.

- Mooresboro has restarted, and we are continuing the ramp-up process. We **expect to continue ramping up zinc production to our full operating capacity of 155,000 tons per year through the remainder of this year**.

- We expect the first lead-silver concentrate production in August of this year. Once we reach full operating capacity in both the zinc plant and the co-product circuit **we continue to believe we will realize $90 million to $110 million of incremental EBITDA benefit**.

- We could, in fact, ramp it up much quicker [than 12 months] than that if we don't run into trouble. **And the commissioning, so far, has gone relatively smoothly. We haven't uncovered any particular issues. But I think we're probably looking at first quarter of next year of beginning to see some significant revenue from that operation**.

(Emphasis added.)

112.    Similarly, Defendant Scherich stated that that the Company's liquidity, cash on

hand, and expected cash flows "will provide adequate liquidity to support both general corporate purposes and potential business opportunities through the full ramp-up of the Mooresboro facility." He also stated as follows:

- Near term, and that's really through this ramp-up period, we'll continue, kind of, paying down payables related to the project. We don't see cash flow generation occurring until we hit, kind of, the end of the year as we've achieved the full ramp-up. **So as we go into the new year, we anticipate, as you indicated, robust cash flow starting, and I think that will be our focus fairly quickly, looking at deleveraging a little bit but ultimately looking to refinance the debt down the road to get a better cost of debt in place**.

(Emphasis added.)

113.   On that day, Horsehead's stock closed at $19.50, up from the previous day's trading of $18.83.

114.   The statements referenced above in ¶¶ 109-12 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.   That significant and costly problems at the Mooresboro Facility, including but not limited to problems with the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.   That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to state that "the commissioning, so far, has gone relatively smoothly," that "[w]e haven't uncovered any particular issues," or that "we have not encountered or identified any insurmountable technical or operational obstacles that materially challenge the value proposition in this project";

CONSOLIDATED CLASS ACTION COMPLAINT

      c.     That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to make the projections that they "expect to continue ramping up zinc production to our full operating capacity of 155,000 tons per year through the remainder of this year"; and

      d.     That Defendants knew or were reckless in not knowing that technical problems were so significant that they would prevent Mooresboro from operating at breakeven capacity, let alone nameplate capacity, and thus they had no basis to "anticipate . . . robust cash flow starting" or to "continue to believe we will realize $90 million to $110 million of incremental EBITDA benefit."

115.    On November 10, 2014, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports Third Quarter 2014 Results." Therein, the Company, in relevant part, stated:

Following the unplanned shutdown of the facility at the start of the third quarter due to a corrosion issue which was resolved by upgrading the materials of construction of the affected mixing impellers, we have operated continuously for over three months although we have experienced intermittent disruptions of and bottlenecks in production output as we have attempted to ramp-up the facility. The primary bottleneck thus far has been with solids/liquid separation at the front end of the process. This is conventional technology used extensively in hydrometallurgical and mining applications, so we anticipate that this issue will be resolved. We have made progress through better control of the process and by minor equipment modifications. If additional equipment modifications or additions are required to fully resolve the issue we have identified, we do not believe the cost would be material. Several improvements have been implemented which have allowed us to continue ramping up production. During the third quarter of 2014, we averaged 60 tons per day (tpd) of zinc plated in the cell house. During the first 24 days of October while we were in the process of implementing several process improvements, we averaged 87 tpd. During the last week of October through the first week of November we began ramping up production to an average of 160 tpd with a further increase to 205 tpd from November 5th through the 8th. To put these figures into perspective, we estimate that the production rate needed for expected revenues at current prices to cover the plant's

operating cost and cash interest expense is approximately 230 tons shipped per day and the original design capacity, which we expect to achieve, is 427 tpd. **We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of this project; however, issues such as solids removal described above have slowed the rate of our ramp-up and delayed the realization of these benefits.**

(Emphasis added.)

116.    That same day, Horsehead released its 3Q 2014 Form 10-Q, signed by Defendants

Hensler and Scherich, which stated in relevant part that:

- While **numerous improvements were made to several unit operations at the facility during the quarter which should help to accelerate the ramp-up rate going forward**, production during the second half of the quarter was impeded mainly by operational issues associated with controlling the removal of solids in the clarifier unit downstream of the leaching process. **These issues were diagnosed and solutions implemented**. We also commissioned the casting line for SHG and CGG "jumbo" ingots.

- We enter the fourth quarter of 2014 with the expectation that we have resolved several issues that will improve the level of operation going forward. The primary bottleneck thus far has been with solids/liquid separation at the front end of the process. This is conventional technology used extensively in hydrometallurgical and mining applications, so we anticipate that this issue will be resolved. We have made progress through better control of the process and by minor equipment modifications. If additional equipment modifications or additions are required to fully resolve the issue we have identified, **we do not believe the cost would be material.** Several improvements have been implemented which have allowed us to continue ramping up production. Since the end of the third quarter of 2014, we have continued to increase the level of production of zinc. **We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of this project**; however, issues such as the solids removal described above have slowed the rate of our ramp-up and delayed the realization of these benefits. During this ramp up we plan to continue to sell zinc calcine.

(Emphasis added.)

117.    That same day, the Company held an earnings call, in which Defendant Hensler

stated as follows:

Problems at the plant limited to a clarifier that was not properly removing solids. He stated: "[o]nce we get past that issue, **we believe we don't see**

CONSOLIDATED CLASS ACTION COMPLAINT

**another significant bottleneck in front of us that would move us up to – restrict us from moving up to closer to design capacity.**"

- "[o]ver the next few weeks, **we think we'll be at a better point of understanding whether this is a clarifier design issue versus an operating issue.** But once we get past that issue, we believe we have a lot more running room in terms of being able to move up production. As I said in the script, **this is a conventional technology**. The ability to get solids out is something that the technology exists to do it. **We've been putting all of our efforts right now into trying to get the existing equipment to do what it's supposed to do, but we may come to the conclusion we need to add additional equipment to get the clarity we need. We haven't spent much time focusing on designing that equipment, but we know that there is technology out there that we can use.**"

- "And the other option that we're considering is we have another clarifier in the facility that we believe could be re-purposed for this. **And so that wouldn't necessarily be very capital intensive**. It would require some re-piping and **is something that we may be able to do fairly quickly**. So if the things we're working on to try to make the current equipment work better don't pan out, we would go down that path."

- "**The milestone I was referring to is to get consistently operate above this estimated cash breakeven rate** which we estimate at 230 tons of shipped product per day. And we – as Bob explained, we think that covers operating cost plus the cash interest expense at Mooresboro. That's a big target for us to get to that point because **at that point, Mooresboro's self-sustaining**, and so that's really where our focus is. And **we hope to be able to get there by early in the first quarter next year** based upon the things we have planned between now and then in terms of improvements to this solids issue particularly that we talked about."

- With regard to the lead and silver byproduct recovery circuit at the Mooresboro Facility, defendant Hensler stated that the Company had **"uncovered some issues," but "nothing really major." He continued: "[w]e don't really see any particular issues in the plant ramp-up that would affect our initial thinking on that**, but it's probably a 12 month process before we really ramp it up**. But we would expect to start producing some salable product out of that operation before the end of the year." Similarly, with respect to the production of high-grade zinc at the Mooresboro Facility, an analyst asked "how should we think about it going forward? . . . **And is there any lag effect or anything which we should be aware of?"** Defendant Hensler responded: "**No. Not really**."

(Emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT

118.    At that same conference call, Defendant Scherich stated that the Company's cash on hand and expected cash flows "will provide adequate liquidity to meet our needs through the full ramp-up of the Mooresboro facility."

119.    On that day, Horsehead's stock closed at $15.90, up from the previous day's trading of $15.56.

120.    The statements referenced above in ¶¶ 115-18 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.      That significant and costly problems at the Mooresboro Facility, including but not limited to problems with the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.      That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to state that "[w]e have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of this project" or that that the issues were "nothing really major";

c.      That Defendants' statement concerning clarifiers that "we think we'll be at a better point of understanding whether this is a clarifier design issue versus an operating issue" was false and misleading since, according to CW2, the clarifiers were designed with a rubber lining, but this lining was never installed which was discovered during the commissioning phase, and led to clogs and corrosion issues later on; and

CONSOLIDATED CLASS ACTION COMPLAINT

   d.  That, as a result of the issues above, Defendants' projection that "we hope to be able to [become self-sustaining] by early in the first quarter next year" was not realistic.

121. On January 5, 2015, Horsehead filed a Form 8-K, signed by Defendant Scherich, attaching a press release with a statement from Defendant Hensler about the Mooresboro facility:

> We are encouraged by the progress made during the fourth quarter of 2014. **We are particularly pleased that for extended periods in December, the facility operated near our estimated cash-flow breakeven level after cash interest expense of 230 tons per day.** While we still face potential risks, the team on-site is working diligently to continue to increase production and remains optimistic that the identified challenges can be mitigated or resolved. We are pleased with the progress being made and continue to believe this investment will achieve the previously stated financial performance goals.
> (Emphasis added.)

122. On January 6, 2015, Horsehead filed a Form 8-K, signed by Defendant Scherich, attaching an investor slide show presentation. The slides accompanying the presentation stated that the ramp-up at the facility had "accelerated after some initial delays" and production was "approaching cash flow breakeven" with a target date of January 15, 2015. The slides also stated that the facility was still expected to generate a $90-$110 million annualized EBIDTA benefit, and that the Company was already looking beyond the ramp-up to "focus on future growth opportunities."

123. The statements referenced above in ¶¶ 121-22 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

   a.  That significant problems at the Mooresboro Facility, including but not limited to the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning; and

CONSOLIDATED CLASS ACTION COMPLAINT

b.      That, as a result, the statement that "for extended periods in December, the facility operated near our estimated cash-flow breakeven level" was misleading because it was not reflective of the entire month, as breakeven was at 60% of nameplate capacity, but as Hensler testified, in December 2014 Mooresboro only achieved 40% nameplate capacity; and

c.      That due to these problems, Mooresboro could not be expected to operate at breakeven level for any extended period of time.

124.    On January 20, 2015 and again on January 23, 2015, Horsehead issued a Final Prospectus Supplement for the Secondary Offering of five million shares priced at $12.75 per share. (Defendants signed the October 2013 Form S-3 Registration Statement that was incorporated by reference to the Final Prospectus Supplement). The proceeds were to be used for "general corporate purposes, which may include capital expenditures, acquisitions, working capital and liquidity for operational contingencies." Since the offering was oversubscribed a total of 5,750,000 shares were sold by Horsehead at $12.75 per share, for gross proceeds of $73.3 million. The offering was completed on January 28, 2015.

125.    The Final Prospectus Supplement stated, in relevant part, as follows:

- **Once the new zinc facility is fully operational, we believe that the foregoing benefits will result in annual incremental Adjusted EBITDA of approximately $90 million to $110 million, independent of the price of zinc, compared to our prior operations at our Monaca, Pennsylvania facility**. . . .

- . . . **Once fully operational, we expect the new zinc facility to be capable of producing over 155,000 tons of zinc metal per year with equipment capable of producing over 175,000 tons of zinc metal per year without significant additional investment**.

Our new zinc facility is currently in the ramp-up stage and has experienced operational difficulties that we believe are typical of a start-up of this size and that have resulted in production interruptions. **Numerous improvements have been**

**made to remediate these issues and improve the ramp-up rate**. The primary bottleneck thus far has been the removal of solids at the front end of the process. **This is conventional technology used extensively in hydrometallurgical and mining applications, thus we anticipate that this issue will be resolved. We have made progress through better control of the process and improvements in equipment reliability. We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility**.

(Emphasis added.)

126.     The statements referenced above in ¶¶ 124-25 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.      As testimony at the Bankruptcy Trial revealed, until Mooresboro came close to producing at nameplate capacity (which never occurred), Defendants had no basis in fact to state that Mooresboro could exceed nameplate capacity "without significant additional investment";

b.      That significant problems at the Mooresboro Facility, including but not limited to problems with the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

c       That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to state that "[w]e have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility"; and

d.      That these problems would prevent Mooresboro from operating at breakeven capacity, let alone nameplate capacity, and would thus prevent an annualized EBITDA benefit of $90-$110 million.

127.     On February 24, 2015, the Company filed a Form 8-K, signed by Defendant

CONSOLIDATED CLASS ACTION COMPLAINT

Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports Fourth Quarter 2014 Results." Therein, Defendants, in relevant part, stated:

> Our primary focus during the quarter was the ramp-up of the Mooresboro facility. The facility produced approximately 12,000 tons of zinc metal during the quarter compared to 4,300 tons in the third quarter of 2014. Production for the month of December was approximately 5,400 tons as improvements with equipment reliability and process debottlenecking helped to increase the ramp up rate during the quarter. We made significant progress with the previously reported solids/liquid separation issue at the front end of the process, allowing the production rate to increase. **We were particularly pleased that for extended periods in December, the facility operated near our estimated cash flow break-even level after cash interest expense of 230 tons per day.** Zinc metal sales continued to be supplemented with the sale of approximately 23,500 tons of zinc calcine during the fourth quarter. As a result of strong zinc calcine sales, the total quantity of zinc contained in all product shipments during the quarter was 39,621 tons which was essentially equal to the prior year's quarter despite the lower metal production during the ramp-up of Mooresboro.
>
> Since the beginning of 2015, the daily average production rate continued to improve compared with the fourth quarter rate. During January 2015 we produced approximately 4,600 tons of zinc metal. We reduced the plating rate for several days in January to perform some needed maintenance in the cell house. We also experienced intermittent equipment reliability issues, particularly with some key pumps, which were further exacerbated by recent extreme cold weather conditions. On February 20, 2015 we began a planned seven day outage to address several of these issues. We expect to ramp up production following this outage. **Our interim target is to demonstrate that no bottlenecks exist to operating the facility at 75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015.** We believe that our ability to achieve this higher level of production will depend primarily on the absence of further unplanned equipment issues.
>
> &ast;&ast;&ast;
>
> **"We are pleased with the progress being made and continue to believe that once we are operating at full capacity, we will realize $90 to $110 million of incremental EBITDA benefit as a result of the investment in this transformation.** However, the timing for completion of the ramp up cannot be determined with certainty at this time," added Hensler.

(Emphasis added.)

128.    That same day, Horsehead conducted an investor call with the following highlights:

- Defendant Hensler finished his prepared remarks by stating that **"[a]ll of the equipment or operating issues" the Mooresboro Facility had "experienced recently are minor in nature"**

- In his prepared remarks, defendant Scherich stated: "**[w]e believe we have adequate liquidity to meet the capital needs of the business and the ramp up of the Mooresboro facility**."

- Hensler also stated that **"[w]hat we think right now is as far as bottlenecks are concerned we don't see anything that would impede us from getting to 330 other than unplanned equipment outages**."

- Defendant Hensler also continued to downplay the operational issues at the Mooresboro Facility. For example, with respect to the failure of clarifiers at the facility to adequately separate solids, he stated that the Company was "**doing a pretty good job of managing the solid**" issue, "**working on slight modifications**," and **was able to "actually manage that solid issue up to pretty high levels of production that way**." Similarly, as to the maintenance of the cell house, he stated "**now that's behind us**, we are now into a cycle where every 30 days we will straighten anodes, **so we should be able to manage that problem going forward**." Likewise, as to problems with pipes at the facility, he stated that the Company was installing a "**permanent bypass line will allow us to continue to ramp up**." Finally, defendant Hensler stated that he did not expect additional operational issues to significantly impact the realization of additional production going forward: "**We fully think we can**" make "**improvements in reliability to be able to get to the highest level of production**."

- Defendant Hensler discussed the funds obtained from the secondary offering" "[A]s we said during the recent equity offering we want to use the proceeds to provide **sufficient liquidity to support not only strategic growth projects but also to provide some backstop liquidity in case we encounter more unforeseen issues at Mooresboro**."

(Emphasis added.)

129. On that day, Horsehead's stock closed at $13.99, up from the previous day's close of $13.34.

130. The statements referenced above in ¶¶ 127-28 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

CONSOLIDATED CLASS ACTION COMPLAINT

a.      That significant problems at the Mooresboro Facility, including but not limited to problems in the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.      That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to state that Mooresboro's problems were "minor in nature"; that Defendants could make "improvements in reliability to be able to get to the highest level of production";

b.      That Defendants knew or were reckless in not knowing that that they had no basis in fact to be able to demonstrate "that no bottlenecks exist to operating the facility at 75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015", given that given that the bleed treatment bottleneck would allow at best 60% of nameplate capacity;

d.      That Defendants knew or were reckless in not knowing that technical problems were so significant that they would prevent Mooresboro from operating at breakeven capacity, let alone nameplate capacity, and thus they knew that they were unlikely to operate at full capacity and an annualized EBITDA benefit of $90-$110 million was thus unrealistic; and

e.      That, as a result, the statement that "for extended periods in December, the facility operated near our estimated cash-flow breakeven level " was misleading because it was not reflective of the entire month's output, as breakeven was at 60% of nameplate capacity, but as Hensler testified, in December 2014 Mooresboro only achieved 40% nameplate capacity.

131.    On March 2, 2015, the Company issued its Form 10-K for 2014. The Form 10-K,

CONSOLIDATED CLASS ACTION COMPLAINT

which was signed by Defendants, contained the following statements about Mooresboro:

- We expect to ramp-up production following this outage. **Our interim target is to demonstrate that no bottlenecks exist to operating the facility at 75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015**. We believe that our ability to achieve this higher level of production will depend primarily on the absence of further unplanned equipment issues. **Once fully operational, we expect the new zinc facility to be capable of producing over 155,000 tons of zinc metal per year with equipment capable of producing over 170,000 tons of zinc metal per year without significant additional investment**.

- the Company's "**operational standards . . . allow [it] to deliver higher quality metal than many of [its] competitors**."

- the Company believed it had cash on hand, credit access and expected cash flow "**sufficient to satisfy our liquidity and capital requirements, including capital requirements related to our capital needs based on the expected ramp-up to full production of the new zinc facility, for the next twelve months**."

(Emphasis added.)

132.    The statements referenced above in ¶ 131 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.    Significant problems at the Mooresboro Facility, including but not limited to problems in the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.    Given these problems, and the cash burn caused by them, Defendants had no basis in fact to state that Horsehead had resources "sufficient to satisfy our liquidity and capital requirements . . . for the next twelve months";

c.    There was no basis in fact to project that Mooresboro would reach 75% of nameplate capacity during the second quarter, given that the bleed treatment bottleneck would allow at best 60% of nameplate capacity; and

d.      As testimony at the Bankruptcy Trial revealed, until Mooresboro came

close to producing at nameplate capacity (which never occurred), Defendants had no

basis in fact to state that Mooresboro could exceed nameplate capacity "without

significant additional investment".

133.    On April 1, 2015, the Company filed a Form 8-K, signed by Defendant Scherich,

attaching a press release concerning the Mooresboro facility, which stated, in relevant part:

- After an extended period to completely drain the clarifier, **the root cause of the issue
  was addressed and the clarifier was placed back into service yesterday.** We
  continued to supplement zinc metal sales with the sale of approximately 23,200 tons of
  zinc calcine during the first quarter.

- Jim Hensler, the Company's President and CEO, issued the following statement: "**[w]e
  are pleased to have been able to substantially resolve the issues which forced us to
  take an outage in February and continue to see progress in our efforts to anticipate
  and resolve a number of other potential equipment issues**. While we did not reach the
  production rates we hoped to achieve during the quarter, **we believe the most significant
  reasons for that are behind us and we are now focused on ramping up to our
  interim goal of 75% of nameplate capacity during the second quarter.**"

(Emphasis added.)

134.    The statements referenced above in ¶ 133 were materially false and misleading

when made because they failed to disclose the following adverse facts which were known by

defendants or recklessly disregarded by them:

a.      That significant problems at the Mooresboro Facility, including but

not limited to problems in the bleed treatment area, clarifiers, and cell house, were

known to Defendants since shortly after Mooresboro's commissioning;

b.      Given Defendants' awareness of these problems, there was no

basis in fact to state that the "most significant reasons [for problems with the

facility] are behind us"; and

CONSOLIDATED CLASS ACTION COMPLAINT

c.    There was no basis in fact to project that Mooresboro would reach 75% of nameplate capacity during the second quarter, because the bleed treatment bottleneck would allow at best 60% of nameplate capacity, and, given the magnitude of the problems with the bleed treatment area, Defendants had no basis in fact to state that these problems would be solved by the end of the second quarter.

135.    On May 8, 2015, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports First Quarter 2015 Results." Therein, the Company, in relevant part, stated:

> "While the first quarter was challenging, we are confident in our plan to address the known issues that are affecting the pace of the ramp-up. We have added resources to accelerate the rate of the ramp-up. **We continue to believe that after we are operating at full capacity, we will realize $90 to $110 million of incremental EBITDA benefit as a result of our investment in this transformative project.** However, the timing for completion of the ramp up cannot be determined with certainty at this time," added Hensler.

> (Emphasis added.)

136.    That day, Horsehead filed its Annual Report with the SEC on Form 10-K for 1Q 2014. The Form 10-Q was signed by Defendants Hensler and Scherich. It contained the following highlights:

- Our new zinc facility, currently in the ramp-up phase, has experienced operational difficulties that we believe are typical of a start-up of this size, which have resulted in production interruptions. Numerous improvements have been made to remediate these issues. The primary bottlenecks thus far have been the removal of solids at the front end of the process and the processing of extraneous water through the effluent treatment system. This is conventional technology used extensively in hydrometallurgical and mining applications, thus we anticipate that these issues can be readily addressed. **We have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility.**

> (Emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT

137.    On that same day, the Company had an investor conference call, with the following highlights:

- When asked by an analyst whether he was still confident the Mooresboro Facility would reach full production, **defendant Hensler responded in the affirmative: "[y]es, we still believe that's possible. We get that confidence because of the sizing of our facility**, and we look at the size of tanks, reactors, cell house, and so on, is the same size as other facilities around the world that are using the same technology and getting the production levels that we expect to get. **So we don't see fundamental problem with the design to get us there**. It's really some of the unique things that we're working through to make the process more reliable and to deal with the specifics of the design that we've got."

- "[W]e actually installed some upgrades during the outage in January, and that's allowed us to increase the power input rate in our melting furnace which has actually resulted in even higher production rates as we exited the quarter, and **through April so far we're actually making up ground on the production we lost in January. So, yes, I think we expect to see the second quarter being stronger, and we actually expect to see that maybe improve even more during the course of the year**."

- Scherich stated that the increased production was expected to "**produce very acceptable run rates on the performance of the business to support refinancing**" later in the year.

(Emphasis added.)

138.    As a result of the acknowledgement of the reduced production, on that day, Horsehead's stock closed at $13.02, down from the previous day's close of $14.30 on heavy volume of nearly 1.5 million shares.

139.    The statements referenced above in ¶¶ 135-37 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.     That significant problems at the Mooresboro Facility, including but not limited to problems in the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

CONSOLIDATED CLASS ACTION COMPLAINT

47

b.      Given Defendants' awareness of these problems, there was no basis in fact to state that "we don't see fundamental problem with the design to get us" to full production;

c.      Given Defendants' contemporaneous knowledge that the bleed treatment area was too small, the statement that "[w]e get that confidence [that we will reach full production] because of the sizing of our facility" has no basis in fact;

d.      That because of the significant and costly problems that were known to Defendants at the time, Defendants had no basis in fact to state that "[w]e have not identified any insurmountable technical or operational obstacles that materially challenge the value proposition of our new zinc facility"; and

e.      That Defendants knew or were reckless in not knowing that technical problems were so significant that they would prevent Mooresboro from operating at breakeven capacity, let alone nameplate capacity, and thus they knew that they were unlikely to operate at full capacity and an annualized EBITDA benefit of $90-$110 million was thus unrealistic.

140.    On June 1, 2015, after the market closed, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release:

> PITTSBURGH--(BUSINESS WIRE)--Horsehead Holding Corp. (NASDAQ: ZINC) today issued an update on operations at its Mooresboro, North Carolina zinc production facility. The Company reported that the facility produced approximately 4,100 tons of zinc metal in May of 2015, compared to 2,600 tons and 2,800 tons in March and April of 2015, respectively. May's production was the highest monthly production since January of this year**. Although production improved, it continues to primarily be paced by the capacity of our process and stormwater treatment system and by intermittent equipment reliability issues**.

CONSOLIDATED CLASS ACTION COMPLAINT

48

Jim Hensler, the Company's President and CEO, issued the following statement: "[a]s noted previously, with the technical assistance of Hatch Associates, we are identifying the causes of the problems that have adversely affected the ramp-up of production, and are confident that these issues can be addressed. We have seen improvement in several areas, which has resulted in an increase in production. **In May, we engaged Veolia, a water treatment specialist, to install an interim facility to process stormwater on the site and the unit is now operational, mitigating substantially the risk of a plant shut down caused by significant rainfall. This is the first step in addressing the bottleneck caused by our treatment system.** In June, we will be implementing additional process changes to further mitigate this issue. In July, we expect to complete several upgrades discussed during our last earnings call, including installing a bypass around the first solvent extraction unit to reduce the risk of solids accumulation in the settler, increasing cathode inventory to support the production ramp-up schedule and upgrading some key pumps that have had on-going reliability issues. **We remain focused on ramping up to our interim goal of 75% of nameplate capacity, which we hope to achieve during the third quarter."**

(Emphasis added.)

141.    The market responded positively to these explanations. The stock price closed at

$12.60, up from $12.13 the day before.

142.    On July 2, 2015, the Company filed a Form 8-K, signed by Defendant Scherich,

attaching a press release entitled "Horsehead Update on Mooresboro, NC Facility." Therein, the

Company conceded ongoing issues with bleed treatment and the cell house, disclosing, in

relevant part:

Jim Hensler, the Company's President and CEO, issued the following statement: "We are encouraged by the improvements implemented in June. We better understand the bottleneck issues in bleed treatment and we have successfully implemented measures which have allowed us to increase production. **We have developed a concept for the final solution to the design limitation in bleed treatment and will be installing temporary equipment to test this concept before we engineer and install the permanent solution.** Currently, the production rate is paced by the rate at which we are able to add electrodes to the cellhouse. **We remain focused on ramping up to our interim goal of 75% of nameplate capacity which we still hope to achieve during the third quarter.**

(Emphasis added.)

CONSOLIDATED CLASS ACTION COMPLAINT

49

143.    On this news, shares of Horsehead fell $1.91 per share, or more than 16%, to close at $9.54 on July 6, 2015, on unusually heavy trading volume of more than 4.7 million shares – a ten-fold increase over the preceding trading day.

144.    The statements referenced above in ¶¶ 140 and 142 were materially false and misleading when made because they failed to disclose that there was no basis in fact to project that Mooresboro would reach 75% of nameplate capacity during the third quarter, because the bleed treatment bottleneck would allow at best 60% of nameplate capacity, and, given the magnitude of the problems with the bleed treatment area, Defendants had no basis in fact to state that these problems would be solved by the end of the third quarter.

145.    On July 7, 2015, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release informing investors that it terminated its revolving credit facility with Wells Fargo and PNC, and entered into a revolving credit facility with Macquarie maturing on May 15, 2017.

146.    On August 7, 2015, the Company Filed a Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports Second Quarter 2015 Results." Therein, the Company, in relevant part, stated:

> "The pace of the ramp-up increased as we exited the second quarter and in July, a month in which we took a planned outage, the facility produced approximately 4,000 tons of zinc metal, a 7% increase over June's production. Upgrades made during the planned outage, along with the additional processing capacity supplied by Veolia (a water treatment specialist), have eased the bottleneck in our bleed treatment circuit. We also made progress on the previously mentioned pilot plant designed to quickly add and evaluate incremental bleed treatment capacity. We expect it to be operational sometime in August. We expected better performance in July; however, we experienced unexpected production constraints due to equipment reliability issues, caused mainly by design deficiencies, some of which we have already remedied. **We are encouraged that the operations in Mooresboro appear to have stabilized over the past quarter. We expect continued steady progress as we debottleneck the facility and systematically address equipment reliability issues. We continue to believe that, once the**

CONSOLIDATED CLASS ACTION COMPLAINT

**Mooresboro facility is fully and efficiently operating, we will realize $90 to $110 million of incremental Adjusted EBITDA compared to our prior operations at Monaca.** However, the timing for achieving specific milestones during the ramp-up or the completion of the ramp-up cannot be predicted with certainty," added Hensler.

147.    That same day, the Company issued its 2Q 2015 Form 10-Q, signed by Defendants, which stated, in relevant part, that:

Regarding the third quarter of 2015, we are encouraged by the improvements implemented in July. We better understand the bottleneck issues in bleed treatment and have successfully implemented measures which have allowed us to increase production. We took a short outage in early July to perform needed maintenance work, however, we have deferred the installation of the previously announced bypass around the first solvent extraction settler while we evaluate an alternate, lower-cost approach to control solids accumulation in the settler. **We have developed a final solution to the design limitation in bleed treatment and will be installing a temporary pilot plant to test this concept before we engineer and install the permanent solution and expect this to be operational sometime in August.** Upgrades made during the planned outage, along with the additional treatment capacity supplied by Veolia for processing rain water, have eased the bottleneck in our bleed treatment circuit. Several upgrades aimed at improving the reliability of pumps, piping and control systems are scheduled to be installed in the third quarter. We have decided to postpone any further ramp-up activity on the lead-silver recovery circuit until the arrival and installation of new pumps and other equipment that are properly designed to efficiently operate that facility.

(Emphasis added.)

148.    The Form 10-Q also stated that the Company's cash on hand, borrowing availability under various credit facilities, cost reduction initiatives and cash flow from operations "will be sufficient to satisfy our liquidity and capital requirements, including capital requirements related to our capital needs based on the ramp-up to full production of the new zinc facility, for the next twelve months."

149.    That same day, the Company had an investor conference call in which Defendants fully acknowledged the deficient bleed treatment design, where the following statements were made:

CONSOLIDATED CLASS ACTION COMPLAINT

51

- Defendant Hensler stated that "I'd like to say that while the second quarter was challenging, **operations in Mooresboro have started to stabilize and we are making steady progress toward addressing the various design deficiencies and equipment issues that we have discovered since startup**, including those related to the most significant bottleneck associated with the bleed treatment system. **We are implementing a plan to mitigate this bottleneck.** "

- Later on the call, defendant Hensler also stated that the Company did not anticipate any liquidity problems during the remainder of the year and had the capacity to add $50 million in unsecured debt if needed: "[s]o we think that holds fairly steady, given the hedging that's in place and kind of the steady progress that we're making. **So we're not anticipating the liquidity changing much here for the balance of the year**. But it could, and one of the things that's still out there is the capacity to add up to $50 million of additional unsecured debt. **And that's something that's always a next available alternative**."

- Defendant Scherich stated that "We believe we have **adequate liquidity to meet the capital needs of the business through completion of the ramp up of the Mooresboro facility.**"

(Emphasis added.)

150.    The statements referenced above in ¶¶ 145-49 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.    That significant problems at the Mooresboro Facility, including but not limited to problems in the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.    Defendants did not "develop[] a final solution to the design limitation in bleed treatment" at that time, because it was still working with Hatch to figure out such solutions in August 2015, as detailed in ¶¶ 80-84.

c.    Given these problems, and the cash burn caused by them, Defendants had no basis in fact to state that Horsehead had resources "sufficient to satisfy our liquidity and capital requirements . . . for the next twelve months";

CONSOLIDATED CLASS ACTION COMPLAINT

d.      Because Defendants provided weekly updates to Macquarie about its Borrowing Base, as detailed in ¶ 89, and were aware of the problems discussed above, Defendants had no basis in fact to state that "we're not anticipating the liquidity changing much here for the balance of the year", especially given that Macquarie was to the credit limit less than one month later; and

e.      That Defendants knew or were reckless in not knowing that technical problems were so significant that they would prevent Mooresboro from operating at breakeven capacity, let alone nameplate capacity, and thus they knew that they were unlikely to operate at full capacity and an annualized EBITDA benefit of $90-$110 million was thus unrealistic.

151.    On September 1, 2015, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release informing investors of additional problems at Mooresboro:

> The Company reported that the facility produced approximately 3,200 tons of zinc metal in August, bringing the quarter-to-date production to over 7,000 tons after two months. Production in August was limited by two primary factors: (1) equipment downtime primarily related to plugging of lines carrying feedstock, gypsum and lime which forced us to idle the plant for several days while these issues were being addressed and (2) lower than expected current efficiency in the cell house which resulted in reduced production for a given power input. Modifications were made to reduce the frequency of the plugging issues and the current efficiency improved during the month and is expected to continue to improve in September.

152.    The market immediately reacted to this negative news concerning Mooresboro. That same day Horsehead's share priced declined more than 7% and a further 4% the following day with a two-day volume of more than 2.1 million shares.

153.    On September 11, 2015, investment bank Stifel Nicolaus (who was an underwriter in the Secondary Offering, as well as the at-the-market offering discussed below) issued a report following an analyst tour of the Mooresboro Facility, amplifying in pertinent part

issues that continued to plague the Mooresboro Facility:

> Horsehead's focus areas in its ramp include: (1) addressing the bottleneck in its bleed treatment system, largely through the implementation of a pilot plant designed to allow the overall plant to operate at 300-330 tons/day of zinc output; (2) equipment reliability issues, including the slurry pumping systems that plugged in August, and filtration systems; and (3) current efficiency in the cell house.

154.    This negative report had an immediate impact on the share price. That same day Horsehead's share priced declined more than 7.4%.

155.    Over the weekend of September 12-13, 2015, Defendant Scherich spoke at an investor conference in Southern California hosted by Mohnish Pabrai. According to message boards, Defendant Scherich then first disclosed that the Mooresboro Facility would operate at breakeven only if functioning at 70-75% capacity (rather than the previously-disclosed 60% capacity), a feat unrealistic given the myriad challenges the Mooresboro Facility faced. On Monday, September 14, 2015, its stock price fell more than 10% on unusually heavy volume of 2.5 million shares.

156.    On October 15, 2015, Horsehead's stock price fell more than 12% and an additional 10% on the following day in the wake of a report by White Diamond Research which was critical of Defendants:

> **The Mooresboro Plant's Continuous Problems**
> Horsehead management has continually underestimated its problems at its Mooresboro plant. This plant is Horsehead's biggest and most important and its success or failure will make or break the company. From their initial estimates last year to get the plant at full capacity, management is 25% over budget so far and more than a year behind schedule. There's a real possibility that Mooresboro will never reach the cash flow breakeven point of 50%-60% capacity and Horsehead will have to shut it down. This could cause Horsehead to go bankrupt in less than two years, which is why the 2017 convertible bonds are currently offering a 35% yield to maturity.
>
> On 10/1/15, Horsehead reported an update on its Mooresboro plant, and it's a chaotic mess. Mooresboro's production was only 3,000 tons of zinc for

CONSOLIDATED CLASS ACTION COMPLAINT

September which is far from approaching 50% capacity. 3,000 tons per month only comes out to about 40,000 tons per year whereas 50% capacity at Mooresboro is about 75,000 tons per year.

Horsehead's management was highly optimistic of the plant on its 2Q 2014 earnings call on 8/6/14. Management said:

> "Mooresboro has restarted and we are continuing the ramp-up process. We expect to continue ramping up zinc production to our full operating capacity of 155,000 tons per year through the remainder of this year."
> "We continue to expect the ramp up to full production to be completed near the end of the year."
> "Once we get above 50% to 60% capacity utilization, we should be cash flow positive out of Mooresboro."

From the above quotes, management thought it would only take four months to get Mooresboro to full capacity. Now, let's take a look over a year later, at what Horsehead's CEO, Jim Hensler, says need to be fixed at the plant. From the 10/1/15 update:

> "In addition to the upgrades to the control systems completed in September which we believe should improve plant reliability going forward we also upgraded another of the problematic pumps during the month. During the fourth quarter we expect to connect the previously installed bypass around the first SX settler to allow solids removal from that settler, modify the design of the mixer tanks on the settlers to remove a potential bottleneck, upgrade components in the hydrochloric acid recovery circuit to improve corrosion resistance, upgrade the Waelz oxide delivery system to the leaching process to minimize further plugging issues and improve process control of the circuit, further upgrade the control system in bleed treatment and complete the first phase of an upgrade to the acid distribution system. However, we cannot guarantee that these improvements will be finally completed during the fourth quarter, or fully address the operational challenges we have faced, or that additional challenges might not arise."

Wow, so many problems and need for upgrades, we believe it's unlikely the plant will achieve 50% capacity even next year, or if it even is possible. Even if everything goes to plan with all of the projects mentioned in the above update, they are only slight improvements to the current situation. And that last sentence: "However, we cannot guarantee that these improvements will be finally completed during the fourth quarter, or fully address the operational challenges we have faced, or that additional challenges might not arise" is new language by

CONSOLIDATED CLASS ACTION COMPLAINT

the company. Management has always spoken optimistically before in its earnings calls and updates that they will get their problems solved soon. But now they are starting to sound pessimistic after all the issues and failures they've encountered at Mooresboro.

157.    On October 23, 2015, the Company issued an At-The-Market Equity Offering Sales Agreement with Stifel Nicolaus, through which Horsehead could sell shares of its common stock, which provided the ability to obtain up to $50 million.

158.    On November 9, 2015, the Company filed a Form 8-K, signed by Defendant Scherich, attaching a press release entitled "Horsehead Holding Corp. Reports Third Quarter 2015 Results." Therein, the Company, in relevant part, stated:

> During the past few months of 2015, we have significantly enhanced our internal organization at the Mooresboro facility, and we have recently expanded the use of external engineering resources assigned to the Mooresboro projects to accelerate the rate that changes are implemented. **These resources, which include engineering, technical support and operations management, have validated the feasibility of the technology, developed improvements to many of the known issues and confirmed the nature and general extent of the operational and financial benefits we expect from this facility.** We are focused on implementing these improvements, a number of which were achieved during the recent outage. However, the timing for achieving specific milestones during the ramp-up or the completion of the ramp-up cannot be predicted with certainty.
>
> "The significant reduction in commodity prices combined with the uncertainty of production levels at Mooresboro has increased the need to focus on options to maintain liquidity to support the on-going ramp-up of Mooresboro. The at-the-market ("ATM") program announced on October 23, 2015 was put in place to provide flexibility. Additional supplementary financings may be considered, based on the future pace of the ramp-up and commodity prices," added Hensler.

(Emphasis added.)

159.    That same day, the Company issued its 3Q 2015 Form 10-Q, signed by Defendants, which discussed the Macquarie credit facility:

- On June 30, 2015, the Company's wholly owned direct and indirect subsidiaries, INMETCO, Horsehead Corporation and HMP, entered into the Macquarie Credit Facility with Macquarie Bank Limited, which became effective on July 6, 2015. The Macquarie Credit Facility matures on May 15, 2017. The new $80,000[000]

CONSOLIDATED CLASS ACTION COMPLAINT

facility replaces both the ABL Facility and the INMETCO Facility. The Macquarie Credit Facility is the same maximum principal amount, and is secured by the same collateral of such subsidiaries. **However, the new credit facility accommodates a broader borrowing base than the two previous credit facilities.** The Company had $59,451[000] in outstanding borrowings and $20,549[000] in undrawn availability at September 30, 2015. The carrying amount of the debt approximated fair value at September 30, 2015.

- The Macquarie Credit Facility contains customary restrictive negative covenants as well as customary reporting and other affirmative covenants. Additionally, the Company must be in compliance at all times with certain financial covenants relating to tangible net worth, net working capital and adjusted EBITDA as defined in the credit agreement governing the Macquarie Credit Facility. **The Company was in compliance with all covenants at September 30, 2015.**

(Emphasis added.)

160.    That same day, the Company had an investor conference call, where the following statements were made by Defendant Hensler:

- During the past few months, we have enhanced our Mooresboro organization and have expanded the use of external engineering assistance. These resources, which include engineering, technical support, and operations management, have validated the feasibility of the technology, developed improvements to many of the known issues, and **confirmed the nature and general extent of the operational and financial benefits we expect from this facility**. We are focused on implementing the various improvements, a number of which were completed during the recent outage.

- It's going to be a few more weeks before we have a better estimate on the bleed treatment expansion. We've done the process engineering. So we know what the flow sheet looks like. And we -- basically the understanding of what equipment we need but we haven't really done the engineering on the equipment, so that we could put a real capital cost estimate together. **But our internal estimate or working estimate is that expansion is going to be about $15 million investment.**

(Emphasis added.)

161.    On the same call, Defendant Scherich nonetheless touted the Company's financial health despite these problems:

- Capital spending was $11.7 million for the quarter and financing activities, net of an increase in restricted cash used $2.1 million of cash. Cash on hand and

CONSOLIDATED CLASS ACTION COMPLAINT

availability on our credit facilities totaled $68 million at the end of the quarter. **In July, we completed a refinancing of two of our credit facilities, adding approximately $30 million of additional liquidity at the end of June.** In October, we announced an ATM equity program under which we may offer and sell, from time to time, shares of our common stock having an aggregate value of up to $50 million.

- Given our current liquidity and expected cash flow from operations, the current commodity prices, **we believe that we have adequate liquidity and availability of capital resources including the ATM program to support the business for the next 12 months**. Depending on actual commodity prices and the actual capital spending next year, we may need to raise additional capital.

(Emphasis added.)

162.    On that day, Horsehead's stock closed at $2.57, down more than 10% from the previous day's close at $2.86 on volume of nearly 3.7 million shares.

163.    The statements referenced above in ¶¶ 158-61 were materially false and misleading when made because they failed to disclose the following adverse facts which were known by defendants or recklessly disregarded by them:

a.      That significant problems at the Mooresboro Facility, including but not limited to problems in the bleed treatment area, clarifiers, and cell house, were known to Defendants since shortly after Mooresboro's commissioning;

b.      Macquarie lowered Horsehead's credit limit on September 1, 2015, so the statements that the Company "add[ed] approximately $30 million of additional liquidity" and "[t]he Company was in compliance with all covenants at September 30, 2015" were materially misleading and misrepresented the true problems with the Macquarie credit facility; and

c.      Given these problems, especially Macquarie lowering the credit limit, and the cash burn caused by these problems, Defendants had no basis in fact

CONSOLIDATED CLASS ACTION COMPLAINT

to state that it had liquidity and resources "to support the business for the next 12 months".

164.    On December 11, 2015, Horsehead issued a Form 8-K, signed by Defendant Scherich, announcing:

> On December 09, 2015, the Company entered into the First Amendment to the Revolving Credit and Security Agreement (the "First Amendment"), by and among Zochem, Inc. ("Zochem") the Guarantors thereto, and PNC Bank, National Association ("PNC"). Zochem, as borrower, the Guarantors thereto and PNC, as lender, originally entered into the Revolving Credit and Security Agreement ("Credit Agreement") on April 29, 2014.
>
> The First Amendment amended certain provisions of the Credit Agreement to permit letters of credit to be issued with an expiration date of up to one year beyond the expiration of the Credit Agreement, on September 28, 2016, as long as such letters of credit are cash collateralized on or before the thirtieth day prior to the expiration date of the Credit Agreement. The First Amendment has an effective date of December 09, 2015.

165.    On January 13, 2016, BLOOMBERG reported that Horsehead missed a $1.8 million debt payment and entered a grace period for repayment. As this missed payment contradicted Horsehead's previous statements on its financial health, on this news, Horsehead's stock declined nearly 40% on unusually heavy trading volume.

166.    On January 19, 2016, Horsehead issued a Form 8-K announcing that it entered into a forbearance agreement with Macquarie:

> On January 15, 2016, Horsehead Corporation ("Horsehead"), The International Metals Reclamation Company, LLC and Horsehead Metal Products, LLC, each a subsidiary of Horsehead Holding Corp. (the "Company") (collectively, the "Borrowers"), the Company, as guarantor, and another guarantor party thereto, entered into a Forbearance and Amendment Agreement (the "Macquarie Forbearance") with respect to the Credit Agreement, dated as of June 30, 2015 (as amended from time to time, the "Horsehead Credit Facility"), with Macquarie Bank Limited, as administrative agent and lender ("Macquarie"). Pursuant to the Macquarie Forbearance, Macquarie agreed to temporarily forbear from exercising rights and remedies related to certain events of default related to, among other things, insufficient availability under the Horsehead Credit Facility. Macquarie initially notified the Borrowers of the existence of the events of default on

CONSOLIDATED CLASS ACTION COMPLAINT

January 5, 2016, at which time the parties commenced negotiations on the Macquarie Forbearance.

Pursuant to the Macquarie Forbearance, cash held in certain of the Borrowers' third-party bank accounts will be transferred to accounts controlled by Macquarie. Disbursements of funds from the controlled accounts to the Borrowers will be subject to a budget as specified in the Macquarie Forbearance. During the Macquarie Forbearance Period (as defined below), borrowings will be available to the Borrowers in amounts based on the borrowing base under the Horsehead Credit Facility plus overage amounts specified in the Macquarie Forbearance, subject to certain adjustments.

Pursuant to the Macquarie Forbearance, the Borrowers agreed, among other things, (i) to pay down outstanding borrowings under the Horsehead Credit Facility so that the aggregate amount outstanding as of the date of effectiveness of the Macquarie Forbearance does not exceed $40 million and (ii) to pay are structuring fee in an amount ranging from $1 million to $2.5 million in the event the obligations under the Horsehead Credit Facility are not paid in full by February 1, 2016, with the amount of such fee increasing over time from February 1, 2016 through April 30, 2016. Pursuant to the Macquarie Forbearance, the Company will also terminate certain physical base metals contracts with Macquarie and pay a fee for such early termination in the amount of approximately $840,000. The Macquarie Forbearance will not become effective until the Borrowers comply with certain conditions precedent set forth in the Macquarie Forbearance, including the agreements described in this paragraph. The Company and the Borrowers currently expect to satisfy all of the conditions precedent on January 19, 2016 although there can be no assurance that they will be able to do so.

Once effective, Macquarie's forbearance will remain effective until the earliest to occur of (i) 12:01 a.m. on February 1, 2016; (ii) the failure of the Company or any Borrower to comply with any of its covenants and obligations under the Macquarie Forbearance; (iii) any representation or warranty made by the Company or any Borrower proving to be untrue or incorrect in any material respect; (iv) the occurrence of an event of default under the Horsehead Credit Facility other than those that resulted in the entry into the Macquarie Forbearance, including arising from a bankruptcy filing of the Company or any Borrower; (v) the termination of the PNC Forbearance (as defined below); (vi) the exercise of remedies by holders of the Company's outstanding 3.80% Convertible Senior Notes due 2017 or 9.00% Senior Notes due 2017 or by secured creditors of the Company or any Borrower holding claims in excess of $500,000 (other than Macquarie); and (vii) the taking of an action by the Company or any Borrower to repudiate or assert a defense to any of the obligations under the Horsehead Credit Facility, the Macquarie Forbearance or any other related documents (the "Macquarie Forbearance Period").

CONSOLIDATED CLASS ACTION COMPLAINT

167.    On January 21, 2016, Horsehead issued a Form 8-K announcing that:

As previously disclosed, Horsehead Holding Corp. (the "Company") and its subsidiaries Horsehead Corporation, The International Metals Reclamation Company, LLC and Horsehead Metal Products, LLC entered into a Forbearance and Amendment Agreement dated as of January 15, 2016 (the "Macquarie Forbearance") with Macquarie Bank Limited, as administrative agent and lender under the Credit Agreement dated as of June 30, 2015. As previously disclosed, effectiveness of the Macquarie Forbearance was subject to certain conditions precedent. All of the conditions precedent were satisfied on January 20, 2016 and the Macquarie Forbearance is now in full force and effect.

168.    On January 22, 2016, Horsehead issued a Form 8-K, signed by Defendant Scherich, announcing it was "temporarily idling its Mooresboro, North Carolina zinc production facility." It stated that "the decision to temporarily idle the facility is the result of many factors, including a depressed zinc price which recently has languished near its seven year low and the Company's current liquidity situation."

## Disclosures at the End of the Class Period

169.    On February 2, 2016, the Company filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

170.    On this news, shares of Horsehead fell to $0.19 per share, or 76% from a close of $0.26 per share on February 1, 2016, to a close of $0.06 per share on February 3, 2016, on an unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Horsehead securities between February 25, 2014 and February 2, 2016, inclusive, seeking to pursue remedies under the Exchange Act; and were damaged thereby (collectively, the "Class"). Excluded from the Class are Defendants, the officers and directors of

the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

172.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Horsehead's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Horsehead shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Horsehead or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

173.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

175.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

CONSOLIDATED CLASS ACTION COMPLAINT

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Horsehead; and

(c)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

176.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

177.     Defendants' wrongful conduct, as alleged herein directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

178.     During the Class Period, Plaintiffs and the Class purchased Horsehead's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As detailed above and in the chart below, on May 8, 2015, July 2, 2015, September 11-14, 2015, November 9, 2015, January 13, 2016 and February 2, 2016, Horsehead's common stock, declined substantially in response to partial corrective disclosures revealing, in part, the falsity of Defendants' misrepresentations.

CONSOLIDATED CLASS ACTION COMPLAINT

| Dates | Disclosures | Drops |
|-------|-------------|-------|
| May 8, 2015 | Horsehead announced Mooresboro had decreased production in the first quarter of 2015. | 9% |
| July 2, 2015 | Horsehead provided update discussing problems with Mooresboro's bleed treatment area and cell house. | 16% |
| September 11-14, 2015 | Stifel Nicolaus issued an analyst report discussing problems at Mooresboro, and Defendant Scherich spoke at a conference where he further discussed problems at Mooresboro. | 7.4% on 9/11 10% on 9/14 |
| January 13, 2016 | BLOOMBERG reported that Horsehead missed a $1.8 million debt payment and entered a grace period for repayment. | 40% |
| February 2, 2016 | Horsehead entered bankruptcy, further revealing the true nature of Mooresboro's problems as well as Horsehead's liquidity issues. | 76% |

179.    On these dates, Horsehead's stock exhibited statistically significant abnormal returns and unusually high trading volumes, showing that partial corrections had entered into the market.

## SCIENTER ALLEGATIONS

180.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth in more detail herein, Defendants, by virtue of their specific misrepresentations which lacked a factual basis, receipt of information reflecting the true facts regarding Horsehead, their control over, and/or receipt and/or modification of Horsehead's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Horsehead, participated in the fraudulent scheme alleged herein.

CONSOLIDATED CLASS ACTION COMPLAINT

181.    The Mooresboro facility constituted the core operations of Horsehead. According to documents filed by Horsehead in the bankruptcy action, Horsehead's Board of Directors received no fewer than 46 presentations between September 2015 and February 2016 regarding the Mooresboro Facility, as well as no fewer than 100 weekly or bi-weekly email reports, which included "detailed summaries of the technical problems faced at Horsehead." As Defendant Hensler himself stated, it was a substantial cause of the Company's bankruptcy. Accordingly, Defendants had knowledge of such core operations, as they included matters critical to the long term viability of Horsehead, and Mooresboro affected a significant source of Horsehead's income. During the Class Period, the Mooresboro Facility became the main focus of Horsehead, was of vital interest to investors, and used the majority of Horsehead's cash. The failure of the Mooresboro facility drove Horsehead into bankruptcy, further evidencing that it constituted the core operation of Horsehead.

### APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

182.    The market for Horsehead's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Horsehead's securities traded at artificially inflated prices during the Class Period. On July 23, 2014, the Company's stock closed at a Class Period high of $20.70 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Horsehead's securities and market information relating to Horsehead, and have been damaged thereby.

183.    During the Class Period, the artificial inflation of Horsehead's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the

CONSOLIDATED CLASS ACTION COMPLAINT

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Horsehead's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Horsehead and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

184.    Horsehead's average weekly Class Period Trading volume exceeded 4.5 million shares, which represents no fewer than 7.8% of the number of Horsehead shares outstanding. No fewer than 11 analysts from nine financial institutions issued regular reports on Horsehead during the Class Period. Horsehead's common stock had no fewer than 60 market makers, including most, if not all, of the largest brokerage houses and/or their affiliates. Moreover, the Company maintained market capitalization in excess of $75 million and was thus eligible to file an SEC Form S-3 Registration Statement from the commencement of the Class Period through January 2016. Likewise, as detailed herein, there was an immediate and substantial cause-and-effect relationship between unexpected corporate events or disclosures and a response in stock price (i.e. abnormal returns).

185.    Thus, at all relevant times, the market for Horsehead's securities was an efficient market for the following reasons, among others:

(a)     Horsehead stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

CONSOLIDATED CLASS ACTION COMPLAINT

(b)     As a regulated issuer, Horsehead filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Horsehead regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Horsehead was followed by securities analysts employed by brokerage firms who followed the Company and/or wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. These reports were publicly available and entered the public marketplace.

186.    As a result of the foregoing, the market for Horsehead's securities promptly digested current information regarding Horsehead from all publicly available sources and reflected such information in Horsehead's stock price. Under these circumstances, all purchasers of Horsehead's securities during the Class Period suffered similar injury through their purchase of Horsehead's securities at artificially inflated prices and a presumption of reliance applies.

## FIRST CLAIM

**Pursuant to Section 10(b) of
The Exchange Act and Rule 10b-5 Promulgated Thereunder
<u>(Against the Individual Defendants)</u>**

186.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

187.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

CONSOLIDATED CLASS ACTION COMPLAINT

public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Horsehead's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

188.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Horsehead's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

189.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Horsehead's financial well-being and prospects, as specified herein.

190.    These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Horsehead's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Horsehead and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

CONSOLIDATED CLASS ACTION COMPLAINT

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

191.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and were advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

192.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Horsehead's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless

CONSOLIDATED CLASS ACTION COMPLAINT

in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

193.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Horsehead's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Horsehead's securities during the Class Period at artificially high prices and were damaged thereby.

194.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Horsehead was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Horsehead securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

195.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

CONSOLIDATED CLASS ACTION COMPLAINT

196.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Pursuant to Section 20(a) of The Exchange Act
### (Against the Individual Defendants)

197.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

198.    The Individual Defendants acted as controlling persons of Horsehead within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

199.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

CONSOLIDATED CLASS ACTION COMPLAINT

200.    As set forth above, Horsehead and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

CONSOLIDATED CLASS ACTION COMPLAINT

Dated: March 31, 2017                           Respectfully submitted,

                                                MONTGOMERY MCCRACKEN
                                                WALKER & RHOADS LLP

                                    By:         _s/ Sidney S. Liebesman_____
                                                Sidney S. Liebesman (DE #3702)
                                                Lisa Zwally Brown (DE #4328)
                                                William J. Burton (DE #6243)
                                                1105 North Market Street, Suite 1500
                                                Wilmington, DE 19801
                                                Telephone: (302) 504-7826
                                                Facsimile: (302) 504-7820

                                                **Liaison Counsel for Lead Plaintiffs**

CONSOLIDATED CLASS ACTION COMPLAINT

GLANCY PRONGAY & MURRAY LLP
Brian P. Murray (admitted *pro hac vice*)
Gregory B. Linkh (admitted *pro hac vice*)
122 East 42nd Street, Suite 2920
New York, NY 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com

**Lead Counsel for Lead Plaintiffs**

KRANENBURG
Werner R. Kranenburg (admitted *pro hac vice*)
80-83 Long Lane
London EC1A 9ET
United Kingdom
Telephone: +44-20-3174-0365
werner@kranenburgesq.com

THE WAGNER FIRM
Avi Wagner
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 491-7949
Facsimile: (310) 694-3967
avi@thewagnerfirm.com

**Counsel for Lead Plaintiffs**

CONSOLIDATED CLASS ACTION COMPLAINT