**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE HORSEHEAD HOLDING )     Civil Action No. 16-292-LPS-CJB
CORP. SECURITIES LITIGATION )     Consolidated
                       )     CLASS ACTION

## REPORT AND RECOMMENDATION

In this consolidated securities class action, Plaintiffs assert claims against Defendants

James M. Hensler ("Hensler") and Robert D. Scherich ("Scherich") (collectively, "Defendants"),

pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b)

and 78t(a) (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5,

17 C.F.R. § 240.10b-5. Presently before the Court is Defendants' motion (the "Motion") to

dismiss Plaintiffs' Consolidated Class Action Complaint (the "CAC"), filed pursuant to Federal

Rules of Civil Procedure 12(b)(6). (D.I. 51) For the following reasons, the Court recommends

that Defendants' motion be DENIED.

## I. BACKGROUND

### A. Background Regarding Horsehead, the Parties and the Litigation

#### 1. Horsehead and the Mooresboro Facility

Horsehead Holding Corp. ("Horsehead" or the "Company") was the parent company of

several entities, including Horsehead Corporation, a producer of zinc metal and recycler of

electric arc furnace dust. (D.I. 45 at ¶ 31) In 2010, Horsehead operated its primary zinc-metal

production facility in Monaca, Pennsylvania ("Monaca"). (*Id.* at ¶ 39)

In July 2010, there was an explosion at the Monaca zinc-metal production facility, which

resulted in the complete shutdown of the plant's refinery operations. (*Id.*) After the damage was

repaired, this incident cost the Company "over $4.2 million in unreimbursed direct operating

costs, not to mention legal, regulatory and reputational exposure." (*Id.* at ¶ 40) Thereafter, acquiring or building a new facility became a significant priority for the Company. (*Id.*) At the time, the "nameplate capacity"[1] of Monaca was approximately 150,000 tons of zinc per year, and the facility accounted for a significant portion of the Company's production of zinc metal. (D.I. 53, ex. 4 at 46 of 171; *compare id.* at 15 of 171, *with id.* at 51 of 171 (showing Monaca's production and the Company's total production))

In September 2011, Horsehead began construction on a new, purportedly state-of-the-art zinc production facility in Mooresboro, North Carolina ("Mooresboro" or the "Mooresboro Facility"). (D.I. 45 at ¶ 44)[2] The Company's Form 10-K for 2012 stated that "[t]he new [Mooresboro] zinc facility will replace our current zinc smelter in Monaca, Pennsylvania, which is over 80 years old and utilizes a higher-cost pyrometallurgical process."[3] (*Id.* at ¶ 45; *see also* D.I. 53, ex. 4 at 5 of 171) As the replacement for Monaca, the Mooresboro Facility was to be similarly sized, with a nameplate capacity of 155,000 tons of zinc per year. (D.I. 45 at ¶ 48) In 2012, the Company estimated that it would cost "approximately $415 million" to build the Mooresboro Facility. (*Id.* at ¶ 45)

---

[1]     "Nameplate capacity" is a facility's "intended full-load sustained output[.]" (D.I. 45 at 2 n.1)

[2]     Horsehead's subsidiary Horsehead Corporation is the parent company of Horsehead Metal Products, LLC, which in turn is the entity that actually owned and operated the zinc processing facility in Mooresboro. (D.I. 45 at ¶ 2)

[3]     Key benefits of the Mooresboro facility were expected to include lower energy costs, higher labor productivity, reduced operating maintenance costs, lower operating costs in other production processes, and reduced emissions of particulates and greenhouse gases. (D.I. 53, ex. 4 at 53 of 171)

2

In the meantime, Monaca reopened and operated at full capacity by the end of 2010; it produced 137,000 tons of zinc in 2011 and 146,000 tons in 2012. (D.I. 53, ex. 4 at 15 of 171) In 2013, Monaca "operated at less than full capacity" and produced 125,000 tons of zinc that year. (*Id.*) The Company began commissioning Mooresboro in late 2013, (D.I. 45 at ¶¶ 93-95), and in May 2014, the Company shut Monaca down, (*id.* at ¶ 100).

## 2. Plaintiffs and the Consolidated Class Action Complaints

This consolidated securities class action arises out of two class action complaints filed on April 22, 2016, (D.I. 1), and May 18, 2016, (Civil Action No. 16-369-LPS-CJB, D.I. 1). (D.I. 32 at 2-3) On July 29, 2016, Chief Judge Leonard P. Stark ordered that the cases be referred to the Court to hear and resolve all pre-trial matters, up to and including the resolution of case-dispositive motions. (*See, e.g.*, D.I. 31) On February 14, 2017, the Court consolidated the class actions and appointed Raymond Cook and Dyson Capital Management Ltd. to serve as Lead Plaintiff in this suit on behalf of themselves and others (collectively, "Plaintiffs"). (D.I. 33) Counsel for Plaintiffs filed the CAC on March 31, 2017 "on behalf of persons or entities who purchased or otherwise acquired Horsehead securities between February 25, 2014 and February 2, 2016, inclusive" (the "Class Period"). (D.I. 45 at ¶ 1)

## 3. Defendants

The CAC names Hensler and Scherich as Defendants. (*Id.* at ¶¶ 27-28) During the Class Period, Hensler was President and Chief Executive Officer of Horsehead, and Scherich was Vice President and Chief Financial Officer of the Company. (*Id.* at ¶¶ 2, 27-28) Plaintiffs allege that "because of their positions within the Company, [Defendants] possessed the power and authority to control the contents of Horsehead's reports to the SEC, press releases and presentations to

3

securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market." (*Id.* at ¶ 29) Plaintiffs contend that "Horsehead would have been named as a Defendant but for its bankruptcy."[4] (*Id.* at ¶ 2)

## B. Plaintiffs' Allegations

The CAC alleges that beginning with the commissioning process (and unbeknownst to the investing public), the Mooresboro Facility was plagued with severe construction, engineering and operational defects. (*Id.* at ¶¶ 10, 13-14) Yet throughout the Class Period, beginning in early 2014, Defendants are alleged to have provided operational updates that: (1) misstated the extent of certain testing that Horsehead had conducted during the facility's commissioning; (2) concealed the seriousness of the facility's problems; (3) provided misleading zinc production estimates for the facility; and (4) failed to disclose cash and revenue shortfalls that threatened the Company's ability to pay its creditors and to complete the facility's ramp-up. (*Id.* at ¶¶ 3-10)

It is alleged that during the Class Period, the Company's stock thus traded at an artificially inflated price. (*Id.* at ¶¶ 178, 182-86) During this time, the Company proceeded forward with a January 2015 Horsehead stock offering (offering 5.75 million shares of its common stock at $12.75 per share, and generating $73.3 million in gross offering proceeds), despite allegedly making similarly false and misleading disclosures in the relevant registration statement. (*Id.* at ¶¶ 8, 124-26) The CAC alleges that only thereafter, in a series of partial disclosures, did the Company reveal various production problems at the Mooresboro Facility. (*Id.* at ¶ 11) At the same time, however, certain Defendants continued to make allegedly false

---

[4]    As is further set out below, Horsehead filed for bankruptcy protection in 2016; the bankruptcy case is in the United States Bankruptcy Court for the District of Delaware. *In re American Zinc Recycling LLC (F/K/A Horsehead Holding Corp.), et al.*, Case No. 16-10287-CSS (Bankr. D. Del.).

4

and misleading positive statements about the Company's ability to address these issues and to grow in the future. (*Id.* at ¶¶ 135-39, 142, 144-50, 158-61, 163)

By early January 2016, the Company had failed to make a $1.8 million debt payment to creditors. (*Id.* at ¶ 165) Then on January 22, 2016, the Company announced that it was idling the Mooresboro Facility. (*Id.* at ¶ 168) On February 2, 2016, the Company initiated bankruptcy proceedings under Chapter 11 of the U.S. Bankruptcy Code. (*Id.* at ¶¶ 12, 169) And in a bankruptcy filing on that same day, the Company made additional disclosures about the significant issues that plagued the Mooresboro Facility, stating that it would take 12 to 18 months to get the facility back on track. (*Id.* at ¶¶ 13-14) In an April 14, 2016 Disclosure Statement filed in the bankruptcy proceeding, the Company estimated that it would take $117 million in capital expenditures for the facility to reach full operational capacity. (*Id.* at ¶¶ 15-16)

In addition to alleging that Horsehead common stock traded at an artificially inflated price during the Class Period due to Defendants' false and misleading statements, the CAC also asserts that after certain of the above-referenced revelations about the Mooresboro Facility's problems were made public, Horsehead common stock dropped in value. (*Id.* at ¶¶ 138, 143, 154-55, 162) By February 2016, when trading in Horsehead stock was suspended, the stock was down to $0.06 per share in value, and is now said to be essentially worthless. (*Id.* at ¶¶ 12, 170)

Plaintiffs allege five types of actionable false and misleading statements and omissions made by Defendants about Mooresboro that are said to give rise to violations of the Exchange Act: (1) Defendants misrepresented the Mooresboro Facility's ability to ramp up to and past nameplate capacity; (2) Defendants concealed issues regarding the "bleed treatment issue area"; (3) Defendants concealed issues with four clarifiers at the facility; (4) Defendants concealed the fact that the facility was not water-tested properly and was not ready for production; and (5)

5

Defendants falsely represented Horsehead's true financial health and liquidity. (D.I. 56 at 8-11) These specific allegations, as found in the CAC, are discussed below.

### 1. Nameplate Capacity

The CAC alleges that, although Mooresboro "was designed with a nameplate capacity of 155,000 tons of zinc annually," (D.I. 45 at ¶ 48), the Company regularly stated (such as it did on March 13, 2014 in its Form 10-K for the fiscal year ending December 31, 2013) that the Mooresboro Facility "is designed to be capable of producing up to 175,000 tons of zinc metal per year without significant additional investment[,]" (*id.* at ¶ 98 (emphasis omitted); *see also* D.I. 53, ex. 4 at 5 of 171). Plaintiffs allege that Horsehead made similar statements on other occasions, including on January 20 and 23, 2015 in a Final Prospectus Supplement regarding the January 2015 Horsehead stock offering. (D.I. 45 at ¶¶ 124-25; *see also id.* at ¶ 132)

According to Plaintiffs, these statements were false and misleading, because "until Mooresboro came close to proceeding at nameplate capacity (which never occurred), Defendants had no basis in fact to state that Mooresboro could exceed nameplate capacity 'without significant additional investment[.]'" (*Id.* at ¶ 99; *see also id.* at ¶¶ 77-79) Moreover, the CAC alleges that in February 2015, Defendants claimed an interim target "to demonstrate that no bottlenecks exist to operating the facility at 75% of nameplate capacity," (*id.* at ¶ 127 (emphasis omitted)), when there was no basis in fact for that projection, because "the bleed treatment bottleneck [discussed below] would allow at best 60% of nameplate capacity[,]" (*id.* at ¶ 130). Plaintiffs contend that while Mooresboro was able to come close to 60% of nameplate capacity "for a few days at a time, it never averaged more than 40% in a month (which happened in December 2014)." (*Id.* at ¶ 48)

6

## 2.    Bleed Treatment Area

According to Plaintiffs, the processes employed in the Mooresboro Facility "use a significant amount of water." (*Id.* at ¶ 38) And Plaintiffs assert that "the location of the Mooresboro [F]acility was chosen because of its proximity to the Broad River, where it can both use water from and discharge water into the river." (*Id.*) "The bleed treatment area is one of the final stages that water passes through before it is discharged into the river." (*Id.*) In addition, "[s]ome water from the bleed treatment area is [] recycled back into the plant to be used in the solvent extraction process." (*Id.*) Plaintiffs contend that "if the bleed treatment area produces contaminated water, this could not only lead to pollution problems, but the contaminated water that is recycled back to the plant could cause problems for all the processes in the plant that use the water, including the solvent extraction processes." (*Id.*)

In the CAC, Plaintiffs assert that the bleed treatment area presented a fundamental design limitation to the ability of the Mooresboro Facility to reach nameplate capacity, as "the bleed treatment[area] was too small to handle the requisite volume of water[,]" (*id.* at ¶ 54), and at best would allow only 60% of nameplate capacity, (*id.* at ¶ 144). And Plaintiffs aver that Defendants made numerous false and misleading statements about the bleed treatment area and its capabilities. One of these came on a conference call on August 6, 2014 announcing Horsehead's second quarter (or "2Q") 2014 results; during that call, Hensler stated that while Horsehead had encountered "normal startup issues" at the plant, it had "not encountered or identified any insurmountable technical or operational obstacles that materially challenge the value proposition in this project." (*Id.* at ¶ 111 (emphasis omitted); *see also* D.I. 53, ex. 12 at 2) Plaintiffs contend to the contrary that "significant and costly problems at the Mooresboro Facility, including but not limited to problems with the bleed treatment area . . . were known to Defendants since

7

shortly after Mooresboro's commissioning[.]" (D.I. 45 at ¶ 114) Other misleading statements came when Defendants failed to disclose in public statements the problems with the bleed treatment area. (*Id.* at ¶¶ 107, 120, 126, 130, 132, 134, 139, 144, 150, 163)

In addition, Plaintiffs allege that in July and August 2015, Defendants stated (via Company Form 8-Ks filed by Scherich) that the Company had "developed a final solution to the design limitation in bleed treatment[.]" (*Id.* at ¶ 147; *see also id.* at ¶ 142) This was false, Plaintiffs contend, because the extent of this solution was an August 7, 2015 proposal that the Company had received for the "[p]reliminary [p]rocess [e]ngineering" of an *interim* solution to the bleed treatment area limitations. (*Id.* at ¶¶ 81, 83) Moreover, Plaintiffs allege, subsequent proposals made it clear that the interim system would take approximately 6 months to implement and would have a design life of 2 years. (*Id.* at ¶¶ 80-84)

### 3. Clarifiers

Another area that Plaintiffs contend was poorly designed and implemented were the "four 'clarifiers,' which are tanks that allow solids to settle from the water." (*Id.* at ¶ 66) Plaintiffs allege that, according to Confidential Witness 1 (or "CW1"),[5] "one of the four clarifiers (CL 103) did not work effectively since February 2014, and there were constant issues with another clarifier (CL 104)" that caused a substantial bottleneck. (*Id.* at ¶¶ 66-67; *see also id.* at ¶ 7) Plaintiffs allege that "[t]hese problems [were] known at the [Mooresboro] facility since commissioning[,]" (*id.* at ¶ 66), and "Defendants knew or should have known that fixing or replacing the clarifiers would require significant additional investment[,]" (*id.* at ¶ 7).

---

[5]     In the CAC, Plaintiffs reference four confidential witnesses who provide detail about the problems at Mooresboro. (D.I. 45 at ¶¶ 49-53)

However, the CAC alleges that Defendants made statements during the Class Period that were false and misleading, in that they failed to disclose Defendants' knowledge about the problems with the clarifiers. (*Id.* at ¶¶ 107, 114, 120, 123) One such instance came in a November 2014 conference call when Hensler said that soon "we'll be at a better point of understanding whether there is a clarifier design issue versus an operating issue"; Plaintiffs allege this was false and misleading since Hensler knew that the clarifiers were designed to have a rubber lining, but this lining had never been installed (an issue that later led to clogs and corrosion issues). (*Id.* at ¶¶ 69, 117, 120)

### 4.    Water-testing and "Ready for Production"

Plaintiffs allege that, according to CW1, "before the Mooresboro [F]acility was to begin operation the plant equipment should have been flushed for 30-60 days with nothing but pure water [to identify possible leaks]. However, this was never done." (*Id.* at ¶ 62) Instead, Horsehead "added chemicals at the outset. . . . [and p]roper water-only testing was never conducted." (*Id.* at ¶ 63) The result was that "there was prevalent leaking throughout the over 65 miles of piping within Mooresboro. . . .[and] Horsehead could not safely and effectively identify root causes of these leaks." (*Id.*) The CAC also alleges that: (1) the Company did not (but should have) put "heat tracers (a system of electric insulating wire)" on the pipes; and that (2) according to Confidential Witness 2, "shortly after beginning Mooresboro's commissioning phase, the pipes froze and it was determined that the pipes had not been treated or covered with the proper materials to prevent freezing." (*Id.* at ¶¶ 64-65)

In February and March 2014, Defendants made a series of statements related to the water circulation testing and to the effect of cold weather on the facility's pipes. (*Id.* at ¶¶ 93-99) In a February 25, 2014 press release, Scherich stated that "[a]lthough severe cold weather delayed the

9

progress of water circulation testing by several weeks, we have successfully achieved key milestones of our commissioning plan." (*Id.* at ¶ 93 (emphasis omitted)) On an investor conference call held that same day, when asked specifically about whether the current "cold weather issues" would present a problem in the future, Hensler explained that although the plant had experienced damages to valves and piping due to "cold weather conditions" and "minor equipment issues . . . . the main process equipment and piping that we'll be using or processing in moving either acid or loaded electrolyte, will actually be operating at a temperature that's around 90 to 100 degrees Fahrenheit. So [in the future] we wouldn't expect that to be susceptible to freezing." (*Id.* at ¶¶ 94-95 (emphasis omitted)) Hensler also stated that "during this phase of commissioning, we are circulating water through pipes that are—ultimately ended up having acidified solution going through them." (*Id.* at ¶ 95 (emphasis omitted))

The CAC alleges that these statements were misleading, because: (1) Horsehead had not done any water circulation testing as of early 2014, so it was misleading for Hensler to say such testing had been "delayed"; and (2) the "'minor equipment issues'" related to weather "were greatly self-inflicted by non-placement of heat tracers" and were not "minor" at all. (*Id.* at ¶ 97; *see also id.* at ¶¶ 62-65)

### 5. Horsehead's Financial Health and Liquidity

The CAC alleges that Defendants knowingly misrepresented the Company's liquidity and true financial health to raise money: (1) in the January 2015 secondary offering, and (2) via an $80 million credit facility secured in July 2015 from Macquarie Bank Limited ("Macquarie"). (*Id.* at ¶¶ 8-10) The lines of credit were tied to a "borrowing base" based in large part on the value of the Mooresboro Facility. (*Id.* at ¶ 9) As a result, the CAC alleges that "it was all but certain that, unless Horsehead could fix Mooresboro's problems quickly, available credit would

10

be reduced. In fact, beginning in September 2015, [this is what happened when] Macquarie (who only became Horsehead's lender two months earlier) quickly reduced Horsehead's available credit, and ultimately froze credit entirely." (*Id.*; *see also id.* at ¶¶ 88-92) Nonetheless, Plaintiffs contend that "even as this was happening, Defendants concealed Macquarie's credit reductions from investors." (*Id.* at ¶ 9; *see also id.* at ¶¶ 131, 148-50, 158, 161, 163)

### C.    Defendants' Motion

On June 12, 2017, Defendants moved to dismiss Plaintiffs' claims in the CAC for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 51) The Motion was fully briefed on August 17, 2017. (D.I. 57)

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(6) Motion to Dismiss

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When presented with such a motion, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing the

11

plausibility of a claim, the court must "'construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## B.  Special Pleading Requirements for Securities Fraud Allegations

### 1.  Section 10(b)

In connection with the "purchase or sale of any security[,]" Section 10(b) prohibits the "use or employ . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) ("Section 10(b)"). Pursuant to its statutory authority, the SEC promulgated Rule 10b-5, which "in connection with the purchase or sale of any security" makes it "unlawful . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). "The courts have implied from these statutes and Rule [10b-5] a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). According to the Supreme Court of the United States, the elements of a Section 10(b) claim are:

> (1) a material misrepresentation (or omission) . . .[;] (2) scienter, i.e., a wrongful state of mind . . .[;] (3) a connection with the purchase or sale of a security. . .[;] (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation . . . [;]" (5) economic loss . . . [;]

12

and (6) "loss causation," i.e., a causal connection between the
material misrepresentation and the loss.

*Id.* at 341-42 (emphasis and citations omitted).

### a. Heightened pleading requirements for Section 10(b) claims

A securities fraud action "requires more than mere reference to the conventional standard
applicable to motions under Rule 12(b)(6)." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311
F.3d 198, 215 (3d Cir. 2002). For example, in the Private Securities Litigation Reform Act of
1995 ("PSLRA"), Congress raised the pleading standards for the first two Section 10(b)
elements—material misrepresentation (or omission) and scienter. *Institutional Inv'rs Grp. v.
Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009). With regard to a material misrepresentation or
omission, "the complaint shall specify each statement alleged to have been misleading, the
reason or reasons why the statement is misleading, and, if an allegation regarding the statement
or omission is made on information and belief, the complaint shall state with particularity all
facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B) (the "particularity
requirement"); *see also Avaya*, 564 F.3d at 252-53. With regard to scienter, "the complaint shall
. . . state with particularity facts giving rise to a strong inference that the defendant acted with the
required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (the "scienter requirement"); *see also
Avaya*, 564 F.3d at 253.

### b. Rule 9(b) considerations

"In addition to the PSLRA [particularity and scienter] requirements, plaintiffs alleging
fraud under the Exchange Act must also comply with the heightened pleading requirement of
Rule 9(b)." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (citation
omitted). According to Rule 9(b), a party alleging fraud or mistake "must state with particularity

the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of [Section 10(b)] securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 217 (citation omitted).

For the most part, the PSLRA's particularity requirement harmonizes with Rule 9(b). That is, the United States Court of Appeals for the Third Circuit has concluded that "Rule 9(b)'s particularity requirement 'is comparable to and effectively subsumed by the requirements of . . . the PSLRA.'" *Avaya*, 564 F.3d at 253 (citation omitted).

However, the PSLRA's requirement for pleading scienter "marks a sharp break with Rule 9(b)," *id.*, because Rule 9(b) allows plaintiffs to plead scienter generally, Fed. R. Civ. P. 9(b). Thus, "[t]o the extent that Rule 9(b)'s allowance of general pleading with respect to mental state conflicts with the PSLRA's requirement that plaintiffs state with particularity facts giving rise to a strong inference that the defendant acted with scienter . . . the PSLRA 'supersedes Rule 9(b) as it relates to Rule 10b-5 actions.'" *Suprema Specialties*, 438 F.3d at 277 (citation omitted); *see also Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Swanson*, Civil Action No. 09-799, 2011 WL 2444675, at *5 (D. Del. June 14, 2011).

### c. Pleading scienter

Because the PSLRA pleading requirement governs scienter, the complaint, as noted above, must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). And "in determining whether the pleaded facts give rise to [that type of] a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights,*

14

*Ltd.*, 551 U.S. 308, 323 (2007). Specifically, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326. Courts evaluate scienter by examining the totality of the circumstances. *Avaya*, 564 F.3d at 269 ("Accordingly, as with all totality-of-the circumstances tests, our analysis will be case specific."); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448-49 (D. Del. 2014).

"Scienter is a mental state embracing intent to deceive, manipulate, or defraud, . . . and requires a knowing or reckless state of mind[.]" *Avaya*, 564 F.3d at 252 (internal quotation marks and citations omitted). A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)). One may "state a claim based on recklessness[,]" for example, by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (citation and internal quotation marks omitted); *see also City of Roseville Emps.' Retirement Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 424 (D. Del. 2009) (same).[6]

---

[6]     In *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), the Third Circuit held that plaintiffs asserting a Section 10(b) claim may "plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute

15

### 2. Section 20(a)

Section 20(a) of the Exchange Act provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" 15 U.S.C. § 78t(a) ("Section 20(a)"). This "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, who has committed a section 10(b) violation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014) (citation omitted). "Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252.

## III. DISCUSSION

In resolving the Motion, the Court will first address a threshold issue regarding the appropriate materials of record. Thereafter, the Court will address each of Defendants' arguments for dismissal.

---

circumstantial evidence of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534-35 (internal quotation marks and citations omitted). In 2009, the Third Circuit addressed this question further; it recognized that after the Supreme Court's 2007 decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), a "showing of motive and opportunity" could no longer amount to independent grounds for demonstrating scienter. *Avaya*, 564 F.3d at 276-77 & n.50; *see also City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014) (citing *Advanta* as "abrogated . . . by" *Tellabs*); *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (noting that a plaintiff properly pleads scienter by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior, and that motive and opportunity may no longer serve as an independent route to scienter). Instead, the Third Circuit concluded that "a general rule that motive allegations are sufficient—or necessary—is unsound." *Avaya*, 564 F.3d at 277. That said, the Third Circuit also recognized that the Supreme Court left much of the case law "about 'motive and opportunity' undisturbed." *Id.* As a result, it concluded that "allegations of motive and opportunity are not entitled to a special, independent status. . . . [but] they are to be considered along with all the other allegations in the complaint." *Id.*

## A. Defendants' Appendix and the Appropriate Record

Defendants attached to their opening brief an appendix (the "Appendix") comprising 40 separate exhibits and hundreds of pages of material. (D.I. 53-55) Defendants explain that in the Appendix, they "have filed the complete regulatory filing, press release, or transcript of investor call[s that are referenced in the CAC] as exhibits[.]" (D.I. 52 at 1 n.1) They did so because, according to Defendants, the CAC selectively reproduces only certain excerpts from those documents, which tells a "skewed and incomplete story," (*id.* at 1), that is contradicted by the full content of the documents, (*id.* at 1 & n.1). In their briefing, Defendants often cite to portions of the Appendix in arguing that Plaintiffs have not met their burden, and they urge the Court to rely on the full content of these documents in resolving the Motion.

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Pursuant to Federal Rule of Civil Procedure 12(d), if matters outside the pleadings are presented to and not excluded by the court, then the "motion must be treated as one for summary judgment under Rule 56[,]" with all parties being given a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ. P. 12(d).

However, there is a further exception to Rule 12(d). Even if a document is not attached as an exhibit to the complaint, if it is nevertheless "*integral to or explicitly relied upon* in the complaint[,]" the court may consider the document without converting the motion to dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original); *see also Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342 (3d Cir. 2004). What is critical is "whether the claims in the complaint are 'based' on an

extrinsic document"—not "merely whether the extrinsic document was explicitly cited." *In re Burlington Coat Factory*, 114 F.3d at 1426. In the context of securities fraud claims pursuant to Rule 10b-5, for example, this rule is intended "to prevent [] the situation in which a plaintiff . . . maintain[s] a claim of fraud [through a motion to dismiss] by extracting an isolated statement from a document . . . , even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id.* Indeed, in the context of securities fraud claims, the Third Circuit has stated that "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

Plaintiffs, for their part, object to the way that Defendants have used the Appendix in pressing their Motion. (D.I. 56 at 1 n.1 & ex. A) More specifically, Plaintiffs argue that "[w]hen considering [the documents included in the Appendix, such documents should be] considered for the fact of their existence, not the truth of the matters asserted[.]" (*Id.* at 1 n.1 (citing *Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999))). And they complain that at times, Defendants have improperly relied upon such documents for "the truth of the matters asserted[.]" (*Id.*) They also argue that in other instances, Defendants have, *inter alia*, relied upon documents in the Appendix that are "not relevant[.]" (*Id.*)

With regard to Plaintiffs' argument that the documents in the Appendix may only be "considered for the fact of their existence," Plaintiffs are conflating two different legal concepts. Both cases relied on by Plaintiffs (*Benak* and *S. Cross Overseas Agencies*) were referring to circumstances when it is appropriate for a court to take *judicial notice* of a document (e.g., of

18

another court's opinion, or newspaper articles) in resolving a motion to dismiss, where the document itself was not relied upon or integral to the complaint at issue. *See Benak ex rel. All. Premier Growth Fund*, 435 F.3d at 401 n.15; *S. Cross Overseas Agencies, Inc.*, 181 F.3d at 426-27. If a court does take judicial notice of a document in this way, then it is true that the court may notice only the existence of the document, not the truth of the facts recited therein (e.g., the existence of a judicial opinion, not the truth of the facts cited in that opinion). *See Benak ex rel. All. Premier Growth Fund*, 435 F.3d at 401 n.15; *S. Cross Overseas Agencies, Inc.*, 181 F.3d at 426-27. However, if a plaintiff's complaint explicitly relies upon a document, or the document is integral to the complaint, then so long as the document is undisputedly authentic,[7] a reviewing court may take into account the full contents of the document. The court construes the contents of such a document in the light most favorable to the plaintiff and decides whether the document helps render the plaintiff's claims plausible (or, alternatively, whether it contradicts the plaintiff's allegations). *See, e.g., S. Cross Overseas Agencies, Inc.*, 181 F.3d at 426-27 (noting that where a judicial opinion was actually relied upon in the complaint at issue to show alleged fraud, the reviewing court could "examine the decision to see if it contradicts the complaint's legal conclusions or factual claims"); *Pension Ben. Guar. Corp.*, 998 F.2d at 1196. So, to the extent that the CAC alleges that a statement embodied in a particular document is false or misleading, the Court may consider the entirety of that document (if included in the Appendix) to see whether it is plausible that this is so. *In re Burlington Coat Factory*, 114 F.3d at 1426.[8]

---

[7]     So far as the Court is aware, there is no dispute as to the authenticity of any document referenced in the CAC that is included in the Appendix.

[8]     Any Appendix documents cited in the "Background" section of the Report and Recommendation are documents that were referenced in the CAC.

With regard to Plaintiffs' argument about relevance, at times Defendants rely on documents from the Appendix that are *not referenced at all* in the CAC. One such document is a transcript of an August 6, 2012 investor conference call, (D.I. 53, ex. 1), which contains statements made well before the Class Period—statements that Defendants acknowledge were not "mentioned anywhere in the Complaint[,]" (D.I. 52 at 2) Similarly, Defendants make reference to an October 1, 2014 Form 8-K, which they also admit is "not mentioned in the Complaint[.]" (*Id.* at 6 (citing D.I. 53, ex. 13))[9] Because documents like these are not explicitly relied upon by the CAC, and because Defendants have not made a case as to how the CAC can otherwise be said to be "based" on such documents, the Court will not take them into account in resolving the instant Rule 12(b)(6) Motion.

## B.     Defendants' Arguments for Dismissal of the Section 10(b) Claims

Defendants present a number of different arguments in support of dismissal of Plaintiffs' Section 10(b) claims. Many of these arguments have to do with why Plaintiffs have purportedly not alleged actionable false or misleading statements. (D.I. 52 at 16-20) The Court will take these arguments up first. Defendants also assert that Plaintiffs have not adequately pleaded scienter, (*id.* at 14-15), and the Court will address those arguments last.

### 1.     Material Misrepresentations or Omissions

Defendants assert that Plaintiffs have not alleged actionable false or misleading statements or omissions, and that the CAC should be dismissed on this ground. (*Id.* at 16-20)

---

[9]     Other such documents include an October 1, 2015 press release entitled "Horsehead Update on Mooresboro, NC Facility[,]" (D.I. 55, ex. 33 (*quoted in* D.I. 52 at 12)), and a December 1, 2015 press release entitled "Horsehead Update on Mooresboro, NC Facility[,]" (*id.*, ex. 37 (*quoted in* D.I. 52 at 12-13)).

As noted above, under Rule 10b-5, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5. As a result, "a material misrepresentation (or omission)" is a key element of a Section 10(b) claim. *Dura Pharm., Inc.*, 544 U.S. at 341 (emphasis omitted).

### a.      The PSLRA's Safe Harbor and Forward-looking Statements

Defendants first argue that their statements regarding nameplate capacity, ramp-up time, expected production, and financial outlook were not misleading, and instead that they were "forward-looking[,]" were accompanied by "meaningful cautionary statements" and were "not material." (D.I. 52 at 17-19 (internal quotation marks omitted))  These arguments are meant to reference the PSLRA's Safe Harbor provision (the "safe harbor"), which explains that "in any private action . . . a person . . . shall not be liable with respect to any forward-looking statement . . . if . . . (A) the forward looking statement is—(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement . . . [made by a person] was made with actual knowledge . . . that the statement was false or misleading[.]" 15 U.S.C. § 78u-5(c)(1). Forward-looking statements include statements relating to: "projection[s] of revenues, income . . . , earnings . . . , or other financial items;" "plans and objectives of management for future operations[;]" and "future economic performance[.]" 15 U.S.C. § 78u-5(i)(1)(A)-(F). "Thus, the safe harbor applies to statements that are forward-looking as defined by the statute provided that they are (1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the

21

statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278-79 (3d Cir. 2010).[10] And "[o]n any motion to dismiss . . . the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e).

Defendants appear to take a few different tacks in attempting to invoke the safe harbor.

First, in Subsection III.C.2.a of their opening brief, Defendants specifically identify five examples of asserted forward-looking statements. (D.I. 52 at 17) In doing so, they quote from particular portions of those statements (apparently because they deem those portions of the statements as being significant to their argument), arguing that the content of the statements indicates that "dismiss[al]" of Plaintiffs' related claims is appropriate. (*Id.*) These five statements are set out in the table below, along with: (1) allegations in the CAC that relate to the

---

[10]      As to what is a "meaningful cautionary statement," the law requires that "[c]autionary language must be extensive and specific" and it notes that a "vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Avaya*, 564 F.3d at 256 (internal quotation marks and citations omitted). "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* (internal quotation marks and citation omitted).

As to materiality, a statement or omission is "material" when there is a "substantial likelihood that a reasonable shareholder would consider [the statement or omission] important in deciding how to [act]." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d at 283 (internal quotation marks and citation omitted). A material misrepresentation or omission is actionable if it "significantly altered the 'total mix' of information made available." *Id.* (certain internal quotation marks and citation omitted); *In re Burlington Coat Factory*, 114 F.3d at 1425-26. Questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, though if it is obvious that alleged misstatements or omissions are unimportant, courts can rule them immaterial as a matter of law at the pleading stage. *In Burlington Coat Factory*, 114 F.3d at 1426.

22

statements; and (2) the portion of the statements that Defendants highlighted in their opening brief.

| Date | Relevant Document Description | Relevant Allegations in CAC | Portion of Alleged Forward-looking Statement Highlighted by Defendants (D.I. 52 at 17) |
|---|---|---|---|
| 8/6/2014 | 8-K 2Q 2014 results | CAC at ¶ 109<br><br>D.I. 53, ex. 10 at 1 of 8 | — |
| | 10-Q 2Q 2014 results | CAC at ¶ 110<br><br>D.I. 53, ex. 11 at 64 of 108 | — |
| | Investor conference call | CAC at ¶¶ 111-12<br><br>D.I. 53, ex. 12 at 2 of 11<br><br>(statement about reaching nameplate capacity) | D.I. 53, ex. 12 at 9 of 11<br><br><br>(statement about exceeding nameplate capacity) |
| 2/24/2015 | 8-K 4Q 2014 results | CAC at ¶ 127<br><br>D.I. 54, ex. 20 at 1 of 7<br><br>(various statements) | D.I. 54, ex. 20 at 1 of 7<br><br>("We believe that our ability to achieve this higher level of production will depend primarily on the absence of further unplanned equipment issues.") |
| | Investor conference call | CAC at ¶ 128<br><br>D.I. 54, ex. 21 | — |
| 3/2/2015 | 10-K FY 2014 Annual Report | CAC at ¶ 131<br><br>D.I. 54, ex. 22 at 87 of 181<br><br>(statements about financial health) | D.I. 54, ex. 22 at 87 of 181<br><br>("Although we believe we could obtain additional credit and reduce our capital requirements if necessary, our ability to do so may be affected by industry factors . . . [.]") |

| Date | Relevant Document Description | Relevant Allegations in CAC | Portion of Alleged Forward-looking Statement Highlighted by Defendants (D.I. 52 at 17) |
|---|---|---|---|
| 7/2/2015 | 8-K "Horsehead Update on Mooresboro, NC Facility" | CAC at ¶ 142<br><br>D.I. 54, ex. 28 at 1 of 2<br><br>(statements about a final solution for the design limitation in bleed treatment, bottlenecks, and achieving 75% of nameplate capacity) | D.I. 54, ex. 28 at 1 of 2<br><br>("While the timing of achieving full zinc production cannot be predicted with certainty at this time, based on our financing sources we believe we have adequate liquidity to support the ramp-up.") |
| 8/7/2015 | 8-K 2Q 2015 results | CAC at ¶ 146<br><br>D.I. 54, ex. 29 | — |
| | 10-Q 2Q 2015 results | CAC at ¶¶ 147-48<br><br>D.I. 54, ex. 31 | — |
| | Investor conference call | CAC at ¶ 149<br><br>D.I. 54, ex. 30 at 4-5 of 16, 10-11 of 16<br><br>(statements about bleed treatment area bottleneck, financial health, and liquidity) | D.I. 54, ex. 30 at 2 of 16<br><br>("While there are no guarantees if the pilot plant [per]forms as expected, we believe it will add sufficient capacity to debottleneck production by approximately 100 tons per day over current levels assuming no new bottlenecks arise at higher production levels.") |

Out of an abundance of caution, the Court will assume that what Defendants are arguing here is that: (1) the statements at issue are forward-looking, *and* (2) the particular portions of the statements that Defendants quote in their brief amount to meaningful cautionary language that sufficiently implicates the safe harbor's protections.[11]

---

[11]     The Court makes this assumption because the fact that a statement was forward-looking, in and of itself, does not absolve the speaker from liability pursuant to the safe harbor. The statement would have to be, *inter alia*, both forward-looking *and* accompanied by a meaningful cautionary statement to qualify for such immunity.

Second, in Section III.C.2.(b) of their opening brief, Defendants point to specific language that was found in "nearly every regulatory filing, press release or investor call at issue" in the CAC. (D.I. 52 at 18) They suggest that this language also amounts to a meaningful cautionary statement that triggers the safe harbor. (*Id.*)

And third, in Section III.C.2.(c) of their opening brief, Defendants offer the blanket assertion that none of the allegedly false or misleading statements or omissions cited in the CAC were material. (*Id.* at 18-19)

The Court will address these three arguments (as it understands them) in turn.

### i.    Defendants' Arguments Regarding Five Specific Statements and Particular Cautionary Language Contained Therein

#### (a)  August 6, 2014

In an earnings conference call on August 6, 2014, Hensler was asked a question about when Horsehead would consider "expanding capacity [at the Facility] beyond the initial 155,000 tons[.]" (D.I. 53, ex. 12 at 9 of 11) In response to this question, Defendants point out that Hensler replied: "As I think we've said in the past, we believe that the capacity is there to get to the 170,000, 175,000 range, and it's a matter of getting additional zinc units to feed it." (D.I. 52 at 17 (quoting D.I. 53, ex. 12 at 9 of 11)) Defendants suggest that the statement is not only forward-looking, but that it also contains meaningful cautionary language. (*Id.*)

The problem for Defendants, however, is that the subject matter of this statement is unrelated to Plaintiffs' assertions in the CAC as to why Defendants made false or misleading statements about operating capacity on this August 2014 conference call. The CAC does call out as false and misleading one of Hensler's statements on that call. But the CAC is there referring to Hensler's *earlier* statement that: "We expect to continue ramping up production to our full

25

operating capacity of 155,000 tons per year through the remainder of the year." (D.I. 45 at ¶ 111

(emphasis omitted); *see also* D.I. 53, ex. 12 at 2 of 11) This is a statement about whether

Horsehead expected to *reach* nameplate capacity (and when), not about whether Horsehead

expected to *exceed* nameplate capacity (and when).[12] Plaintiffs do allege in the CAC that

Defendants had no basis in fact to make *this* projection (i.e., about the ability to ramp up to

155,000 tons), and they allege that Defendants did so knowing (or that they were reckless in not

knowing) that the statement was false. (*Id.* at ¶ 114(c) & (d))

Thus, Hensler's statement about exceeding nameplate capacity on the August 6, 2014

conference call cannot establish safe harbor protection for the other statements highlighted in the

CAC made on that same call. Therefore, the statement provides no basis for granting the

Motion.

### (b) February 24, 2015

The CAC alleges that on February 24, 2015, the Company filed a Form 8-K, signed by

Scherich, attaching a press release announcing fourth quarter 2014 results. The Form 8-K stated:

> Since the beginning of 2015, the daily average production rate
> continued to improve compared with the fourth quarter rate.
> During January 2015 we produced approximately 4,600 tons of
> zinc metal. We reduced the plating rate for several days in January
> to perform some needed maintenance in the cell house. We also
> experienced intermittent equipment reliability issues, particularly
> with some key pumps, which were further exacerbated by recent
> extreme cold weather conditions. On February 20, 2015 we began
> a planned seven day outage to address several of these issues. We
> expect to ramp up production following this outage. **Our interim**

---

[12]     To the extent that Plaintiffs focus in the CAC on Defendants' statements
regarding *exceeding* nameplate capacity and producing up to 175,000 tons of zinc per year at the
Facility, those statements are made either months before this August 2014 conference call,
(D.I. 45 at ¶¶ 98-99), or months after, (*id.* at ¶¶ 125-26, 131-32).

> **target is to demonstrate that no bottlenecks exist to operating**
> **the facility at 75% of nameplate capacity, or 330 tons per day,**
> **by the end of the first quarter of 2015.** We believe that our
> ability to achieve this higher level of production will depend
> primarily on the absence of further unplanned equipment issues.

(D.I. 45 at ¶ 127 (emphasis in original); *see also* D.I. 54, ex. 20 at 1 of 7) This appears to be a

forward-looking statement, in that it is an expression of management's plans and objectives for

future operations. 15 U.S.C. § 78u-5(i)(1). According to the CAC, however, this statement was

false or misleading, because "Defendants knew or were reckless in not knowing that that they

had no basis in fact to be able to demonstrate 'that no bottlenecks exist to operating the facility at

75% of nameplate capacity, or 330 tons per day, by the end of the first quarter of 2015', given

that . . . the bleed treatment bottleneck would allow at best 60% of nameplate capacity[.]"

(D.I. 45 at ¶ 130(b); *see also id.* at ¶¶ 54-61)

Defendants nevertheless argue that the safe harbor applies here, and they point

particularly to the presence of the following alleged cautionary statement contained within the

above excerpt from the Form 8-K: "We believe that our ability to achieve this higher level of

production will depend primarily on the absence of further unplanned equipment issues."

(D.I. 52 at 17 (quoting D.I. 54, ex. 20 at 1 of 7)) That statement might possibly be exculpatory

as to any *future* "equipment issues" or the like that might have threatened the Company's ability

to reach 75% of nameplate capacity. But the alleged misrepresentation here is that Defendants

knew at the time that *then-existing* bottlenecks, including those relating to the bleed treatment

area and the clarifiers, would absolutely prevent the Facility from reaching the 75% threshold by

the relevant date. (D.I. 56 at 15-16 & n.9) Thus, the alleged cautionary statement does not

directly relate to the asserted misrepresentation at issue, and so it cannot provide protection from

liability for that alleged misrepresentation. *Cf. Martin v. Altisource Residential Corp.*, Civ. No.

27

15-0024, 2017 WL 1068208, at \*5-6 (D.V.I. Mar. 16, 2017) (finding that defendants' statement that their operating results could be affected in the future if a loan servicer became unable to service certain acquired loans was "not entitled to safe harbor" with respect to the allegations regarding the servicer's "then-existing problems[.]"); *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund*, 2011 WL 2444675, at \*13 (concluding that claims should not be dismissed at the Rule 12(b)(6) stage pursuant to the safe harbor provision where the alleged cautionary statement failed to "warn[] of a secular decline, the issue that Plaintiff here claims Defendant failed to disclose").

### (c) March 2, 2015

In the CAC, Plaintiffs allege that in a March 2, 2015 Form 10-K for 2014, the Company stated that it "believed it had cash on hand, credit access and expected cash flow **'sufficient to satisfy our liquidity and capital requirements, including capital requirements related to our capital needs based on the expected ramp-up to full production of the new zinc facility, for the next twelve months.'"** (D.I. 45 at ¶ 131 (emphasis in original); *see also* D.I. 54, ex. 22 at 87 of 181) In the CAC, as to this statement, Plaintiffs contended that "[g]iven [the known design] problems [with the Mooresboro Facility], and the cash burn caused by them, Defendants had no basis in fact to state that Horsehead had resources 'sufficient to satisfy our liquidity and capital requirements . . . for the next twelve months[.]'" (D.I. 45 at ¶ 132(b)) The statement at issue is surely a forward-looking statement, because it is a "statement of the plans and objectives of management[,]" and contains "a statement of the assumptions" underlying or relating to projections about "capital expenditures . . . capital structure [and] other financial items[.]" 15 U.S.C. § 78u-5(i)(1).

28

Defendants, however, aver that that the next sentence in this Form 10-K (a sentence that Plaintiffs left out of the CAC) amounts to a meaningful cautionary statement that qualifies for the safe harbor: "Although we believe we could obtain additional credit and reduce our capital requirements if necessary, our ability to do so may be affected by [a number of] industry factors, including LME zinc prices, by factors relating to the ramp-up of our new zinc facility and by general economic, financial, competitive, legislative, regulatory and other factors discussed in this report." (D.I. 54, ex. 22 at 87 of 181 *(cited in D.I. 52 at 17))* The problem again for Defendants, however, is that the purported meaningful cautionary statement does not address the nature of the particular misrepresentation called out by Plaintiffs in the CAC. The CAC's alleged misrepresentation is about whether the Company had sufficient ready cash, access to credit and expected cash flow to satisfy its currently-expected liquidity and capital requirements over the next twelve months. The CAC alleges that Defendants then knew that the Company did not and would not have sufficient access to cash and credit over the relevant period. The cautionary statement, in contrast, is focused not on whether the Company can satisfy its current expected liquidity and capital requirements, but about the prospects of obtaining *additional* credit and/or *reducing* the company's capital requirements (and about future contingencies that might make that more difficult in the future). For these reasons, the statement does not qualify for safe harbor protection.

### (d) July 2, 2015

On July 2, 2015, Plaintiffs allege that Horsehead issued a Form 8-K, signed by Scherich, that attached a press release containing the following statement from Hensler:

> We are encouraged by the improvements implemented in June.
> We better understand the bottleneck issues in bleed treatment and
> we have successfully implemented measures which have allowed

29

> us to increase production. **We have developed a concept for the
> final solution to the design limitation in bleed treatment and
> will be installing temporary equipment to test this concept
> before we engineer and install the permanent solution.**
> Currently, the production rate is paced by the rate at which we are
> able to add electrodes to the cellhouse. **We remain focused on
> ramping up to our interim goal of 75% of nameplate capacity
> which we still hope to achieve during the third quarter.**

(D.I. 45 at ¶ 142 (emphasis in original); *see also* D.I. 54, ex. 28 at 1 of 2)  Plaintiffs contend that

"there was no basis in fact to project that Mooresboro would reach 75% of nameplate capacity

during the third quarter, because the bleed treatment bottleneck would allow at best 60% of

nameplate capacity, and, given the magnitude of the problems with the bleed treatment area,

Defendants had no basis in fact to state that these problems would be solved by the end of the

third quarter."  (D.I. 45 at ¶ 144)  The statement in the Form 8-K does appear to be a forward-

looking statement, as it is an expression of management's plans and objectives for future

operations.  15 U.S.C. § 78u-5(i)(1)(B).

Defendants, however, point to another portion of Hensler's statement in the press

release—one they contend places the entire statement within the confines of the safe harbor's

protections.  There, Hensler noted that "[w]hile the timing of achieving full zinc production

cannot be predicted with certainty at this time, based on our financing sources we believe we

have adequate liquidity to support the ramp-up."  (D.I. 52 at 17 (quoting D.I. 54, ex. 28 at 1 of

2))

Here again, the cautionary language called out by Defendants does not relate to the

subject matter of the allegedly false or misleading statements at issue.  The cautionary statement

at issue relates to whether the Company would have sufficient *liquidity* to support full zinc

production.  But the false statement at issue in the CAC relates to whether, in light of physical

30

limitations to the bleed treatment area, it was even *operationally* possible for the Company to exceed 60% of nameplate capacity in this quarter. Therefore, the statement identified by Defendants cannot establish safe harbor protection for the allegedly false and misleading statement identified in the CAC.

### (e) August 7, 2015

On August 7, 2015, the Company held an investor conference call after issuing a Form 8-K signed by Scherich (accompanied by a press release) and its 2Q 2015 Form 10-Q. (D.I. 45 at ¶¶ 146-49) Plaintiffs identify numerous allegedly false or misleading statements made by Defendants in the conference call. These include Hensler's statement that the Company was "making steady progress toward addressing the various design deficiencies and equipment issues that we have discovered since startup" and that as to the bottleneck associated with the bleed treatment system, the Company was "implementing a plan to mitigate this bottleneck." (*Id.* at ¶ 149 (emphasis omitted)) In the CAC, Plaintiffs alleged that statements like these were false in that, as of that month, the bleed treatment area continued to have significant problems and Defendants were still trying to figure out solutions to those problems. (*Id.* at ¶ 150(a)-(b))

Yet Defendants argue that on the conference call, Hensler made a meaningful cautionary statement. In discussing a "pilot plant" that was expected to be operational in August, he noted that "[w]hile there are no guarantees[,] if the pilot plant [per]forms as expected, we believe it will add sufficient capacity to debottleneck production by approximately 100 tons per day over current levels assuming no new bottlenecks arise at higher production levels[.]" (D.I. 52 at 17 (quoting D.I. 54, ex. 30 at 2 of 16))

As noted above, however, while cautionary language can protect a forward-looking statement from liability, that language cannot amount to a "vague or blanket (boilerplate)

31

disclaimer"; it must be "extensive yet specific to prevent a reasonable investor from relying on specific projections." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 183 (3d Cir. 2000) (internal quotation marks and citations omitted). Here, the mere statement that "there are no guarantees" as to how the pilot program may perform is neither extensive nor specific. Thus, it is not "sufficiently cautionary" to provide safe harbor to the other statements from the conference call regarding the bottleneck that are called out in the CAC. *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896 (WJM), 2005 WL 2840336, at *8 (D.N.J. Oct. 27, 2005) (finding language warning investors of the "risks and uncertainties that exist" which might cause results to differ materially from the Company's expectations was "too vague to protect earnings estimates that were based on allegedly fraudulent accounting practices") (internal quotation marks and citation omitted).

Since Plaintiffs allege (with supporting facts) that those statements were knowingly false when made, (D.I. 56 at 15-16 n.9; *see also* D.I. 45 at ¶ 150), the statements are potentially actionable.

> ii. **Defendants' Arguments Regarding the Presence of Certain Asserted Meaningful Cautionary Statements that Accompanied All of Defendants' Statements at Issue**

Next, Defendants argue that "nearly every regulatory filing, press release, or investor call" put at issue by the CAC contained "similar cautionary statement[s]"; Defendants assert that this standard language was "extensive, specific, and directly related to Horsehead's future operational performance, future profitability and future capital and liquidity needs" such that it should implicate the safe harbor and absolve them from liability. (D.I. 52 at 18 & n.14) The standard language specifically cited by Defendants is as follows:

> [C]ontains forward-looking statements, including statements about business outlook, future operating levels, proposed and potential

32

> initiatives and strategy, financial and performance targets and
> statements about historical results that may suggest trends for our
> business. These statements are based on assumptions, estimates
> and information available to us at the time of this press release and
> are not guarantees of future performance.

(*Id.* at 18 (quoting D.I. 53, ex. 2 at 5 of 7))  Plaintiffs respond that Horsehead's "boilerplate language warning of generic risks that could apply to any investment does not shield Defendants from liability[.]"  (D.I. 56 at 13)

The Court agrees with Plaintiffs.  The above language is not (as it must be to qualify as a "meaningful cautionary statement") "tailored to the specific future projections, estimates, or opinions . . . which the plaintiffs challenge."  *Avaya*, 564 F.3d at 256 (internal quotation marks and citations omitted).  Clearly, it could not be so tailored, since:  (1) it (or a version of it) shows up in nearly every Horsehead document at issue; and (2) on its face, the statement does not deal with any *specific* risk factor, or any *specific* subject matter at the Facility.  *Cf. In re Emerson Radio Corp. Sec. Litig.*, Civil Action No.: 03-4201 (JLL), 2005 WL 8131267, at *9-11 (D.N.J. Dec. 20, 2005) (finding that the alleged cautionary language did not save defendants from liability for their forward-looking statements under the safe harbor where "Defendants solely rely on general, boilerplate language, rather than specific language that addresses the subject-matter of the statements").

The Court notes that when the above-referenced "generic" statement shows up in Horsehead filings or press releases or the like, it tends to be followed by some additional language relating to risk factors.  Representative is a February 2014 Horsehead press release that contained the above-referenced language in a paragraph titled "Cautionary Statement about Forward-Looking Statements."  (D.I. 53, ex. 2 at 5 of 7 (emphasis omitted))  In that paragraph, the above-referenced language was followed by the below:

There may be several factors that may cause our actual results to differ materially from the forward-looking statements, including, among others, the impact of future market conditions or unexpected production disruptions, including labor disruptions associated with the wind down of our Monaca facility, on our results of operations, our future operating costs and production levels and our expansion plans and initiatives, delays in the achievement of full commercial operations at our Mooresboro facility, our ability to successfully implement and maintain past and future price increases, our ability to achieve the benefits we expect to achieve from the new zinc plant once fully operational, the ultimate cost to construct and start up the new plant and our ability to pay these costs and maintain adequate liquidity, our ability to obtain environmental and regulatory permits and approvals, and the success and timing of our expansion plans and initiatives and their impact on our future capabilities, capacity and production costs and our financial results. Our actual results, performance or achievements could differ materially from those expressed in, or implied by, the forward-looking statements. We can give no assurances that any of the events anticipated by the forward-looking statements will occur or, if any of them does, what impact they will have on our results of operations and financial condition. You should carefully read the factors described in the "Risk Factors" section of our filings with the Securities and Exchange Commission for a description of certain risks that could, among other things, cause our actual results to differ from these forward-looking statements. All forward-looking statements are qualified in their entirety by this cautionary statement, and we undertake no obligation to revise or update this earnings release to reflect events or circumstances after the date hereof.

*(Id.)*

Yet if Defendants believed that some portion of this laundry list of qualifications amounts to a meaningful cautionary statement that absolves them from liability as to particular allegations in the CAC, then it was incumbent upon them to point that out with particularity in the "Argument" section of their opening brief. They did not do so, however, *(see* D.I. 52 at 18), and so they cannot later point in their reply brief to similar language and argue that it absolves them from liability, *(see, e.g.,* D.I. 57 at 5).

There are many reasons for the requirement that a movant must make its arguments for dismissal clearly and cogently in the "Argument" section of its opening brief. Chief among them are the need for efficiency and fairness in the briefing process. The "Argument" section of a party's opening brief, after all, is the place where the legal arguments supporting a motion are supposed to be located. It is the place where Plaintiffs are meant to look to see why the CAC is supposedly subject to dismissal and to know what they have to respond to. If Defendants did not make their best arguments clearly in that part of their opening brief, or if they hid such arguments in the lengthy "Statement of Facts" section of the brief, *(see* D.I. 52 at 2-13), this would not fairly warn Plaintiffs of what they must respond to in their answering brief. *Cf. Cunningham v. Jackson Hole Mountain Resort Corp.*, 673 F. App'x 841, 845 (10th Cir. 2016) ("Although the Cunninghams maintained they raised the public-duty issue below, the discussion was limited to isolated references in the *facts* section of their memorandum to the district court . . . . The Cunninghams did not provide analysis or argument to the district court related to JHMR's public duty . . . . Under these circumstances, the Cunninghams have forfeited these arguments[.]") (emphasis in original); *Little v. Dean*, Civil Action No. 1:13-cv-165-KOB, 2014 WL 4388298, at *3 (N.D. Ala. Aug. 29, 2014) ("To the extent that either party included arguments in their fact section, the court will disregard those arguments."). Moreover, Defendants are not permitted to save for their reply brief arguments that they should have more clearly made in their opening brief. *See, e.g., Integra LifeSciences. Corp. v. HyperBranch Med. Tech., Inc.*, C.A. No. 15-819-LPS-CJB, 2018 WL 2551053, at *5 n.3 (citing D. Del. LR 7.1.3(c)(2)); *Lab. Skin Care, Inc. v. Limited Brands, Inc.*, 757 F. Supp. 2d 431, 439 (D. Del.

35

2010).[13] With Defendants having failed to clearly assert in their opening brief that statements like the above should absolve them from liability pursuant to the PSLRA's safe harbor, the Motion cannot be granted on such grounds now.

### iii. Defendants' General Arguments Regarding Materiality

Defendants also argue, in Section III.C.2.(c) of the Argument section of their opening brief, that as a general matter, the allegedly false or misleading statements in the CAC could not have been material. (D.I. 52 at 18-19) This is said to be because "Horsehead's statements regarding its future operational performance and its future capital and liquidity needs—contained in the 'RISK FACTORS' sections of its Form 10-K and 10-Q filings—were accompanied by far too many qualifications and assumptions to amount to anything on which a reasonable investor might rely, much less amount to a securities fraud class action." (*Id.*)

Defendants' arguments are far too vague and general to allow the Court to grant their Motion on this ground. The relevant portion of Defendants' opening brief fails to lay out the legal case for the absence of materiality. Indeed, it contains only two paragraphs of argument. The first paragraph simply describes the Third Circuit caselaw on what constitutes a material misrepresentation or omission. (*Id.* at 18) And the second paragraph merely contains a broad assertion that tags all of the CAC's identified false statements or omissions as immaterial (citing

---

[13]    In their reply brief, Defendants seemed to cite to certain additional alleged "meaningful cautionary statements" that were referenced in the "Statement of Facts" section of their opening brief; they argue that these statements also help show why they are protected by the safe harbor. (D.I. 57 at 6 (citing D.I. 52 at 6-9)) But as noted above, if Defendants wished to argue that the presence of these additional statements had relevance to the PSLRA safe harbor inquiry, they should have more clearly referenced them in the "Argument" section of their opening brief. They did not do so, (D.I. 52 at 16-19), and so, understandably, Plaintiffs did not address the statements in their answering brief. As a result, the Court will not consider these statements here.

only to one case in support), followed by a "[*s*]*ee generally*" citation to the entirety of the "Statement of Facts" section of the opening brief. (*Id.* at 18-19 (citing *id.* at 2-13))

This approach amounts to little more than a blanket assertion that "the alleged misstatements are not material" and a suggestion to the Court that it should do the work on its own to figure out why this is so. What *particular* alleged statement or omission is said not to be material? What *particular* portion of the other information accompanying such a statement demonstrates *why* there is an absence of materiality? On these key questions, there is a lack of actual argument from Defendants. That approach cannot be sufficient to warrant grant of the Motion on this ground, especially as to an issue like materiality, which is generally "an issue left to the factfinder and . . . not typically a matter for a Rule 12(b)(6) dismissal." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004).

### iv. Conclusion Regarding the Safe Harbor

For the reasons set forth above, Defendants' arguments invoking the safe harbor do not provide a basis for dismissal.

### b. Fraud by Hindsight

Next, Defendants argue that Plaintiffs have not alleged actionable false or misleading statements because Plaintiffs "impermissibly attempt to plead 'fraud by hindsight.'" (D.I. 52 at 16) This is a reference to the fact that for a false or misleading statement to be actionable under Section 10(b), it must "have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1330 (3d Cir. 2002).

37

Since Defendants' argument is made in only one sparse paragraph in the Argument section of their opening brief, it is a little difficult to divine exactly what they are trying to say. But in that paragraph, Defendants note that the CAC refers at times to certain statements that Hensler made during the bankruptcy proceeding (either in affidavits or in verbal testimony). (D.I. 52 at 16 ("Plaintiffs cannot rely on Hensler's testimony in the bankruptcy to demonstrate fraud . . . ."); *see also, e.g.*, D.I. 45 at ¶¶ 13-14, 54, 60, 67, 79, 99, 126, 132) A representative example comes when: (1) the CAC notes that in 2014 and 2015 Hensler and Scherich stated that the Facility was designed to be capable of producing up to 175,000 tons of zinc metal per year without "significant additional investment[,]" (*id.* at ¶¶ 98, 125, 132); and (2) the CAC then points to Hensler's later testimony in the August 2016 bankruptcy trial, where Hensler testified that the company did not "know which specific modifications would be required" to get the Facility to 170,000 tons a year (i.e. above nameplate capacity), because "we haven't operated it near nameplate capacity [and so it would be] hard to know at this point . . . where the bottlenecks would be to get it above nameplate capacity[,]" (*id.* at ¶¶ 77, 79 (internal quotation marks omitted); *see also* D.I. 56 at 14). Defendants' position seems to be that during the bankruptcy trial, Hensler was testifying "with the benefit of 'hindsight;' and none of the testimony cited by Plaintiffs shows . . . that Hensler had material information earlier than what was disclosed [i.e., back in 2014 or 2015.]" (D.I. 52 at 16)

Of course, if Plaintiffs' claims were entirely "based on events that took place [or knowledge gained] after [the] allegedly fraudulent statements [were made,]" *In re NAHC, Inc. Sec. Litig.,* 306 F.3d at 1330, they would not be actionable. But here Plaintiffs have alleged various other specific facts—aside from Hensler's testimony in the 2016 bankruptcy proceeding—indicating that: (1) problems associated with, *inter alia*, the Facility's bleed

38

treatment area and clarifiers threatened the Facility's ability to produce sufficient amounts of zinc; and (2) these problems were well known within the company and by Horsehead's management as of 2014 and 2015. (D.I. 45 at ¶¶ 54-61, 66-70) The citations to Hensler's bankruptcy-related testimony in the CAC can appropriately be used to *corroborate* these other allegations, by further underscoring what were the Facility's problems as of 2014 and 2015. And Hensler's bankruptcy testimony might also reasonably be used to show (in conjunction with other evidence) that Hensler not only knew these facts after the bankruptcy, but was also aware of them well *before* the bankruptcy.

Thus, the CAC's citation to Hensler's testimony from the bankruptcy proceeding does not indicate, as Defendants suggest, that Plaintiffs are simply pleading "fraud by hindsight."

### c.    Duty to Disclose

Lastly, Defendants argue that with regard to the "[m]any of Plaintiffs' allegations [that] concern an alleged failure by Hensler and Scherich to provide investors with all material information regarding technical and operational performance issues associated with Mooresboro[,]" i.e., alleged material omissions, these do not count as actionable misrepresentations because Defendants had no duty to disclose the omitted facts. (D.I. 52 at 19-20) "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *see also In re Burlington Coat Factory*, 114 F.3d at 1432 (citation omitted) ("Except for specific periodic reporting requirements (primarily the requirements to file quarterly and annual reports), there is no general duty on the part of a company to provide the public with all material information."). "When you speak, however, and it is material, you are 'bound to speak truthfully.'" *United States v. Schiff*, 602 F.3d 152, 162 (3d Cir. 2010) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992)). "[A] duty to

39

disclose under Rule 10b-5 may arise in three circumstances: 'when there is [1] insider trading, [2] a statute requiring disclosure, or [3] an inaccurate, incomplete or misleading prior disclosure.'" *Id.* (brackets in original) (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)).

Again, however, Defendants' argument here suffers from a lack of specificity. In the Argument section of their opening brief, Defendants never *specifically* reference any asserted material omissions in the CAC. (D.I. 52 at 19-20) And they never make any *specific* argument about why any particular alleged omitted fact did not rise to the level of an "incomplete or misleading prior disclosure." (*Id.*) Instead, they simply lump together all of the allegations in the CAC that have anything to do with "technical and operational performance issues[,]" and make the broad, unsupported assertion that Defendants "had no duty to disclose [any omitted] information" about such subjects. (*Id.* at 19) This simply cannot be enough to make out an understandable argument as to why their Motion should be granted on this ground.

### d. Conclusion Regarding Alleged Material Misrepresentations and Omissions

Although Defendants make various arguments as to why Plaintiffs have not alleged actionable false or misleading statements or omissions, (D.I. 52 at 16-20), those arguments are not well taken. Therefore, the Court recommends that the District Court deny the Motion on these grounds.

### 2. Scienter

Defendants also assert that Plaintiffs' scienter allegations are insufficient. Defendants seemed to make two primary arguments in this regard.

40

First, Defendants argue that Plaintiffs have relied on "group pleading" and that "[t]here [are] no specific scienter allegations concerning Scherich in the Complaint." (*Id.* at 15) By way of example, they point to the two-paragraph section of the CAC labeled "Scienter Allegations" and note that this section is filled with "'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action,' vaguely aimed at both Hensler and Scherich." (*Id.* at 14; *see also* D.I. 45 at ¶¶ 180-81)

"Historically, under the group pleading doctrine, a company's statements or omissions 'may be presumed to be the collective work of those individuals with direct involvement in the everyday business of the company.'" *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002) (quoting *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 902 n.45 (S.D. Tex. 2001)). However, in light of the PSLRA's scienter requirement, the Third Circuit has held that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA." *Winer Family Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007); *see also Zazzali v. Alexander Partners, LLC*, Civil Action No. 12-828-GMS, 2013 WL 5416871, at *7 n.8 (D. Del. Sept. 25, 2013). Instead, the PSLRA requires that a plaintiff must plead particular facts associating the defendants with the alleged knowing or reckless misstatements or omissions. *See Winer Family Tr.*, 503 F.3d at 335-36; *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del. 2016).

Were Plaintiffs' allegations regarding scienter limited to just the two paragraphs in the "Scienter Allegations" section of the CAC, Defendants' argument would be on surer footing. But the allegations are not so limited. Instead, as Plaintiffs have noted, (D.I. 56 at 20 & n.16), the CAC is littered with dozens of specific references to allegedly false or misleading statements

41

made by both Defendants, including Scherich.[14] And, as to Scherich, after the CAC makes such allegations regarding the false or misleading nature of his statements, it follows up by: (1) asserting he made them while knowing or recklessly disregarding certain adverse facts; and (2) laying out those facts. (*See, e.g.*, D.I. 45 at ¶¶ 93, 97-99, 102, 104, 107, 109, 112, 114-16, 118, 120, 122-23, 127-28, 130-31, 133-35, 137, 139-40, 142, 144, 146-47, 149-50, 158, 161, 163) Perhaps tellingly, after Plaintiffs pointed this out in their answering brief, Defendants did not further address the "group pleading" issue in their reply brief. (D.I. 57 at 8-10) Thus, Defendants' assertions about "group pleading" are not a basis for dismissal.

Second, Defendants argue that "notably absent from the complaint are any allegations that are typically pled when scienter exists such as how Hensler and Scherich each personally benefitted as a result of the alleged fraud[.]" (D.I. 52 at 15 (citing *Avaya*, 564 F.3d at 278-79); *see also* D.I. 57 at 8-9). Yet as Defendants' phraseology suggests, even if such allegations are "typically" pleaded to demonstrate scienter, they are not required. The Supreme Court made this clear in its decision in *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), noting that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325. In light of *Tellabs*, the Third Circuit concluded that "a general rule that motive allegations are sufficient—or necessary—is unsound." *Avaya, Inc.*, 564 F.3d at

---

[14]     The CAC alleges that during the Class Period, Hensler and Scherich were key executives of the Company who signed the relevant documents, publicly discussed statements in the documents, and answered questions from the financial community about these statements on investor conference calls. (D.I. 45 at ¶¶ 27-29) Therefore, it is apparent that, for purposes of Rule 10b-5, Hensler and Scherich made such alleged statements, in that they were "the person[s] . . . with ultimate authority over the statement[s], including [the statements'] content and whether and how to communicate [the statements]." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

277. Thus, even if there were no allegations in the CAC suggesting that Defendants had a motive to make their allegedly false or misleading statements, that fact would not mandate dismissal.

### C.    Section 20(a)

Defendants' argument for dismissing the CAC's Section 20(a) claims is linked to their arguments for dismissal of the Section 10(b) claims. That is, Defendants assert that if the latter claims are dismissed, the former claims must be as well. (D.I. 52 at 14 n.11) Since the Court is not recommending that the Section 10(b) claims be dismissed, it also does not recommend dismissal of the Section 20(a) claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the District Court DENY the Motion in its entirety.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: October 4, 2018

_Christopher J. Burke_
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

44